**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JERE HINMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No._____** |
| | ) | |
| **VALLEYCREST LANDSCAPE** | ) | **JURY DEMAND** |
| **DEVELOPMENT, INC.; BRIGHTVIEW** | ) | |
| **LANDSCAPE DEVELOPMENT, INC.; and** | ) | |
| **AQUATIC DESIGN & ENGINEERING, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## C O M P L A I N T

### PARTIES

1.      Plaintiff Jere Hinman ("Ms. Hinman") is an adult resident of Lebanon, Wilson County, Tennessee.

2.      Defendant ValleyCrest Landscape Development, Inc. ("ValleyCrest") is a California corporation with its principal place of business at 24151 Ventura Boulevard, Calabasas, California 91302-1449.  ValleyCrest, upon information and belief, is affiliated with Defendant BrightView Landscape Development, Inc. ("BrightView").

3.      BrightView is a California corporation with its principal place of business at 24151 Ventura Boulevard, Calabasas, California 91302-1449.    BrightView, upon information and belief, is affiliated with ValleyCrest.

4.      Defendant Aquatic Design & Engineering, Inc. ("Aquatic") is a Florida corporation with its principal place of business at 189 South Orange Avenue, Suite 1220,

Orlando, Florida 32801. ValleyCrest, BrightView, and Aquatic are sometimes referred to collectively as "Defendants."

## NATURE OF ACTION

5.      This action is for breach of contract, breach of warranty, violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*, fraudulent inducement and fraud, fraudulent and wrongful concealment, conspiracy, and negligence in connection with a contract entered into between Ms. Hinman and ValleyCrest for construction of a $1 million large pool or "aquascape" constructed in a natural setting with waterfalls and extensive landscaping at Ms. Hinman's home in Lebanon, Wilson County, Tennessee (the "Project").

## JURISDICTION AND VENUE

6.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2).   A substantial part of the events and omissions giving rise to these claims occurred, or alternatively a substantial part of the property that is the subject of this action is located, in this district.

## FACTUAL BACKGROUND

8.      BrightView, upon information and belief, is an affiliate of the successor in interest to ValleyCrest Companies, LLC, ValleyCrest's parent company, on the one hand, and Brickman Group, Ltd., LLC, on the other hand, pursuant to a merger between the two parent companies in 2014.  Prior to the merger, Brickman described itself as a leading national landscape maintenance company.  ValleyCrest's parent company described itself

as the nation's largest integrated landscape services company and was also in the business of designing, installing, and maintaining commercial pools and expensive residential pools through its affiliate, ValleyCrest.

9.      Ms. Hinman sought to have a large pool built at her new home that would blend in with its natural surroundings. In late Summer 2014 she discussed construction of a pool with ValleyCrest. Consistent with its advertising, ValleyCrest represented to Ms. Hinman that it was a national company with substantial experience and expertise in building complex, "high-end" pools and aquascapes. Based upon these representations, Ms. Hinman decided to utilize ValleyCrest to build the pool.

10.     Ms. Hinman and ValleyCrest entered into a design-build contract for ValleyCrest to build the pool (the "Contract"). Although the Contract states that it is dated February 9, 2015 (Article 1), an Addendum was entered into that changed the start date to "TBD." In fact the Contract was signed by Ms. Hinman for herself on March 19, 2015, and, upon information and belief, by Brian Chestnut on behalf of ValleyCrest on March 19, 2015. A copy of the Contract is attached as Exhibit A. The Addendum is attached as Exhibit A-1.

11.     The parties to the Contract were Ms. Hinman as "Owner" and ValleyCrest as "Design-Builder." Contract, Article 1. ValleyCrest listed its address as 4821 W. Carey Avenue, North Las Vegas, Nevada 89032. *Id.* Ms. Hinman reasonably relied upon these contractual descriptions and representations as to the identity of the design-build contractor.

12.     ValleyCrest operated under license number 36314. Upon information and belief, ValleyCrest and BrightView had already merged at the time Ms. Hinman entered into the Contract with ValleyCrest. License 36314, at some point in time still unknown to

3

Ms. Hinman, was apparently transferred by ValleyCrest to BrightView, which now operates under that license number (BrightView is not a party to the Contract). After the apparent license transfer, ValleyCrest was no longer a licensed contractor in Tennessee. Beginning in approximately August 2015, while the pool was still under construction, BrightView began performing ValleyCrest's obligations under the Contract, even though Ms. Hinman had not given written approval for assignment as required by Article 13.2.

13.     After the license was apparently transferred to BrightView, ValleyCrest could not perform its construction, warranty, repair, and other obligations under the Contract. But BrightView also could not legally perform those obligations because the Contract was never properly assigned from ValleyCrest to BrightView (an action that required Ms. Hinman's written consent, which ValleyCrest never sought and Ms. Hinman never gave). The facts and circumstances described below demonstrate that ValleyCrest and BrightView acted interchangeably for all practical purposes, regardless of right and authority under the law and the Contract to do so.[1]

14.     ValleyCrest, in an effort to gain Ms. Hinman's confidence, expressly represented to Ms. Hinman that it was a company of integrity, that she could trust it, and that ValleyCrest would deal with her fairly and in good faith. The Contract provided that "The Parties each agree to proceed with the Project [the pool construction] on the basis of trust, good faith, and fair dealing," Contract, Article 2.1, and further provided, in a section headed "Ethics," that ValleyCrest would act with "integrity." *Id.*, Article 2.1.3.

15.     In addition, the Contract, as amended by the Addendum (Exhibit A-1), provided in pertinent part:

---

[1] Accordingly, references to ValleyCrest in this Complaint will include Brightview unless otherwise indicated.

4

Article 3.1.3.  OWNERSHIP OF DOCUMENTS.

       3.1.3.1. OWNERSHIP OF TANGIBLE DOCUMENTS.  [Ms. Hinman] shall receive ownership of the property rights, except for copyrights, of all documents, drawings, specifications, electronic data, and information (hereinafter "Documents") prepared, provided or procured by [ValleyCrest], its Design Professional [Aquatic], Subcontractors, or consultants and distributed to [Ms. Hinman] for this Project, upon the making of the payment of SIXTY THOUSAND ONE HUNDRED dollars and ZERO cents, ($60,100.00) (for previously executed design services contract) to [ValleyCrest] or in the event of termination under ARTICLE 11, upon payment for all sums due to [ValleyCrest] pursuant to Article 11.

       . . .

       3.1.3.6.  [ValleyCrest] shall obtain from [Aquatic], Subcontractors, and consultants rights and rights of use that correspond to the rights given by [ValleyCrest] to [Ms. Hinman] in this [Contract], and [ValleyCrest] shall provide evidence that such rights have been secured.

Article 3.2.  CONSTRUCTION SERVICES

Article 3.2.1.  Construction will commence upon the issuance by [Ms. Hinman] of a written notice to proceed.

Article 3.2.2.  In order to complete the Work, [ValleyCrest] shall provide all necessary construction supervision, inspection, construction equipment, construction labor, materials, tools, and subcontracted items.  [ValleyCrest] shall maintain continuous and competent supervision onsite at all times when work they are responsible for is occurring onsite.

Article 3.2.3.  COMPLIANCE WITH LAWS . . . . [ValleyCrest] shall be liable to [Ms. Hinman] for all loss, cost, and expense attributable to any acts or omissions by [ValleyCrest], its employees, subcontractors, and agents, resulting from the failure to comply with Laws. . . .

Article 3.2.4.  [ValleyCrest] shall maintain the Schedule of Work.  This schedule shall indicate the dates for the start and completion of the various stages of the construction, including the dates when information and approvals are required from [Ms. Hinman].  It shall be revised as required by the conditions of the Work.

       . . .

Article 3.2.6. [ValleyCrest] shall keep such full and detailed accounts as may be necessary for proper financial management under this [Contract]. [Ms. Hinman] shall be afforded access to all [of ValleyCrest's] records, books, correspondence, instructions, drawings, receipts, vouchers, memoranda, and similar data relating to Change Order work performed on the basis of actual cost. . . .

. . .

Article 3.2.9. [ValleyCrest] shall prepare and submit to [Ms. Hinman] either: final marked up as-built drawings in paper, PDF and CAD files that generally document how the various elements of the Work including changes were actually constructed or installed, or as defined by the Parties by attachment to this [Contract].

. . .

Article 3.7. WARRANTY

> 3.7.1. [ValleyCrest] warrants that all materials and equipment furnished under this [Contract] will be . . . in conformance with the Contract Documents, and free from defective workmanship and materials. . . .

. . .

Article 3.8. CORRECTION OF WORK WITHIN ONE YEAR

> 3.8.1. If, prior to Substantial Completion and within one year after the date of Substantial Completion of the Work or for such longer periods of time as may be set forth with respect to specific warranties required by the Contract Documents, any Defective Work[2] is found, [Ms. Hinman] shall promptly notify [ValleyCrest] in writing. Unless [Ms. Hinman] provides written acceptance of the condition, [ValleyCrest] shall promptly correct the Defective Work at its own cost and time and bear the expense of additional services required for correction of any Defective Work for which it is responsible.

> 3.8.2. With respect to any portion of Work first performed after Substantial Completion, the one-year correction period shall be extended by the period of time between Substantial Completion and the actual performance of the later work. . . .

---

[2] "Defective Work" is defined as "any portion of the Work not in conformance to the requirements of the Contract Documents." Article 2.3.8.

3.8.3.   If [Valley Crest] fails to correct Defective Work within a reasonable time after receiving written notice prior to final payment, [Ms. Hinman] may correct it in accordance with [Ms. Hinman's] right to carry out the Work.  In such case, an appropriate Change Order shall be issued deducting the cost of correcting such deficiencies from payments then or thereafter due [ValleyCrest].  If payments then or thereafter due [ValleyCrest] are not sufficient to cover such amounts, [ValleyCrest] shall pay the difference to [Ms. Hinman].

3.8.4.  [ValleyCrest's] obligations and liability, if any, with respect to any Defective Work discovered after the one-year correction period shall be determined by the Construction Laten [sic] Defect law for the State of Tennessee.  If, after the one-year correction period, but before the statute of limitations for latent defects has expired, [Ms. Hinman] discovers any Work which [Ms. Hinman] considers a latent defect, [Ms. Hinman] shall, unless the latent defect requires emergency correction, promptly notify [ValleyCrest] and allow [ValleyCrest] an opportunity to correct the Work within ten (10) business days, if [ValleyCrest] so chooses.  If [ValleyCrest] elects to correct the latent defect, [ValleyCrest] shall provide written notice of such intent within ten (10) Days of its receipt of the notice from [Ms. Hinman] and shall complete the correction of Work within a mutually agreed timeframe.  If [ValleyCrest] believes the Defective Work is not a latent defect and thus does not elect to provide the correction, [Ms. Hinman] shall be entitled to pursue a claim under the laws for latent defects.  Should a court's final ruling determine that the defect was in fact a latent defect, [ValleyCrest] shall reimburse [Ms. Hinman] for the costs which [Ms. Hinman] paid to have the work corrected.

. . .

3.8.6.  The one-year period for correction of Defective Work does not constitute a limitation period with respect to the enforcement of [ValleyCrest's] other obligations under the Contract Documents.

3.8.7.   Prior to final payment, at [Ms. Hinman's] option, [Ms. Hinman] may elect to accept Defective Work rather than require its removal and correction.  In such case the Contract Price shall be equitably adjusted for any diminution in the value of the Project caused by such Defective Work.

3.8.8.  [ValleyCrest] and [Ms. Hinman] shall conduct a walk-thru of the Project upon completion of the Work to review it in its entirety.  Any defects in quality any design flaws, or discrepancies compared to the plans during such walk-thru, shall be replaced or repaired

7

immediately by [ValleyCrest].  Once all items are completed, the Warranty Period shall begin.

4.6.  RESPONSIBILITIES DURING CONSTRUCTION

. . .

4.6.2.  If [Ms. Hinman] becomes aware of any error, omission, or failure to meet the requirements of the Contract Documents, or any fault or defect in the Work, [Ms. Hinman] shall give prompt written notice to [ValleyCrest].  The failure of [Ms. Hinman] to give such notice shall not relieve [ValleyCrest] of its obligations to fulfill the requirements of the Contract Documents.

Article 6.  CONTRACT TIME.

Article 6.1.  DATE OF COMMENCEMENT.  The Date of Commencement is TBD.  The Work shall proceed in general accordance with the Schedule of Work as such schedule may be amended from time to time, subject, however, to other provisions of this [Contract].

Article 6.2.  SUBSTANTIAL COMPLETION/FINAL COMPLETION.

6.2.1.  Substantial Completion of the Work shall be achieved in fourteen (14) weeks from the Date of Commencement.  Unless otherwise specified, the Work shall be finally complete within Ten (10) Days after the date of Substantial Completion, subject to adjustments as provided for in the Contract Documents.

6.2.2.  Time is of the essence for this [Contract] and Contract Documents.

6.2.3.  The Date of Final Completion of the Work is within Ten (10) Days after the Date of Substantial Completion, subject to adjustments as provided in the Contract Documents.

. . .

6.4.1.  SUBSTANTIAL COMPLETION.  [ValleyCrest] and [Ms. Hinman] agree that this [Contract] shall provide for the imposition of liquidated damages based on the Date of Substantial Completion.

6.4.1.1.  [ValleyCrest] understands that if the Date of Substantial Completion established here-in, as may be amended by subsequent Change Order, is not attained, [Ms. Hinman] will suffer damages which are difficult to determine

8

and accurately specify. [ValleyCrest] agrees that if the Date of Substantial Completion is not attained, [ValleyCrest] shall pay [Ms. Hinman] TWO HUNDRED FIFTY dollars and ZERO cents ($250.00) as liquidated damages and not as a penalty for each Day that Substantial Completion extends beyond the Date of Substantial Completion. The liquidated damages provided herein shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties, and any other damages of whatsoever nature incurred by [Ms. Hinman] which are occasioned by any delay in achieving the Date of Substantial Completion.

. . .

Article 7. CONTRACT PRICE. The Contract Price is Eight Hundred Twenty-Seven Thousand Five Hundred Dollars and Zero Cents ($827,500.00) . . . .

Article 8. CHANGES IN THE WORK. Changes in the Work which are within the general scope of the [Contract] may be accomplished without invalidating this [Contract] by Change Order, [3] Interim Directed Change,[4] or a minor change[5] in the Work, subject to the limitations stated in the [Contract].

Article 8.1. CHANGE ORDERS.

8.1.1. [ValleyCrest] may request or [Ms. Hinman], without invalidating the [Contract], may order changes in the Work within the general scope of the [Contract] consisting of adjustment to the Contract Price or the Date of Substantial Completion[6] or the Date of Final Completion. All such changes in the Work shall be authorized by applicable Change Order, and processed in accordance with this article. . . .

. . .

Article 8.2. INTERIM DIRECTED CHANGE.

---

[3] "Change Order" is defined as "a written order signed by [Ms. Hinman] and [ValleyCrest] after the execution of this [Contract], indicating changes in the scope of the Work or Contract Time, including substitutions proposed by [ValleyCrest] and accepted by [Ms. Hinman]." Article 2.3.3.
[4] "Interim Directed Change," although capitalized, is not a separately defined term in the Contract.
[5] "Minor change" is not a defined term in the Contract.
[6] "Substantial Completion" is defined as occurring "on the date when construction is sufficiently complete in accordance with the [Contract] so that [Ms. Hinman] can occupy or utilize the Project, or a designated portion, for the use for which it is intended, without unscheduled disruption. . . ." Article 2.3.19.

9

8.2.1.  [Ms. Hinman] may issue a written Interim Directed Change directing a change in the Work prior to reaching agreement with [ValleyCrest] on the adjustment, if any, in the Contract Price or the Date of Substantial Completion or the Date of Final Completion . . . .

. . .

8.2.3.  If [Ms. Hinman] and [ValleyCrest] agree upon the adjustments in the Contract Price or the Date of Substantial Completion or the Date of Final Completion, . . . for a change in the Work directed by an Interim Directed Change, such agreement shall be the subject of an appropriate Change Order.  The Change Order shall include all outstanding Interim Directed Changes since the last Change Order.

Article 8.3.  MINOR CHANGES IN THE WORK.

8.3.1.  [ValleyCrest] may make minor changes in the design and construction of the Project consistent with the intent of the [Contract] which do not involve an adjustment in the Contract Price or the Date of Substantial Completion or the date of Final Completion; and do not materially and adversely affect the design of the Project, the quality of any of the materials or equipment specified in the Contract Documents, the performance of any materials, equipment, or systems specified in the Contract Documents, or the quality of workmanship required by the  Contract Documents.

8.3.2.  [ValleyCrest] shall promptly inform [Ms. Hinman] in writing of any such changes on the Design-Build Documents maintained by [ValleyCrest].

Article 8.6.  CLAIMS FOR ADDITIONAL COST OR TIME.

8.6.1.  For any claim for an increase in the Contract Price or an extension in the Date of Substantial Completion or the date of Final Completion, [ValleyCrest] shall give [Ms. Hinman] written notice of the claim within Seven (7) Days after the occurrence giving rise to the claim or Seven (7) Days.  Except in an emergency, notice shall be given before proceeding with the Work. . . .

Article 9.  PAYMENT.

Article 9.1.  PROGRESS PAYMENT.

. . .

9.1.8.  Upon Substantial Completion of the Work, [Ms. Hinman] shall pay [ValleyCrest] the unpaid balance of the Contract Price, less a sum equal to one hundred fifty percent (150%) of [ValleyCrest's] estimated cost of completing any unfinished items as agreed to between [Ms. Hinman] and [ValleyCrest] as to extent and time for completion.    [Ms. Hinman] thereafter shall pay [ValleyCrest] monthly the amount retained for unfinished items as each item is completed.

Article 9.5.  FINAL PAYMENT.

9.5.1.  Final payment, consisting of the unpaid balance of the Contract Price, shall be due and payable when the Work is fully completed. . . .

. . .

Article 13.2.  ASSIGNMENT.  Neither [Ms. Hinman] nor [ValleyCrest] shall assign its interest in this [Contract] without the written consent of the other except as to the assignment of proceeds.  The terms and conditions of this [Contract] shall be binding upon both Parties, their partners, successors, assigns, and legal representatives. . . .

. . .

Article 13.5.  NO WAIVER OF PERFORMANCE.  The failure of either Party to insist, in any one or more instances, on the performance of any of the terms, covenants, or conditions of this [Contract], or to exercise any of its rights, shall not be construed as a waiver or relinquishment of such term, covenant, condition, or right with respect to further performance.

. . .

Article 14.  CONTRACT DOCUMENTS.

14.1.  The Contract Documents are as follows:

EXHIBIT A:  Project Scope of Work
EXHIBIT B:  ADE Drawings dated December 23, 2014
EXHIBIT C:  Project Renderings[7]

---

[7] These Contract Exhibits are included in Exhibit A to the Complaint.

11

16.     ValleyCrest began work on the Project[8] on or after March 23, 2015.  Ms. Hinman entered into the Contract believing that ValleyCrest would act in good faith to build a pool in accordance with the terms of the Contract.  Ms. Hinman reasonably relied upon ValleyCrest and Aquatic's representations that the pool would be built in accordance with the terms of the Contract, including the plans, drawings, and specifications attached as Exhibits A-C to the Contract.

17.     Unknown to Ms. Hinman at the time of construction, ValleyCrest, acting in concert with Aquatic, in fact did not intend to build the pool in accordance with the terms of the Contract that were originally proposed to Ms. Hinman, which required cast-in-place concrete construction, and upon which the Contract was priced.  Instead, ValleyCrest and Aquatic deliberately modified the terms of the Contract in the Addendum, authorizing *carte blanche* changes to the design and construction of the Project without approval by Ms. Hinman, which allowed ValleyCrest and Aquatic to use "shotcrete" rather than cast-in-place construction, at a substantial cost savings (and increased profit) from the original Contract, but without reducing the Contract price.  In addition, ValleyCrest, acting in concert with Aquatic, intentionally and deliberately violated the terms and requirements of the Contract in at least the following the particulars:

> A.     Failing to provide a waterproof shell.  Shotcrete, which was used in place of cast-in-place concrete, in these conditions will crack randomly, which has happened with Ms. Hinman's pool and has contributed to leaking of the pool shell.

---

[8] "Project" is defined in Article 2.3.17. as "the building, facility, or other improvements for which [ValleyCrest] is to perform the Work under this [Contract].  It may also include improvements to be undertaken by [Ms. Hinman] or Others."

B.      ValleyCrest, acting in concert with Aquatic, intentionally deviated from the requirements of the plans by failing to install a required expansion joint.  This deviation, upon information and belief, alone and in conjunction with other Contract deviations, has caused or contributed to the cracking of the pool shell and has caused or contributed to substantial leaking of the pool shell.  It also generated cost savings to ValleyCrest that had the intention and effect of increasing ValleyCrest's profit on the Contract.

C.      ValleyCrest, acting in concert with Aquatic, improperly installed an expansion joint in 2016 after finally informing Ms. Hinman that the expansion joint had been left out.  The improper installation of the expansion joint in 2016 has caused continued leaking of the pool.

D.      ValleyCrest, acting in concert with Aquatic, intentionally deviated from the requirements of the plans by failing to install required grounding systems.  This deviation, upon information and belief, has created a potential safety hazard for persons using or maintaining the pool. This deviation further, upon information and belief, generated cost savings to ValleyCrest that had the intention and effect of increasing ValleyCrest's profit on the Contract.

18.    As time passed, ValleyCrest fell substantially behind on its construction schedule, despite having obligated itself under the Contract to have a working pool ready for Ms. Hinman's use during the summer of 2015 with "Final Completion" to occur no later than 14 weeks plus 10 days from the date construction began.  During the course of the construction, ValleyCrest periodically billed Ms. Hinman for construction costs.

13

These bills were promptly paid by Ms. Hinman.  The dates and amounts of payment were as follows:

| | |
|---|---|
| March 10, 2015 | $60,100.00 |
| May 5, 2015 | $257,361.26 |
| May 22, 2015 | $99,840.77 |
| June 29, 2015 | $254,056.08 |
| August 27, 2015 | $64,369.77 |
| October 6, 2015 | $141,872.12 |
| TOTAL | $877,600.00[9] |

19.     The pool was not completed until the fall of 2015.  ValleyCrest stopped most work on the pool on or about September 13, 2015 but continued for a few additional days to work on the equipment pad for the pool. Photographs taken during construction show that as of July 14, 2015, and August 13, 2015, the pool was far from being ready for use. These photographs are attached as Exhibits B-1 and B-2.  At the time that ValleyCrest stopped work in September 2015, substantial work involving boulders and other items remained to be done.

20.     Throughout the period of construction, Ms. Hinman relied upon ValleyCrest's representations as to how the pool would be built, the materials and techniques that would be used, and ValleyCrest's competence in building the pool, as well as Aquatic to ensure compliance with the plans and drawings and to notify her of any deviations and the consequences of any deviations.  A major deviation was the failure by ValleyCrest to include a required expansion joint.  Since ValleyCrest had, through the

---

[9] Ms. Hinman entered into a separate contract for additional work on the pool with another contractor, bringing the total cost of the pool to approximately $1 million.  The other contract is not at issue.

Addendum, given itself the power to make changes to the plans without obtaining Ms. Hinman's consent or approval, she had no knowledge of this deviation.

21.     After the pool was completed in September 2015, the pool developed serious problems, including:   significant water leakage; problems with the pump system including the failure of the main pump properly to prime, causing problems with the filtration system, water circulation, and other parts of the pool system; an improperly functioning ozonator (which inserts ozone into the water and aerates the water to maintain proper water quality and avoid odors); failure to provide or identify a pool maintenance company with experience and expertise in maintaining such pool structures, despite promising to do so, when the complexity of the pool made it impossible for Ms. Hinman to find and retain a maintenance company; and improper landscaping, resulting in death of most of the plants.

22.     Ms. Hinman timely brought these problems to the attention of ValleyCrest on repeated occasions as warranty items in accordance with the terms of the Contract. ValleyCrest and Aquatic assured Ms. Hinman that the pool had been properly constructed and that any problems with it were either routine small issues that occur with any new construction or were maintenance issues that were her responsibility, rather than construction issues.  These representations were false and were intentionally made for the purpose of deceiving Ms. Hinman as to the manner and competence of the construction, the materials and techniques that were used, and ValleyCrest's compliance with the Contract.  Nevertheless, ValleyCrest and Aquatic did respond to Ms. Hinman's warranty claims and made limited efforts to respond to these problems.  In responding, however, ValleyCrest and Aquatic failed to disclose their substantial deviations from the Contract Documents that caused the problems.

15

23.     In approximately November or December of 2015, Ms. Hinman received a large water bill.  In attempting to learn why the bill was so large, Ms. Hinman contacted ValleyCrest.  ValleyCrest, acting in concert with Aquatic, told Ms. Hinman that the pool was leaking and suggested that it needed an expansion joint that had not been installed as required by the Contract.

24.     Defendants, however, did not reveal that the use of shotcrete made it very difficult to install an expansion joint.  Instead, in May 2016 Defendants simply added an expansion joint. The new joint, however, was improperly installed and did not comply with the Contract requirements.  Despite these deviations, ValleyCrest and Aquatic represented to Ms. Hinman that the improperly added expansion joint would solve whatever problems existed.

25.     An ozonator was installed as provided in the original plans and specifications.  ValleyCrest represented that the ozonator would reduce contamination of the pool and would therefore reduce the need for chlorine.  The ozonator did not work properly and was removed by a ValleyCrest employee for repair.  The ozonator was never repaired and eventually a new ozonator was installed.  Contrary to ValleyCrest's representations, however, an ozonator was not necessary and did not serve any useful purpose.  With the ozonator gone, the pool required no more chlorine than with it.  Ms. Hinman was later told by a ValleyCrest employee that the cost of the ozonator was approximately $75,000 and that it was unnecessary.

26.     Since the pool was built, substantial additional problems have occurred, including, but not limited to, the following:

A.     The sprinkler system used inexpensive heads combined with an expensive commercial sprinkler panel that is worthless for the inexpensive sprinkler heads;

B.     The sprinkler system initially could not be winterized;

C.     The vacuum system was almost impossible to use.  ValleyCrest required Ms. Hinman to install a 220 Volt electrical system that was unnecessary. The original vacuum was almost impossible to use.  A ValleyCrest employee told her that was inadequate and built a new vacuum system using 110 Volt household electricity, but it still does not work properly;

D.     The waterfalls do not contain rebar and are breaking apart;

E.     The ozone tank for the ozonator sprang a leak with water gushing out.  The tank was subsequently replaced twice due to use of inferior equipment;

F.      Resurfacing of the pool after installation of the expansion joint ruined the screens in the home because ValleyCrest failed to protect them from plaster dust;

G.     The waterfall pumps stopped working;

H.     Over time multiple cracks in the pool have developed; and

I.     Ms. Hinman's assistant was nearly electrocuted due to faulty wiring in the electric box on the equipment pad, and her assistant's daughter was electrically shocked due to faulty wiring in the vacuum.

27.     Despite continuing serious problems with the pool, ValleyCrest continually reassured Ms. Hinman that the pool was properly installed, that the issues were maintenance- and not construction-related, and intentionally misled her as to the cause, severity, and requirements to resolve the problems.

17

28.     Ken Martin ("Mr. Martin"), Founding Principal of Aquatic, visited the pool in late-May 2018.  Ms. Hinman asked him whether any change orders had been made since she had not been provided any change orders.  Mr. Martin responded that he was not aware of any change orders, but stated that Aquatic was allowed to approve them if substitutions were of the same value and quality.  Ms. Hinman asked him to verify whether Aquatic had authorized any changes.  Mr. Martin later called Ms. Hinman and confirmed that change orders had been "approved" by someone, presumably Aquatic, but refused to tell Ms. Hinman what the change orders were.

29.     As late as November 1, 2018, Mr. Martin wrote a self-serving exculpatory letter to BrightView regarding Ms. Hinman's pool and his May 2018, visit that, while failing to address the change order and other issues stated, *inter alia*:

> Last evening, we spoke on the phone relating to the email you had recently received from Mrs. Hinman indicating that she was experiencing a suspected pool water leak.  As we discussed, occasionally pools experience water leaks; coincidentally, I am currently experiencing a water leak in my own personal pool.  Yesterday, I contacted a local pool leak repair technician to come to my pool, find the leak, then perform the repairs needed.  We had a similar pool leak a couple of years ago.

> *See* Exhibit C (attached).

The letter also referenced that as of May 2018 the ozonator that had "been removed for service but . . . not yet returned to service."  *Id.*  ValleyCrest subsequently forwarded this letter to Ms. Hinman as part of a joint effort by ValleyCrest and Aquatic to cover-up their misconduct.  The letter mentioned nothing about ValleyCrest and Aquatic's deviations from the Contract documents that have caused the pool's serious problems.

30.     Specifically, Aquatic's letter made no reference to ValleyCrest and Aquatic's failure to install the expansion joint in the first instance; failure to properly install an expansion joint after ValleyCrest admitted that it had deviated from the Contract by

failing to install one during initial construction; or any of the other construction-related deviations and defects that Ms. Hinman has since discovered. Instead, both ValleyCrest and Aquatic, acting in concert, sought to conceal their wrongful actions and omissions, in an effort to mislead Ms. Hinman and to deter her from seeking redress for the damages that she has sustained by, for example, blithely stating in Mr. Martin's letter that "[O]ccasionally pools experience leaks." This letter is but one example of a recurring pattern of cover-up and unfair dealing in which ValleyCrest, BrightView, and Aquatic have engaged since the beginning of the project. This pattern of misconduct has served, among other things, to prevent Ms. Hinman from discovering the wrongful actions, omissions, and other misconduct of ValleyCrest and Aquatic. From the project's beginning to the current day, ValleyCrest and Aquatic have fraudulently induced Ms. Hinman to enter into a contract which they had no intention of performing as originally written and priced, failed to correct the multitude of serious problems, and then sought to hide their misconduct from Ms. Hinman to escape responsibility for their actions. Ms. Hinman has now made her own investigation of these issues and in June 2019 became aware of the misconduct and breaches described above that will require complete replacement of the pool structure.

31. Upon information and belief, water is continuing to leak from the pool and Ms. Hinman continues to suffer ongoing and increasing damage to her home and other property as a result of these breaches and misconduct.

## COUNT ONE

### Breach of Contract
### (Against ValleyCrest and BrightView)

32. The allegations of paragraphs 1-31 above are incorporated by reference.

19

33.     The Contract was a valid and enforceable obligation of the parties and contained mutual covenants and promises as set forth above, among others.  The Contract also contained an implied covenant of good faith and fair dealing.

34.     ValleyCrest and BrightView breached the Contract by, *inter alia*:

A.      Failing to construct the project in accordance with the Contract, in violation of Article 3.1.2.;

B.      Failing to give Ms. Hinman ownership of documents for which she separately paid $60,100, in particular the alleged "change orders" referenced by Aquatic, in violation of Article 3.1.3;

C.      Failing to give Ms. Hinman the same rights from Aquatic that it gave to Ms. Hinman with respect to the alleged change orders, in violation of Article 3.1.3.6.;

D.      Failing to maintain the Schedule of Work and failing to revise the Schedule of Work to account for Defendants' substantial delays, in violation of Article 3.2.4;

E.      Failing to provide Ms. Hinman with access to all of ValleyCrest's records relating to alleged change orders, in violation of Article 3.2.6.;

F.      Failing to provide "as-built" drawings to document how the various elements of the project, including alleged change orders, were actually constructed or installed, in violation of Article 3.2.9;

G.      Failing to perform its warranty obligations, as detailed above, in violation of Article 3.7.1.;

H.      Failing to promptly correct Defective Work, as detailed above, in violation of Articles 3.8.1 and 3.8.2.;

20

I.       Failing to deduct amounts required to be spent by Ms. Hinman to correct Defective Work that ValleyCrest failed to correct from the amounts paid by Ms. Hinman under the Contract, in violation of Article 3.8.3.;

J.       Failing to equitably adjust the Contract Price for diminution in value of the project caused by ValleyCrest's Defective Work, in violation of Article 3.8.7.;

K.       Failing to achieve Substantial Completion of the Contract (as defined in Article 2.3.19.) within 14 weeks from the start date, in violation of Article 6.2.1., failing to achieve final completion within 10 days after that, in violation of Article 6.2.1., despite time being of the essence of the Contract (Article 6.2.2.), and depriving Ms. Hinman of the use of the pool during the summer of 2015, despite having promised her that she would have it for use during that time period.  Ms. Hinman in fact was not billed for and did not make the final progress payment, consisting of the unpaid balance of the Contract Price required upon Substantial Completion (Article 9.1.8.) until October 6, 2015, a payment of $141,872.12 (pursuant to the Contract, Ms. Hinman held back $10,000 of the total Contract Price as a retainage for Final Payment pursuant to Article 9.5.; ValleyCrest never billed her for this amount);

L.       Failing to pay liquidated damages to Ms. Hinman in the amount of $250 per day for each day that ValleyCrest failed to obtain Substantial Completion, in violation of Article 6.4.1.1.;

M.      Failing to be legally licensed to act as a contractor after its license was transferred to BrightView, or, in the alternative, if it assigned its interest in the Contract to BrightView upon transfer of its license or some other event, doing so

21

without Ms. Hinman's knowledge or written consent, in violation of Article 13.2.; and

        N.      Violating the implied covenant of good faith and fair dealing.

35.      Ms. Hinman has been damaged by ValleyCrest and BrightView's breach of contract in the amount of the cost of removal of the existing pool and replacement with a pool conforming to the Contract, plus unpaid liquidated damages for failing to meet the Date of Substantial Completion, and other incidental and consequential damages.

## COUNT TWO

### Breach of Express and Implied Warranty
### (Against ValleyCrest and BrightView)

36.      The allegations of paragraphs 1-35 above are incorporated by reference.

37.      ValleyCrest expressly warranted, *inter alia,* that "all materials and equipment . . . will be . . . of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials. [ValleyCrest] will replace any plant life that dies or is in distress . . . during the warranty period."

38.      ValleyCrest breached this express warranty by, *inter alia,* using equipment and material that was not in conformance with the Contract, including, but not limited to, using equipment and material that was not of good quality, including the sprinkler system, pump system, electrical system, and other equipment, and by failing to replace dead plant life as required, instead providing Ms. Hinman an inadequate allowance of $2,000 for the loss.

39.      Ms. Hinman gave timely notice of her claims.

40.      ValleyCrest failed to fulfill its obligations under the express warranty.

22

41. The Contract contained implied warranties of merchantability and fitness for a particular purpose by ValleyCrest and BrightView on the pool system. The purported waiver of such implied warranties in Article 3.7.2. of the Contract applied only to "products, equipment, systems, or materials . . . specified and purchased by [Ms. Hinman], . . ." not as to products, equipment, systems or materials specified and purchased by ValleyCrest. ValleyCrest and BrightView breached these implied warranties as detailed above. The pool as constructed is not merchantable and is not fit for its intended purpose. In the alternative, any purported waiver of these implied warranties is ineffective due to the misconduct of Defendants detailed above.

42. Ms. Hinman has suffered damages as a result of ValleyCrest's breach of express and implied warranties and is entitled to recover her actual damages and to have the Contract rescinded.

### COUNT THREE

**Violation of the Tennessee Consumer Protection Act**
**Tenn. Code Ann. § 47-18-101 *et seq.***
**(Against All Defendants)**

43. The allegations of paragraphs 1-42 are incorporated by reference.

44. As detailed above, Defendants engaged in the following unfair or deceptive acts and practices in violation of the following subdivisions of Section 47-18-104(b) of the Tennessee Consumer Protection Act ("TCPA"):

> (1)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . ., by, among other things, representing and warranting that: concealing the fact that the contract was priced on the basis of expensive cast-in-place construction when in fact utilizing much less expensive

23

shotcrete construction; concealing the fact that the pool was leaking because Defendants failed to install an expansion joint in the first instance; and concealing the fact that the expansion joint installed in May 2016 was improperly installed, in violation of Tenn. Code Ann. § 47-18-104(b)(5);

(2)    Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another, by, among other things:  concealing the fact that the contract was priced on the basis of expensive cast-in-place construction when in fact utilizing much less expensive shotcrete construction; concealing the fact that the pool was leaking because Defendants failed to install an expansion joint in the first instance; and concealing the fact that the expansion joint installed in May 2016 was improperly installed, in violation of Tenn. Code Ann. § 47-18-104(b)(7); and

(3)    Representing that a person is a licensed contractor when such person has not been licensed as required [by law]; . . . or, acting in the capacity of a contractor . . . , while not licensed, by, upon information and belief, transferring its license, No. 36314 to BrightView while ValleyCrest was still obligated on the Contract to perform according to its terms and to fulfill its warranty obligations, in violation of Tenn. Code Ann. § 47-18-104(b)(35).

45.    The violations of TCPA by Defendants were willful and knowing.

46.    Ms. Hinman has suffered damages as a result of the violation of TCPA by Defendants, and is entitled to recover her actual damages, treble damages, reasonable attorneys' fees, and costs.

## COUNT FOUR

### Fraudulent Inducement and Fraud
### (Against All Defendants)

47.     The allegations of paragraphs 1-46 are incorporated by reference.

48.     Defendants intentionally misrepresented material facts by making false statements and omitting to state material facts, as detailed above, with knowledge of their falsity and with a fraudulent intent, including, but not limited to, a bait-and-switch tactic of entering into the Contract with the intention of using shotcrete construction rather than cast-in-place construction and other "short-cuts" that deviated substantially from the original requirements of the Contract without disclosing the cost savings to Ms. Hinman or re-pricing the contract while pocketing the fraudulently obtained cost savings.

49.     Ms. Hinman reasonably relied upon these false representations and omissions and has been damaged as a result of her reliance.

50.     Defendants intended to induce Ms. Hinman to rely upon their false representations and omissions and did, in fact, fraudulently induce Ms. Hinman to enter into the Contract.

51.     Ms. Hinman has suffered damages as a result of the common law fraud and fraudulent inducement by Defendants and is entitled to recover her actual damages and punitive damages, and to have the Contract rescinded.

### COUNT FIVE

### Fraudulent and Wrongful Concealment
### (Against All Defendants)

52.     The allegations of paragraphs 1-51 are incorporated by reference.

53.     As detailed above, Defendants affirmatively concealed Ms. Hinman's injury and failed to disclose material facts regarding the injury and the wrongdoer, despite

having a duty to make such disclosure by, *inter alia*, concealing the fact that the contract was priced on the basis of expensive cast-in-place construction and not much less expensive shotcrete construction; continually attributing the substantial leaks and other serious problems to maintenance matters that they contended were Ms. Hinman's responsibility; concealing the fact that the pool was leaking because Defendants failed to install an expansion joint in the first instance; concealing the fact that the expansion joint installed in May 2016 was improperly installed; and finally stating as late as November 1, 2018, that "[O]ccasionally pools experience water leaks," in an effort to convince Ms. Hinman that the problems were simply part of the cost of owning a pool.

54. Ms. Hinman could not have discovered the wrongdoing or the identity of the wrongdoer despite reasonable care and diligence, and despite making concerted efforts to find out what was going on, due to Defendants' false statements and misrepresentations as to their conduct and their ongoing refusal to provide basic documents such as alleged change orders to which she was entitled under the Contract.

55. Defendants knew that Ms. Hinman had suffered injury and property damage as a result of their wrongdoing and knew the identities of the wrongdoers.

56. As discussed above, Defendants concealed material information from Ms. Hinman by withholding information and making use of some device to mislead Ms. Hinman in order to exclude suspicion or prevent inquiry.

57. Ms. Hinman has suffered damages as a result of the common law fraudulent and wrongful concealment and is entitled to recover her actual damages and punitive damages, and to have the Contract rescinded.

26

**COUNT SIX**

**Conspiracy**

58.     The allegations of paragraphs 1-57 above are incorporated by reference.

59.     Defendants developed a common design and conspired to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, specifically to fraudulently induce Ms. Hinman to sign the Contract and pay for a pool by means of intentional misrepresentations and omissions, as detailed above.

60.     Defendants each engaged in overt acts in furtherance of the conspiracy, as detailed above, including, but not limited to, a bait-and-switch tactic of entering into the Contract with the intention of using shotcrete construction rather than cast-in-place construction and other "short-cuts" that deviated substantially from the requirements of the Contract; pricing the contract as expensive cast-in-place construction rather than the significantly cheaper shotcrete while pocketing the fraudulently obtained cost savings; preventing Ms. Hinman from discovering whether the project had changed by depriving her of access to alleged "change orders;" and misleading her as to the nature and extent of the problems by falsely telling her repeatedly that the problems were of a maintenance nature rather than construction.

61.     Ms. Hinman has suffered damages as a result of the civil conspiracy of Defendants and is entitled to recover her actual damages and punitive damages, and to have the Contract rescinded.

**COUNT SEVEN**

**Negligence**
**(Against All Defendants)**

62.     The allegations of paragraphs 1-61 above are incorporated by reference.

27

63.     Defendants each owed Ms. Hinman a duty of care to design, engineer, and construct the pool competently in the manner required by the Contract.

64.     As detailed above, Defendants each breached their duty of care by not designing, engineering, and constructing the pool in accordance with the duty of care owed to Ms. Hinman, by, *inter alia*, not using proper waterproofing techniques; by not installing an expansion joint in the first instance; by not properly installing an expansion joint after admitting that the expansion joint had not been originally installed; by not properly grounding electrical equipment; by not properly installing pumps; and by not procuring the proper equipment.

65.     Ms. Hinman has been damaged by Defendants' negligence in the amount of the cost of removal of the existing pool and replacement with a pool conforming to the Contract and other incidental and consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Ms. Hinman demands that judgment be entered against Defendants as specified below:

1.      Compensatory damages be awarded in favor of Ms. Hinman against Defendants, jointly and severally, in the amount of $2,500,000.00, plus pre- and post-judgment interest;

2.      Treble damages be awarded in favor of Ms. Hinman against Defendants jointly and severally, pursuant to the Tennessee Consumer Protection Act, in the amount of $7,500,000, plus pre- and post-judgment interest;

3.      Punitive damages be awarded to Plaintiff Poteet against Defendants, jointly and severally, in the amount of $7,500,000;

4.      The Contract be rescinded;

5.    Ms. Hinman be awarded her reasonable attorney's fees and costs in bringing this action.

6.    Such other and general relief as the Court deems just and proper.

Ms. Hinman further demands a jury to try this cause.


Respectfully submitted,


_____/s/James W. White, Esq._____
James W. White, BPR #11886
John O. Belcher, BPR #18335
FARMER PURCELL WHITE & LASSITER, PLLC
150 Fourth Avenue North, Suite 1820
Nashville, TN 37219
(615) 810-8777
*Attorney for Plaintiffs*

29