**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **JERE HINMAN,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 3:19-cv-00551** |
| **VALLEYCREST LANDSCAPE** ) | **Judge Aleta A. Trauger** |
| **DEVELOPMENT, INC., BRIGHTVIEW** ) | |
| **LANDSCAPE DEVELOPMENT, INC.** ) | |
| **and AQUATIC DESIGN &** ) | |
| **ENGINEERING, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Before the court are the Motions to Dismiss filed by defendants Aquatic Design & Engineering, Inc. (Doc. No. 9) and Brightview Landscape Development, Inc., f/k/a ValleyCrest Landscape Development, Inc. (Doc. No. 24), filed under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth herein, the court will grant in part and deny in part both motions. The dismissal of any claims will be without prejudice to the plaintiff's ability to seek leave to amend the Complaint under Rule 15(a)(2).

## I.      PROCEDURAL BACKGROUND

Plaintiff Jere Hinman, a citizen of Tennessee, filed this suit against defendants ValleyCrest Landscape Development, Inc. ("ValleyCrest"), BrightView Landscape Development, Inc. ("BrightView"), and Aquatic Design & Engineering, Inc. ("Aquatic") on July 1, 2019, asserting numerous claims in connection with the defendants' design and construction of a $1 million pool and associated hardscaping and other landscaping at Hinman's home in Lebanon, Tennessee in 2015. Because it is undisputed (as discussed further, below) that ValleyCrest and BrightView are

the same entity, the court refers herein to these defendants, in the singular, as BrightView.

The Complaint (Doc. No. 1) asserts claims against BrightView for breach of the Standard Design-Build Agreement and General Conditions Between Owner and Design-Builder ("Contract"), executed by BrightView and Hinman in March 2015 (Doc. No. 1-2) (Count One), and breach of express and implied warranties (Count Two). The Complaint asserts claims against both BrightView and Aquatic for violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104 (Count Three), fraudulent inducement and fraud (Count Four), fraudulent concealment (Count Five), conspiracy (Count Six), and negligence (Count Seven). For relief, Hinman demands compensatory damages in the amount of $2,500,000 plus pre- and post-judgment interest; treble damages under the TCPA; and punitive damages in the amount of $7,500,000. She also seeks rescission of the Contract as well as attorney's fees and costs. (Doc. No. 1, at 28–29.)

BrightView and Aquatic have now filed separate Motions to Dismiss, with supporting Memoranda of Law, asserting various theories in support of dismissing each of the claims against them. (Doc. Nos. 9, 10, 24, 24-1.) The plaintiff has filed a Response in opposition to both motions (Doc. Nos. 18, 27), and the defendants have filed Reply briefs (Doc. Nos. 20, 28).

Instead of setting forth a separate Statement of Facts, the court will summarize the facts as needed to address the arguments for and against dismissal of each of the claims.

## II.   STANDARD OF REVIEW

### A.   Rule 12(b)(6)

For purposes of a motion to dismiss under Rule 12(b)(6), the court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face. *Iqbal*, 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.* at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

The *Iqbal* Court suggested that a district court considering a motion to dismiss "can choose to begin" its analysis "by identifying pleadings that . . . are not entitled to the assumption of truth." *Iqbal*, 555 U.S. at 679. As indicated above, pleadings that do not constitute factual allegations, including "bare assertions," a formulaic recitation of the elements, and "conclusory" or "bald" allegations, need not be accepted as true. *Id.* at 681. The question is whether the remaining factual allegations plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss. Fed. R. Civ. P. 10(c). In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999).

### B.     Rule 9(b)

Besides seeking dismissal under Rule 12(b)(6), the defendants also contend that the pleading standard that applies to fraud claims is not satisfied by the allegations in the Complaint. "Because claims based on fraud pose 'a high risk of abusive litigation,' a party making such allegations 'must state with particularity the circumstances constituting fraud or mistake.'" *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (quoting *Twombly*, 550 U.S. at 569 n.14; Fed. R. Civ. P. 9(b)).

To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)). However, the Sixth Circuit has also explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading.

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples

of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

## III. MOTIONS TO DISMISS

Both defendants seek dismissal of all claims against them on statute of limitations grounds. The court will first address this argument and then separately discuss the other arguments raised in each defendant's motion.

### A. Statute of Limitations as Applied to Tort Claims

The defendants argue that, based on the allegations in the Complaint, it is clear that all of Hinman's tort claims accrued no later than May 2016 and, because Hinman did not file suit until July 2019, are barred whether a one-year limitations period applies (for the TCPA claim) or three years (for the other claims). In response, the plaintiff argues that the Complaint clearly alleges that the defendants fraudulently concealed their responsibility for the problems the plaintiff was having with the pool, that such concealment continued at least through November 2018, and that such fraudulent concealment tolled the running of any of the statutes of limitations. She also alleges that she did not actually discover, and could not reasonably have discovered, her claims for purposes of the running of the statutes of limitations until June 2019. (*See* Doc. No. 1 ¶ 30.)

The statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1). A plaintiff typically does not have to anticipate or negate an affirmative defense, such as the statute of limitations, to survive a motion to dismiss. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th

Cir. 2012). Thus, a Rule 12(b)(6) motion is "generally an inappropriate vehicle for dismissing a claim based on the statute of limitations." *Id.* However, when the allegations in the complaint "affirmatively show that [a] claim is time-barred," dismissal may be appropriate under Rule 12(b)(6). *Cataldo Steel*, 676 F,3d at 547 (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)). If the allegations in a complaint affirmatively show that the statute has run, the burden shifts to the plaintiff to allege facts showing that an exception, such as tolling, applies. *Reid v. Baker*, 499 F. App'x 520, 526 (6th Cir. 2012) (citing *Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 356 (6th Cir. 1987)).

As relevant here, the plaintiff alleges that she and BrightView began discussing contracting in the summer of 2014 and actually entered into the Contract in March 2015 for the construction and installation of an elaborate pool with landscaping that would allow the pool to "blend in with its natural surrounds" at her new home. (Doc. No. 1 ¶¶ 9, 10.) Work on the pool construction ("Project") began on or after March 23, 2015. Hinman and BrightView executed an "Addendum" to the Contract effective August 22, 2015. (Doc. No. 1-5.) Hinman alleges that, at the time of contracting, BrightView, acting in concert with defendant Aquatic, "did not intend to build the pool in accordance with the terms of the Contract" as "originally proposed." (Doc. No. 1 ¶ 17.) Instead, unbeknownst to Hinman, BrightView and Aquatic "deliberately modified the terms of the Contract in the Addendum, authorizing *carte blanche* changes to the design and construction of the Project" without Hinman's approval, allowing them to use products not originally anticipated, at cost savings and increased profit to the defendants but without reducing the contract price. (Doc. No. 1 ¶ 17.)

The Complaint alleges that BrightView, "acting in concert with Aquatic, intentionally and deliberately violated the terms and requirements of the Contract." (Doc. No. 1 ¶ 17.) It enumerates

several ways in which the Contract was allegedly breached. These include failure to provide a waterproof shell, which allegedly resulted from the use of "shotcrete" rather than "cast-in-place concrete"; failure to install a required expansion joint, which also caused or contributed to cracking of the pool shell and leakage; improper installation of the expansion joint in 2016, after finally informing Hinman that it had been left out, which has continued to cause leaking; and failure to install required electrical grounding systems. (Doc. No. 1 ¶ 17(A)–(D).) In addition, BrightView failed to abide by the timeline required by the Contract, which required "Final Completion" to occur no more than fourteen weeks plus ten days after the date construction began. (Doc. No. 1 ¶ 18.) BrightView stopped work in September 2015, when substantial work remained to be done. (Doc. No. 1 ¶ 19.)

Hinman nonetheless also alleges that the Project was "completed" in September 2015. (Doc. No. 1 ¶ 21.) Following completion, the pool developed serious problems, including leakage; problems with the pump system, filtration system, water circulation, and other parts of the pool system; an improperly functioning ozonator; failure to provide or identify a pool maintenance company capable of dealing with a pool structure like the plaintiff's; and death of most of the plants installed as part of the Project. (Doc. No. 1 ¶ 21.)

Hinman brought these problems to the attention of BrightView in accordance with the terms of the Contract. BrightView and Aquatic continued to assure Hinman that "the pool had been properly constructed and that any problems with it were either routine small issues that occur with any new construction or were maintenance issues that were her responsibility, rather than construction issues." (Doc. No. 1 ¶ 22.) The plaintiff alleges that these representations were false and "intentionally made for the purpose of deceiving Ms. Hinman as to the manner and competence of the construction, the materials and techniques that were used, and [BrightView's] compliance

with the Contract." (Doc. No. 1 ¶ 22.) She concedes that the defendants responded to her warranty claims and made some effort to remediate the problems, but she maintains that, in doing so, the defendants did not reveal the extent to which their deviations from the Contract terms had caused the problems. (Doc. No. 1 ¶ 22.)

In November or December 2015, the plaintiff brought to the defendants' attention an extremely large water bill, which led to the discovery of leakage and the absence of the necessary expansion joint. The defendants added an expansion joint in May 2016, but, the plaintiff alleges, it was improperly installed. The plaintiff claims that, as a result, BrightView did not cure the original breach of the Contract (caused by omitting the expansion joint in the first place), and that BrightView and Aquatic falsely represented to Hinman that the newly installed expansion joint "would solve whatever problems existed." (Doc. No. 1 ¶ 24.)

The ozonator was installed as called for by the Contract. However, it did not work properly, and a BrightView employee removed it to repair it. BrightView had represented to Hinman that she needed an ozonator to reduce contamination and reduce the amount of chlorine she would need. The ozonator was never repaired and eventually a new one was installed. Hinman asserts that, contrary to BrightView's representations, the ozonator was not necessary and served no useful purpose. Hinman was told by a BrightView employee that the cost of the ozonator was $75,000 and that it was unnecessary. (Doc. No. 1 ¶ 25.)

Other problems have occurred since the Project was completed, including: problems caused by the use of inexpensive and inappropriate sprinkler heads; the sprinkler system "initially could not be winterized"; the vacuum system was "almost impossible to use"; the waterfalls were not constructed with rebar and are "breaking apart"; the material used for the ozone tank for the ozonator was inferior, resulting in Hinman's twice having to replace the ozone tank; the

resurfacing of the pool after installation of the expansion joint in May 2016 "ruined the screens" on the plaintiff's home, because BrightView failed to protect them from plaster dust; the waterfall pumps failed; multiple cracks in the pool have developed; and one person was "almost electrocuted" and another person was "shocked" due to faulty wiring in the vacuum. (Doc. No. 1 ¶ 26(A)–(I).) The plaintiff does not allege when these events occurred.

Despite continuing problems, BrightView continued to assure Hinman that the pool was properly installed and that the issues were maintenance-related rather than construction-related, thus "intentionally misl[eading] her as to the cause, severity, and requirements to solve the problems." (Doc. No. 1 ¶ 27.)

An Aquatic "Founding Principal," Ken Martin, visited the pool in late May 2018. Upon inquiry by Hinman, Martin told her that he was not aware of whether any change orders had been made during construction and installation. She told him she had not been provided any change orders and asked him to verify whether any had been entered without her knowledge. Martin later called Hinman and told her change orders had been "approved" by someone, but he would not tell her what the change orders were. (Doc. No. 1 ¶ 28.)

On November 1, 2018, Martin wrote a letter to BrightView about the Project and his visit in May 2018. This letter, which BrightView subsequently provided to Hinman, documents a phone call between Martin and Brian Chesnut, BrightView's Vice President/Branch Manager, concerning Hinman's pool. That letter expresses Martin's view that the problems with the pool and expansion joint, if any, were likely maintenance-related. (*See* Doc. No. 1-7.) The letter also references the ozonator that had been removed and, as of May 2018, not yet replaced. (*Id.*)

Even though the letter was not addressed to her, Hinman alleges that it is "one example of a recurring pattern of cover-up and unfair dealing" in which the defendants have been engaged

from the inception of the project, which served to prevent Hinman from discovering their wrongful actions and omissions and misconduct. (Doc. No. 1 ¶ 30.) The plaintiff states that she "has now made her own investigation of these issues and in June 2019 became aware of the misconduct and breaches described above that will require complete replacement of the pool structure." (Doc. No. 1 ¶ 30.) She also alleges that the pool is continuing to leak and she continues to suffer ongoing damage to her home and other property as a result of the breaches and misconduct. (Doc. No. 1 ¶ 30.)

The defendants assert generally that Hinman "cannot fall back on the 'discovery rule' because that equitable doctrine requires a party to exercise 'reasonable care and <u>diligence</u>' in discovering facts that support a claim." (Doc. No. 24-1, at 8 n.3 (quoting *Teeters v. Currey*, 518 S.W.2d 512, 517 (Tenn. 1974)).) The problem with this argument is that the question of whether Hinman acted with reasonable care and diligence is a fact-intensive one that is not appropriate for resolution in the context of a motion to dismiss. Although the Complaint is somewhat vague regarding what the plaintiff discovered when and how exactly the defendants concealed their wrongful conduct, the court finds for purposes of both Motions to Dismiss on statute of limitations grounds that the plaintiff has adequately alleged that she did not discover the facts supporting her tort claims until June 2019, making basically all of her tort claims timely, whether they are governed by a one-year or a three-year statute of limitations. Although the defendants will not be prevented from filing motions for summary judgment on statute of limitations grounds, the facts as alleged in the Complaint are adequate to avoid successful application of the affirmative defense of timeliness at this stage.

The one fairly clear exception to this conclusion is with regard to any negligence claim related to the alleged damage to the plaintiff's screens that occurred when BrightView failed to

protect them from plaster dust during the resurfacing of the pool after the installation of the expansion joint in May 2016.[1] Clearly, the plaintiff was aware of the damage to her screens and the cause of it when it occurred. The Complaint does not precisely specify when the resurfacing occurred other than that it was done in conjunction with the May 2016 installation of the expansion joint. If the resurfacing and damage to the screens occurred prior to July 1, 2016, any negligence claim related to such damage would be barred by the statute of limitations.

### B.      Aquatic's Motion to Dismiss

Aquatic seeks dismissal of all claims asserted against it for failure to state a claim for which relief may be granted under Rule 12(b)(6). It also argues that the fraud claims against it are not pleaded with the particularity required by Rule 9(b).

#### 1.      *Fraud Claims*

Three of the "Counts" in the Complaint are premised on fraud: the TCPA claim (Count Three); a claim for "fraudulent inducement and fraud" (Count Four), which the court construes as stating (or attempting to state) claims for both fraudulent inducement and fraudulent misrepresentation; and a claim for "fraudulent and wrongful concealment" (Count Five).

##### a)      *Elements of the Claims*

The TCPA creates a private cause of action for "[a]ny person who [1] suffers an ascertainable loss of money or property . . . [2] as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b)." Tenn. Code Ann. § 47-18-109(a)(1). Section 47-18-104(b) includes, as relevant here, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that

---

[1] The plaintiff does not state when the electrical shocks occurred. These, too, are events that would have given rise, at a minimum, to inquiry notice when they occurred.

they do not have" and "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." *Id.* § 47-18-104(b)(5) & (b)(7).[2] Although § 47-18-104 does not define "unfair or deceptive," the Tennessee Supreme Court has described a deceptive act or practice as "'a material representation, practice, or omission likely to mislead . . . reasonable consumer[s]' to their detriment." *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009) (quoting *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997)).

Tennessee courts recognize that the TCPA explicitly provides that "it is to be interpreted and construed in accordance with interpretations of [Federal Trade Commission Act] by the Federal Trade Commission and the federal courts." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47-18-115; citing *Ganzevoort*, 949 S.W.2d at 298). "The scope of the TCPA is much broader than that of common-law fraud," and the statute is to be liberally construed to "protect consumers in Tennessee and elsewhere." *Id.* (citations omitted).

The elements of a claim for fraudulent inducement to enter a contract under Tennessee law are: "(1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance." *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000), *cited in Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011).

To recover for fraudulent misrepresentation under Tennessee law, a plaintiff must prove:

(1) that the defendant made a representation of a present or past fact; (2) that the

---

[2] More generally, the TCPA prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person," even if such act is not enumerated in the statute, but "enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter." Tenn. Code Ann. § 47-18-104(b)(27).

representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

*Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 751 (6th Cir. 2014) (quoting *Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012)).

Finally, to state a claim under Tennessee law for fraudulent omission, or failure to disclose a material fact, the plaintiff must prove:

(1) that [the defendant] concealed or suppressed a material fact, (2) that [the defendant] had a duty to disclose that fact to [the plaintiff], (3) that [the defendant] intentionally concealed or suppressed that fact with the intent to deceive [the plaintiff], (4) that [the plaintiff] was unaware of the fact and would have acted differently if it had known about the concealed fact, and (5) that [the plaintiff] was damaged as a result of the concealment or suppression of the fact.

*Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 527 (6th Cir. 2007) (citing *Justice v. Anderson Cty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997)). "[A] statement is material or involves a material fact if it will likely affect the conduct of a reasonable person." *Id.* (quoting *Patel v. Bayliff*, 121 S.W.3d 347, 353 (Tenn. Ct. App. 2003)).

Each of these types of fraud is subject to the heightened pleading standard in Rule 9(b). *See, e.g.*, *Segrist v. Bank of New York Mellon*, 744 F. App'x 932, 940 (6th Cir. 2018) (affirming dismissal of a Tennessee fraudulent inducement claim based on failure to plead the "time or place of the fraudulent statements" as required by Rule 9(b)); *Thompson*, 773 F.3d at 751 (holding that state-law claims of "fraud in the inducement, common-law fraud, fraudulent misrepresentation, and negligent misrepresentation" are all "governed by Fed. R. Civ. P. 9(b)"); *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255 (6th Cir. 2012) (applying Rule 9(b) to a state-law "fraud-by-omission claim"); *Bridgestone Ams., Inc. v. Int'l Business Machines Corp.*, 172 F. Supp.

3d 1007, 1019 (M.D. Ten. 2016) (Sharp, J.) (holding TCPA claims to the higher pleading standard articulated in Rule 9(b); *Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 694 F. Supp. 2d 888, 900, 915 (W.D. Tenn. 2010) (same).[3] Accordingly, to avoid dismissal of these claims, the plaintiff must "set forth specific fraudulent or deceptive acts rather than general allegations." *Bridgestone Ams.*, 172 F. Supp. 3d at 1019. More particularly, as set forth above, a party whose claim is premised upon fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." *Republic Bank & Tr. Co.*, 683 F.3d at 247. This generally means, at a minimum, that the plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied." *Bledsoe*, 501 F.3d at 504.

> b)      *Factual Allegations Concerning Aquatic*

Considering that the Complaint is nearly thirty pages in length, the allegations specifically concerning Aquatic are relatively sparse. The plaintiff alleges that defendant Aquatic is a Florida corporation with its principal place of business in Florida. (Doc. No. 1 ¶ 4.) She does not allege that Aquatic is a party to the Contract or the Addendum or that it had any involvement in negotiating the terms of either. Specifically regarding Aquatic, she states:

> 16.    . . . . Ms. Hinman reasonably relied upon [BrightView] and Aquatic's representations that the pool would be built in accordance with the terms of the Contract, including the plans, drawings, and specifications attached as Exhibits A–C to the Contract.

> 17.    Unknown to Ms. Hinman at the time of construction, [Brightview], acting in concert with Aquatic, in fact did not intend to build the pool in accordance with the terms of the Contract . . . . Instead, [BrightView] and Aquatic deliberately modified the terms of the Contract in the Addendum, authorizing *carte blanche* changes to the design and construction of the Project without approval by Ms. Hinman, which allowed [Brightview] and Aquatic to use "shotcrete" rather than cast-in-place construction, at a substantial cost savings (and increased profit) from

---

[3] Tennessee courts also subject TCPA claims to Rule 9.02 of the Tennessee Rules of Civil Procedure, which is similar to Rule 9(b) of the Federal Rules of Civil Procedure. *See, e.g.*, *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 275 (Tenn. Ct. App. 1999).

the original Contract, but without reducing the Contract price. In addition, [Brightview], acting in concert with Aquatic, intentionally and deliberately violated the terms and requirements of the Contract [by (A) failing to provide a waterproof shell; (B) failing to install a required expansion joint; (C) improperly installing the expansion joint in May 2016; and (D) failing to install required electrical grounding systems.]

. . . .

20.    Throughout the period of construction, Ms. Hinman relied upon . . . Aquatic to ensure compliance with the plans and drawings and to notify her of any deviations and the consequences of any deviations. A major deviation was the failure by [BrightView] to include a required expansion joint. . . .

. . . .

22.    Ms. Hinman timely brought [the numerous problems with the pool] to the attention of [Brightview] on repeated occasions as warranty items in accordance with the terms of the Contract. [Brightview] and Aquatic assured Ms. Hinman that the pool had been properly constructed and that any problems with it were either routine small issues that occur with any new construction or were maintenance issues that were her responsibility, rather than construction issues. These representations were false and were intentionally made for the purpose of deceiving Ms. Hinman as to the manner and competence of the construction, the materials and techniques that were used, and [Brightview]'s compliance with the Contract. Nevertheless, [Brightview] and Aquatic did respond to Ms. Hinman's warranty claims and made limited efforts to respond to these problems. In responding, however, [Brightview] and Aquatic failed to disclose their substantial deviations from the Contract Documents that caused the problems.

23.    In approximately November or December of 2015, Ms. Hinman received a large water bill. In attempting to learn why the bill was so large, Ms. Hinman contacted [Brightview]. [Brightview], acting in concert with Aquatic, told Ms. Hinman that the pool was leaking and suggested that it needed an expansion joint that had not been installed as required by the Contract.

24.    Defendants, however, did not reveal that the use of shotcrete made it very difficult to install an expansion joint. Instead, in May 2016 Defendants simply added an expansion joint. The new joint, however, was improperly installed and did not comply with the Contract requirements. Despite these deviations, [Brightview] and Aquatic represented to Ms. Hinman that the improperly added expansion joint would solve whatever problems existed.

. . . .

28.    Ken Martin ("Mr. Martin"), Founding Principal of Aquatic, visited the pool in late-May 2018. Ms. Hinman asked him whether any change orders had been made since she had not been provided any change orders. Mr. Martin responded

that he was not aware of any change orders, but stated that Aquatic was allowed to approve them if substitutions were of the same value and quality. Ms. Hinman asked him to verify whether Aquatic had authorized any changes. Mr. Martin later called Ms. Hinman and confirmed that change orders had been "approved" by someone, presumably Aquatic, but refused to tell Ms. Hinman what the change orders were.

29. As late as November 1, 2018, Mr. Martin wrote a self-serving exculpatory letter to BrightView regarding Ms. Hinman's pool and his May 2018, visit that, while failing to address the change order and other issues stated, inter alia:

> Last evening, we spoke on the phone relating to the email you had recently received from Mrs. Hinman indicating that she was experiencing a suspected pool water leak. As we discussed, occasionally pools experience water leaks; coincidentally, I am currently experiencing a water leak in my own personal pool. Yesterday, I contacted a local pool leak repair technician to come to my pool, find the leak, then perform the repairs needed. We had a similar pool leak a couple of years ago.

See Exhibit C (attached) [Doc. No. 1-7].

. . . . [Brightview] subsequently forwarded this letter to Ms. Hinman as part of a joint effort by [Brightview] and Aquatic to cover-up their misconduct. The letter mentioned nothing about [Brightview] and Aquatic's deviations from the Contract documents that have caused the pool's serious problems.

30. Specifically, Aquatic's letter made no reference to [Brightview] and Aquatic's failure to install the expansion joint in the first instance; failure to properly install an expansion joint after [Brightview] admitted that it had deviated from the Contract by failing to install one during initial construction; or any of the other construction-related deviations and defects that Ms. Hinman has since discovered. Instead, both [Brightview] and Aquatic, acting in concert, sought to conceal their wrongful actions and omissions, in an effort to mislead Ms. Hinman and to deter her from seeking redress for the damages that she has sustained by, for example, blithely stating in Mr. Martin's letter that "[O]ccasionally pools experience leaks." This letter is but one example of a recurring pattern of cover-up and unfair dealing in which [Brightview] . . . and Aquatic have engaged since the beginning of the project. This pattern of misconduct has served, among other things, to prevent Ms. Hinman from discovering the wrongful actions, omissions, and other misconduct of [Brightview] and Aquatic. From the project's beginning to the current day, [Brightview] and Aquatic have fraudulently induced Ms. Hinman to enter into a contract which they had no intention of performing as originally written and priced, failed to correct the multitude of serious problems, and then sought to hide their misconduct from Ms. Hinman to escape responsibility for their actions. Ms. Hinman has now made her own investigation of these issues and in June 2019 became aware of the misconduct and breaches described above that will require

complete replacement of the pool structure.

(Doc. No. 1 ¶¶ 16–17, 22–24, 28–30.)

>    c)    *Fraudulent Inducement Claim*

These allegations mandate a speedy resolution of the fraudulent-inducement claim against Aquatic. The claim, in fact, fails at the first element: the identification of a false statement material to the plaintiff's decision to contract with BrightView. The Complaint does not specifically allege that Hinman had any direct conversations with any representative of Aquatic during contract negotiations, much less disclose the content of any such conversation, the identity of the person with whom the plaintiff had a conversation, or when it occurred. The Complaint utterly fails to state a fraudulent inducement claim against Aquatic, and certainly does not satisfy the Rule 9(b) standard.

>    d)    *Fraudulent Misrepresentation Claim*

Similarly, any claims based on fraudulent misrepresentation are insufficient under Rule 9(b), because the Complaint does not identify with particularity any communications between the plaintiff and any representative of Aquatic that involved a knowingly false representation of a present or past fact, much less any reliance by the plaintiff on a false statement. *See Thompson*, 773 F.3d at 751. The vast majority of the allegations concerning "misrepresentations" that Aquatic allegedly made to Hinman are too general to satisfy Rule 9(b). (*See, e.g.*, Doc. No. 1 ¶ 22 ("Aquatic assured Ms. Hinman that the pool had been properly constructed and that any problems with it were either routine small issues that occur with any new construction or were maintenance issues that were her responsibility, rather than construction issues."); *id.* ¶ 24 ("Aquatic represented to Ms. Hinman that the improperly added expansion joint would solve whatever problems existed.").) In fact, the only actual communications by an Aquatic agent that the plaintiff describes with any particularity are (1) statements made to her by Ken Martin during her meeting with him in May

2018 and (2) Martin's November 1, 2018 letter to Brian Chesnut describing that meeting.

Regarding the meeting, the plaintiff alleges that she asked Martin whether any change orders had been entered, since she had not been provided any change orders. At that time, Martin told her that he was not aware of any change orders. Hinman asked him to verify whether Aquatic had authorized any changes, and, presumably in response to that request, Martin later called her to tell her that some change orders had been approved, but he refused to tell her who approved them or what the change orders were for. (Doc. No. 1 ¶ 28.) The plaintiff does not allege that any statement made to her by Martin was affirmatively false or that she relied on any statement.

As for Martin's November 1, 2018 "self-serving exculpatory letter," first, there is no indication that Martin intended for the plaintiff to see or be influenced by the letter. Second, the plaintiff has not identified any affirmatively false statements in the letter. The only possible candidates are: (1) "occasionally pools experience water leaks"; (2) "[m]y observation [of the expansion joint] confirmed to me that there were no visual irregularities [and t]he joint appeared to be in good condition"; and (3) "underwater expansion joints are a 'wear item' and require occasional maintenance and/or replacement of the joint material." (Doc. No. 1-7, at 1–2.) The plaintiff does not assert that any of these statements is false, however, and it is difficult to see how she could. The plaintiff also does not indicate when she received this letter or in what context, and she does not claim that she reasonably relied on any part of it.

In sum, the court finds that the Complaint fails to state a claim for fraudulent misrepresentation, because it does not allege with particularity a false statement of fact by Aquatic upon which the plaintiff relied.

*e)*     *Fraudulent Omission Claim*

The plaintiff also alleges that Aquatic had a duty to inform her of, and breached that duty by concealing or failing to disclose to her, the facts that (1) the contract price was premised on the

"expensive cast-in-place construction" rather than the "much less expensive shotcrete construction"; (2) her problems were not simply maintenance issues for which she bore the responsibility; (3) the pool was leaking "because Defendants failed to install an expansion joint"; and (4) "the expansion joint installed in May 2016 was improperly installed." (Doc. No. 1 ¶ 53.)

As detailed above, the Complaint alleges, regarding omissions specifically, that the plaintiff relied on Aquatic "to ensure compliance with the plans and drawings and to notify her of any deviations and the consequences of any deviations," including the failure to include an expansion joint in the original construction (Doc. No. 1 ¶ 20); that Aquatic misled Hinman as to, or concealed from her, the cause of the pool's leaking by falsely assuring her "that the pool had been properly constructed and that any problems with it were either routine small issues that occur with any new construction or were maintenance issues that were her responsibility, rather than construction issues" (*id.* ¶ 22); in responding to Hinman's warranty claims, Aquatic "failed to disclose [the defendants'] substantial deviations from the Contract documents that caused the problems" (*id.*); Martin refused to disclose to her, when asked, what change orders had been approved or by whom (*id.* ¶ 28); Martin's letter to BrightView "mentioned nothing about [the defendants'] deviations from the Contract documents that have caused the pool's serious problems" and constituted a "further cover-up" of the defendants' misconduct (*id.* ¶ 29; *see also id.* ¶ 30); and the defendants "sought to hide their misconduct from Ms. Hinman to escape responsibility for their actions" (*id.* ¶ 30).

To recover based on a theory of fraudulent *omission*, as opposed to a fraudulent statement, the plaintiff must first show that the defendant had a duty to disclose the concealed fact to the plaintiff and that the plaintiff acted differently than she would have if she had known the concealed fact. The Tennessee Supreme Court has explained that "there can be no duty of fraudulent

concealment absent a duty to disclose." *Saltire*, 491 F.3d at 527 (citing *Patten v. Standard Oil Co. of La.*, 55 S.W.2d 759, 761 (Tenn. 1933)). In *Patten*, the Tennessee court stated:

> The equitable doctrine of fraudulent concealment is based upon the principle of fair dealing. Where there is no dealing between the parties, there can be no concealment. And, even where the parties have had business transactions, it is universally held that mere silence does not constitute fraudulent concealment.
>
> . . . .
>
> There must be a concealment, and the silence must amount to fraud. Concealment in this sense may consist in withholding information asked for, or in making use of some device to mislead, thus involving act and intention. The term generally [implies] also that the person is in some way called upon to make a disclosure. It may be said, therefore, that, in addition to a failure to disclose known facts, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry, or else that there must be a legal or equitable duty resting on the party knowing such facts to disclose them.

55 S.W.2d at 761, *quoted in Saltire*, 491 F.3d at 527–28; *see also Justice*, 955 S.W.2d at 616 ("Courts of this state have ruled that liability for non-disclosure can arise only in cases where the person sought to be held responsible had a duty to disclose the facts at issue.").

In addition to the existence of a duty, although it is obviously not possible to allege the time, place, and content of a statement that was not actually made, Rule 9(b) requires a plaintiff alleging fraudulent omission to plead "'the who, what, when, where, and how' of the alleged omission." *Republic Bank & Tr.*, 683 F.3d at 256. Specifically, a plaintiff pleading a fraudulent omission must allege "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [the defendant] obtained as a consequence of the alleged fraud." *Id.*

Applying these principles here, the court finds, first, that Aquatic had no duty to disclose to the plaintiff that the contract price was premised on the "expensive cast-in-place construction" rather than the "much less expensive shotcrete construction" that she complains about. (Doc. No.

1 ¶ 53.) There are simply no allegations in the Complaint that suggest that Aquatic had any involvement in the contracting process between the plaintiff and BrightView.

With respect to the other alleged omissions, however, the court finds that the plaintiff adequately alleges that Aquatic assumed a duty to disclose to her any material deviations from its plan, to the extent it was aware of such deviations, and, if asked, to disclose to the plaintiff any construction or design defects that were causing the plaintiff's problems, again assuming it was aware of such defects, when it entered into a contract with BrightView for the design of the plaintiff's Project and in undertaking to perform services for the plaintiff's benefit. Nonetheless, even accepting that Aquatic had such a duty, the plaintiff does not allege the "'the who, what, when, where, and how'" of any of the alleged omissions. *Republic Bank & Tr.*, 683 F.3d at 256. Nor does she allege facts that reasonably permit the inference that Aquatic was aware of the alleged material deviations and construction defects. For example, she does not allege that Aquatic agents were on premises during the construction of the pool, that they knew or had reason to know that there were problems with the construction, that they knew that the pool was leaking, or that they knew that the leaks were caused by, first, the absence of an expansion joint and, later, by the inadequate installation of an expansion joint. Most critically, the plaintiff does not identify who with Aquatic made the allegedly false assurances, when, or under what circumstances. Her fraudulent omission claims based on the broad and general assertion that she relied on Aquatic to ensure compliance with the drawings and to notify her of any deviations and that she relied upon repeated false assurances by Aquatic that the pool had been properly constructed and all problems were maintenance issues that were her responsibility are not pleaded with the particularity required by Rule 9(b).

The plaintiff does allege with some particularity that she met with Ken Martin in May 2018

and that he affirmatively refused to disclose to her, when asked, what change orders were made and by whom. He initially told her that he did not know but that Aquatic was allowed to approve change orders, "if the substitutions were of the same value and quantity." (Doc. No. 1 ¶ 28.) She asked him to verify whether Aquatic had authorized any changes. Although he later called to confirm that some had been approved, he refused to tell her by whom or what they were. (*Id.*)

While this particular allegation presents a closer call, the court finds as a matter of law that, accepted as true, it would not establish a fraudulent omission claim. Again, there are no specific factual allegations showing that Martin was aware of substantial deviations from Aquatic's original plans or construction defects. Moreover, the fact that Martin told her he was not telling her what change orders had been approved, or by whom, put the plaintiff on inquiry notice of the possibility of a material non-disclosure. She was not deceived, and she clearly did not rely on his statement. There was no "trick or contrivance intended to exclude suspicion and prevent inquiry." *Patten*, 55 S.W.2d at 761.

Finally, insofar as the plaintiff hangs her hat on Martin's November 2018 letter, the letter is addressed to BrightView's Vice President/Branch Manager, Brian Chesnut. Irrespective of what BrightView did with that letter, there is no indication that *Martin* intended for it to reach the plaintiff. If it can constitute a fraudulent omission, it would have to be attributed to BrightView rather than to Aquatic. In addition, the plaintiff, again, does not allege when or under what circumstances she received this letter, as required by Rule 9.

For these reasons, the court finds that the Complaint fails to state a claim against Aquatic based on fraudulent concealment or omission.

### f) TCPA Claim

In support of her TCPA claim, Hinman asserts that Aquatic engaged in unfair or deceptive acts or practices, in violation of Tenn. Code Ann. § 47-18-104(b)(5) and (b)(7), by "representing

and warranting [and] concealing the fact that the contract was priced on the basis of expensive cast-in-place construction when in fact utilizing much less expensive shotcrete construction; concealing the fact that the pool was leaking because Defendants failed to install an expansion joint in the first instance; and concealing the fact that the expansion joint installed in May 2016 was improperly installed." (Doc. No. 1 ¶ 44(1) & (2).)

Although the scope of the TCPA is broader than that of common-law fraud, *Tucker*, 180 S.W.3d at 115, the court finds that the TCPA claim against Aquatic fails for the same reason as the fraudulent misrepresentation and fraudulent omission claims fail: the Complaint simply does not allege with particularity anything Aquatic did or failed to do that qualifies as an unfair or deceptive act. This claim, too, is subject to dismissal under Rule 9(b).

### 2. Conspiracy

The elements of a cause of action for civil conspiracy under Tennessee common law are: "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance or the conspiracy, and (4) resulting injury." *Kincaid v. S. Trust Bank*, 221 S.W.3d 32, 38, (Tenn. Ct. App. 2006). That is, civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC*, 461 F. Supp. 2d 629, 642 (M.D. Tenn. 2006) (Wiseman, J.) (citation omitted). Because the court has concluded that all of the intentional tort claims asserted against Aquatic are subject to dismissal, there is no underlying predicate tort that it could accomplish by concerted action.

In addition, although conspiracy is not referenced in Rule 9, it is clear under both federal and state law that conspiracy claims must be pleaded "with some degree of specificity" and that "[c]onclusory allegations . . . unsupported by material facts will not be sufficient to state such a claim." *Kincaid*, 221 S.W.3d at 38 (citations omitted); *see also Heyne v. Metro. Nashville Pub.*

*Sch.*, 655 F.3d 556, 563 (6th Cir. 2011) ("[I]t is well-settled that conspiracy claims must be pled with some degree of specificity." (citation omitted)). The conspiracy claim in this case is not pleaded with any degree of specificity. The Complaint repeatedly plugs in the words "acting in concert," but it does not include any actual facts that remotely suggest that Aquatic acted in concert with BrightView to build a defective pool for Hinman and then to conceal proof of the defects.

The conspiracy claim will be dismissed for failure to state a claim for which relief may be granted, under Rule 12(b)(6).

### 3. *Negligence*

Negligence claims are not subject to a heightened pleading standard but to Rule 8's requirement that the pleading set fort a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), as interpreted by the Supreme Court in *Twombly* and *Iqbal*. Thus, to state a claim for negligence under Tennessee law, the Complaint must plead factual content that allows the court to draw the reasonable inference that the defendant owed a duty of care to the plaintiff and engaged in conduct falling below the standard of care amounting to a breach of that duty, thus causing the plaintiff an injury or loss. *See Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005) (enumerating elements of Tennessee negligence claim as also requiring proof of "causation in fact" and "proximate or legal cause"); *Iqbal*, 556 U.S. at 678. Threadbare recitals of the elements of a cause of action do not suffice. *Iqbal*, 556 U.S. at 678. Thus, for example, a conclusory assertion that Aquatic had and breached duty of care, thus causing the plaintiff damages, would not satisfy the pleading standard.

In this case, in addition to the factual allegations in the Complaint set forth in nearly their entirety, above, the plaintiff asserts, within the subsection articulating "Count Seven," that Aquatic, as designer and engineer, owed the plaintiff a duty to construct the pool competently in the manner required by the Contract and that it breached that duty by not designing, engineering,

and constructing the pool in accordance with that duty of care. (Doc. No. 1 ¶¶ 63, 64.) Hinman specifically alleges that Aquatic breached its duty of care by "not using proper waterproofing techniques; by not installing an expansion joint in the first instance; by not properly installing an expansion joint after admitting that the expansion joint had not been originally installed; by not properly grounding electrical equipment; by not properly installing pumps; and by not procuring the proper equipment." (Doc. No. 1 ¶ 64.) She alleges that she has suffered damages resulting from this negligence in the form of the cost of removing and replacing the existing pool with one conforming to the Contract. (Doc. No. 1 ¶ 65.)

In its Motion to Dismiss, Aquatic argues that the plaintiff's allegations concerning negligence are all based on "the construction and installation of the [P]roject, not on the design itself. Creative design was the responsibility of [Aquatic], while provision, implementation, installation, and construction of the Project were the responsibility of [BrightView]," as established by the terms of the Contract attached as an exhibit to the Complaint. (Doc. No. 10, at 11.) It asserts that the plaintiff makes no allegations that the design itself was defective. (*Id.*)

In response, the plaintiff asserts that the Complaint adequately alleges that Aquatic "undertook duties to Ms. Hinman that were far more extensive than 'creative design,' as evidenced both by the Contract documents and the allegations of the Complaint. It owed a duty of reasonable care to her. The Complaint properly alleges that Aquatic breached that duty proximately causing injuries to Ms. Hinman." (Doc. No. 18, at 21.)

The determination of whether a duty exists is a question of law. *Biscan*, 160 S.W.3d at 478. Generally, under Tennessee law, "all persons have a broad duty to exercise reasonable care to avoid causing foreseeable injury to others." *Draper v. Westerfield*, 181 S.W.3d 283, 291 (Tenn. 2005) (citing *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992)). Thus, Aquatic, in

undertaking services related to the construction of the plaintiff's pool, clearly had a duty to exercise reasonable care in that role. In addition, the Complaint adequately alleges that Aquatic had a duty to Hinman arising from Hinman's status as a third-party beneficiary of the contract between Aquatic and BrightView. Moreover, "'[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully.'" *Biscan*, 160 S.W.3d at 482–83 (quoting *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. 2000)). The plaintiff has adequately alleged the existence of a duty.

Regarding breach, the Complaint is not terribly specific about what responsibility Aquatic, as opposed to BrightView, had with regard to the construction of the pool. Most of the alleged defects in the pool and its surroundings, as alleged in the Complaint, appear to be related to purportedly shoddy construction and the use of sub-standard materials. The Contract, which is attached to the Complaint, clearly places the responsibility for construction upon BrightView, while Aquatic, which is not a party to the Contract, was retained by BrightView to provide design and engineering studies. The Complaint does not expressly allege that Aquatic was negligent in the design of the Project, and it is deliberately vague regarding the extent to which Aquatic participated in and advised BrightView in the implementation of Aquatic's plans and the construction of the pool, hardscaping, and landscaping that comprised the Project, perhaps because the plaintiff herself is not fully in possession of the facts regarding the relationship.

Nonetheless, the plaintiff points out that, although she is clearly a third-party beneficiary of the contract between BrightView and Aquatic, which is referenced in her Contract with BrightView, she has never seen or been provided a copy of that side agreement and can only guess at what responsibilities are accorded to Aquatic therein. While not a model of clarity, the assertions that Aquatic was negligent in the design, engineering and construction of the Project at the very

least suggest negligence in Aquatic's oversight of the implementation of its design. At this stage in the proceedings, the Court finds that the Complaint adequately alleges breach of a duty by Aquatic, giving rise to the plaintiff's alleged damages.

### C.     BrightView's Motion to Dismiss

In addition to seeking dismissal of all tort claims based on the statute of limitations, which the court has already addressed, BrightView argues that the Complaint is subject to dismissal because (1) the breach of contract claims are also subject to a three-year statute of limitations and are time-barred as a result; (2) the Contract expressly disclaims any implied warranties; (3) the economic loss doctrine bars all tort claims; (4) if the breach of contract and warranties claims are not dismissed, then "the Court should apply the economic loss doctrine and dismiss all tort claims and damages claims inconsistent therewith" (Doc. No. 24-1, at 7); (5) the fraud allegations in Counts Four and Five, claiming fraudulent inducement, fraudulent misrepresentation, and fraudulent concealment, must be dismissed as insufficiently pleaded under Rule 9(b) of the Federal Rules of Civil Procedure; and (6) ValleyCrest officially changed its name to BrightView and, therefore, is not appropriately identified as a separate defendant.

### 1.     Count One: Breach of Contract

BrightView argues, first, that Tennessee's three-year statute of limitations pertaining to actions dealing with "injuries to real property," Tenn. Code Ann. § 28-3-105, rather than the six-year limitations period generally applicable to contract claims under Tennessee law, Tenn. Code Ann. § 28-3-109(c), governs in this case and that Hinman's breach of contract claim is barred by the three-year statute of limitations.

Section 28-3-105(1) provides that actions "for injuries to personal or real property" "shall be commenced within three (3) years" from accrual of the cause of action. Section 28-3-109(c) provides a six-year limitations period, running from accrual, for "[a]ctions on contracts not

otherwise expressly provided for." The language of § 28-3-105 and several older Tennessee state court decisions have contributed to confusion regarding the determination of which statute of limitation applies in a given case. However, in 2015, the Tennessee Supreme Court largely eliminated that confusion.

In *Benz-Elliott v. Barrett Enterprises, LP*, 456 S.W.3d 140, 141 (Tenn. 2015), the court clarified the "analysis that should be used to determine the applicable statute of limitations when a complaint alleges more than one claim." Specifically, the court held that a court must "identify the gravamen of each *claim*" and not the gravamen of the complaint as a whole. *Id.* (emphasis added). And it held that identification of the gravamen required the court to "first consider the legal basis of the claim and then consider the type of injuries for which damages are sought." *Id.* at 151. It recognized that this type of analysis is "necessarily fact-intensive and requires a careful examination of the allegations of the complaint as to each claim for the types of injuries asserted and damages sought." *Id.*

Thus, for example, in that case, the seller of a piece of property brought suit against the buyer for breach of contract and intentional and negligent misrepresentation arising from the failure to incorporate into the warranty deed a contract provision requiring reservation of a sixty-foot strip of property that would allow the seller to access her other property. After a bench trial, the judge dismissed the misrepresentation claims and awarded damages on the breach of contract claim, based on the diminution of the value of the property owner's remaining property resulting from her lack of access to it. On appeal, the Tennessee Court of Appeals found that the claim was barred by the three-year statute of limitations pertaining to injuries to real property. The Tennessee Supreme Court reversed. Applying the two-step approach referenced above, the court first found that, with respect to her claim for breach of contract, the plaintiff had properly alleged the existence

of an enforceable contract and breach thereof, because she had not received the sixty-foot wide strip of property contemplated by the contract. Second, although the contract related to a conveyance of real property, the court found that the damages the plaintiff sought to recover "resulted from the breach of contract." *Id.* at 152. As the court stated:

> Specific performance . . . is available solely for breach of contract claims. The trial court refused to order it here [and] instead awarded [the plaintiff] money damages for the diminution in value to her remaining property resulting from the lack of the contractually guaranteed access road. This injury is financial only, involving no injury to the real property itself. Although diminution in value damages may be recovered for both tort and contract claims, the diminution in value damages [that the plaintiff] sought to recover flowed directly from her breach of contract claim. Thus, because the legal basis of the claim is breach of contract and the damages sought and awarded are for breach of contract, we conclude that [the plaintiff's] breach of contract claim is governed by the six-year statute of limitations applicable to "[a]ctions on contracts not otherwise expressly provided for."

*Id.* (quoting Tenn. Code Ann. § 28-3-109(a)(3); footnotes and other internal citations omitted).

In the present case, the plaintiff brings several claims in her Complaint, one of which is for breach of contract. Under *Benz-Elliott*, the court must first identify the legal basis for that claim. In support of the claim, the plaintiff alleges the existence of an enforceable contract, a copy of which was filed as an exhibit to her Complaint and substantial portions of which are quoted in the Complaint. She alleges numerous specific ways in which BrightView breached the Contract. (Doc. No. 1 ¶¶ 17(A)–(D), 31(A)–(N).) And she asserts that she suffered damages arising from BrightView's breaches of the agreement. (Doc. No. 1 ¶ 35.) Under Tennessee law, all a plaintiff is required to allege to state a claim for breach of contract is (1) the existence of an enforceable contract, (2) non-performance amounting to breach thereof, and (3) resulting damages. *See, e.g.*, *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). The plaintiff has clearly alleged those elements here.

For damages related specifically to the alleged non-performance amounting to breach of

the Contract, the plaintiff seeks rescission, damages related to the cost of removing the non-conforming pool and replacing it with a "pool conforming to the Contract," liquidated damages resulting from the failure to meet the contractual Date of Substantial Completion, plus other "incidental and consequential damages" arising from the alleged breach of contract. Although the plaintiff also seeks other damages that are not available as remedies for breach of contract, these particular damages clearly arise from, and are related to, the alleged breach of contract. Rescission, when available at all, is only available as a remedy in a breach of contract action. The court concludes that "the legal basis of the claim is breach of contract and the damages sought . . . are for breach of contract." *Benz-Elliott*, 456 S.W.3d at 152. Consequently, the breach of contract claim is governed by the six-year statute of limitations applicable to "[a]ctions on contracts not otherwise expressly provided for." Tenn. Code Ann. § 28-3-109(a)(3). The motion to dismiss the contract claim on the basis that it is barred by the three-year statute of limitations in Tenn. Code Ann. § 28-3-105 will, therefore, be denied.

### 2. *Count Two: Breach of Implied Warranty*

BrightView also seeks dismissal, in part, of Count Two of the Complaint, insofar as it asserts a claim for breach of implied warranty, on the basis that the Contract expressly disclaims any implied warranty. It asserts: "Per Tenn. Code Ann. § 47-2-316(2)(a) [sic, there is no subsection (2)(a)], all the more [sic] a party must do to disclaim an implied warranty of merchantability or implied warranty of fitness for a particular purpose is place the disclaimer in a writing in a 'conspicuous' manner (and it must mention the word 'merchantability')." (Doc. No. 24-1, at 12.) It claims that the disclaimer in question is in all capital letters and, therefore, sufficiently conspicuous and that it unambiguously includes all implied warranties.

The relevant paragraphs of the Contract state as follows:

3.7.1. The Design-Builder [BrightView] warrants that all materials and equipment

furnished under this Agreement will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials. Warranties shall commence on the date of Substantial Completion of the Work. Design-Builder will replace any plant life that dies or is in distress and repair erosion that occurs during the warranty period.

3.7.2. To the extent products, equipment, systems, or materials incorporated in the Work are specified and purchased by the Owner [Hinman], they shall be covered exclusively by the warranty of the manufacturer. There are no warranties which extend beyond the description of the face thereof. To the extent products, equipment, systems, or materials incorporated in the Work are specified by the Owner but purchased by the Design-Builder, the Design-Builder shall assist the Owner in pursuing warranty claims. ALL OTHER WARRANTIES EXPRESS OR IMPLIED INCLUDING THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED.

(Doc. No. 1-2 ¶¶ 3.7.1, 3.7.2.)

The Complaint alleges that the Contract "contained implied warranties of merchantability and fitness for a particular purpose by . . . BrightView on the pool system." (Doc. No. 1 ¶ 41.) It acknowledges the waiver language in Article 3.7.2 but asserts that this language "applied only to 'products, equipment, systems, or materials . . . specified and purchased by [Hinman]," and not to products, equipment, systems or materials purchased by BrightView." (*Id.*) The Complaint asserts that the implied warranty with respect to the latter was breached and that the pool as constructed is neither merchantable nor fit for its intended purpose. (*Id.*)

BrightView seeks dismissal of the claim, arguing that the Contract contains no carve-out for products supplied by BrightView and that the clear and conspicuous language of the Contract waived all implied warranties of merchantability and fitness for a particular purpose. In response, the plaintiff maintains that (1) the waiver language, considered in context, clearly pertains only to the "products, equipment, systems, or materials incorporated in the Work" that were either specified and purchased by Hinman or specified by Hinman but purchased by BrightView; or (2) to the extent there is any ambiguity regarding the waiver, it must be construed against BrightView.

As an initial matter, the court notes that it is unclear whether the UCC applies to this contract at all, *see GenTech Constr., LLC v. Natare Corp.*, No. 1:07-cv-192, 2011 WL 1257943, at *20 (E.D. Tenn. March 31, 2011) (noting, in the context of a pool construction contract, that Tennessee has adopted the predominant factor test to determine if the Tennessee UCC applies to a contract). The parties have not briefed or directly addressed this issue,[4] but the case cited by Hinman, in her response, applies Tennessee common law, which recognizes an implied warranty of good workmanship and materials in the context of contracts for construction. *See Dewberry v. Maddox*, 755 S.W.2d 50, 53–54 (Tenn. Ct. App. 1988).

In *Dewberry*, the court noted generally that an implied warranty, to be valid, must be "in clear and unambiguous language" and the disclaimer must be strictly construed against the seller. *Id.* at 55. In this case, the plaintiff alleges that the waiver of the implied warranty contained in Article 3.7.2 of the Contract only unambiguously applied to those items specifically identified in Article 3.7.2 and did not waive the implied warranties related to the items supplied by the defendant. The court finds at this juncture—specifically, in the context of ruling on a motion to dismiss under Rule 12(b)(6)—that the plaintiff has adequately alleged breach of implied warranties. In the absence of briefing on the questions of whether the UCC even applies and what rules govern the construction of the Contract, insofar as they may depend on whether the UCC applies, the court will deny BrightView's motion to dismiss this claim.

### 3. The Economic Loss Doctrine

Next, BrightView argues that, if the breach of contract and warranties claims are not dismissed, then "the Court should apply the economic loss doctrine and dismiss all tort claims and

---

[4] The plaintiff states in passing, in the context of addressing the defendant's theory of dismissal of many of her claims based on the economic loss doctrine, that the contract here is not governed by the UCC. (Doc. No. 27, at 13.)

damages claims inconsistent therewith." (Doc. No. 24-1, at 7.) The defendant then argues very perfunctorily that the plaintiff's claims for $2,500,000 in "compensatory damages," treble damages under the TCPA, and attorney's fees are "inconsistent with the economic loss doctrine." (*Id.* at 8.) The defendant makes no attempt to parse Tennessee law with respect to which claims exactly are barred by the economic loss doctrine.

In response, the plaintiff argues that the cases cited by BrightView are inapplicable. First, she points out that *Trinity Industries, Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159 (Tenn. Ct. App. 2001), *abrogated on other grounds by Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102 (Tenn. 2016), involved a claim under Article Two of the UCC which, she asserts, is not applicable here. And, even if it were, she argues that the contract in this case "failed of its essential purpose" and "in light of the fraudulent and deceptive conduct of defendants . . . was plainly unconscionable." (Doc. No. 27, at 13–14.) She also argues that the Tennessee Supreme Court's decision in *Lincoln General Insurance Co. v. Detroit Diesel Corp.*, 293 S.W.3d 497 (Tenn. 2009), is inapposite because it applied the economic loss doctrine strictly within the confines of a products liability action. Finally, she argues that this court has previously held that TCPA claims are not barred by the economic loss doctrine. (Doc. No. 27, at 14 (citing *Tungate v. Volvo Trucks of N. Am., LLC*, No. 3:09-0579, 2009 WL 4249200, at *2 (M.D. Tenn. Nov. 24, 2009) (Haynes, J.)).)

In light of the perfunctory briefing by the parties, a lack of clarity regarding whether the economic loss doctrine applies to transactions involving services[5] and whether, indeed, this case

---

[5] *Compare Ham v. Swift Transp. Co.*, 694 F. Supp. 2d 915, 922 (W.D. Tenn. 2010), and *Lott v. Swift Transp. Co.*, Inc., 694 F. Supp. 2d 923, 930 (W.D. Tenn. 2010) (both predicting that the Tennessee Supreme Court would decline to extend the economic loss doctrine to cases involving the provision of services as opposed to goods), *with Ladd Landing, LLC v. Tenn. Valley Auth.*, 874 F. Supp. 2d 727, 732 (E.D. Tenn. 2012) (rejecting the rationale of *Ham* and *Swift* and predicting that the Tennessee Supreme Court would not so limit the application of the economic loss doctrine).

is or is not governed by the UCC, the court declines to dismiss any claims at this juncture based on the economic loss doctrine.

### 4. *The Fraud Claims*

BrightView argues that Counts Four and Five, claiming fraudulent inducement, fraudulent misrepresentation, and fraudulent concealment, must be dismissed as insufficiently pleaded under Rule 9(b) of the Federal Rules of Civil Procedure,[6] because the Complaint does not meet the minimal requirements of setting forth with particularity the "time, place, and content of the alleged misrepresentations" on which the plaintiff relied. Without actually pointing to what factual allegations in the Complaint satisfy Rule 9, the plaintiff simply responds that the "fraudulent scheme conceived and perpetrated by [BrightView] and Aquatic is alleged in detail in the Complaint" and that the allegations are not the "threadbare recitals of the elements of a cause of action" to which *Iqbal* refers, 556 U.S. at 678. (Doc. No. 27, at 21.) She also incorporates by reference her response to Aquatic's motion to dismiss the same fraud claims. (*See id.* (referencing Doc. No. 18, at 16–19).)

Regarding her fraudulent inducement claim, the plaintiff asserts that BrightView advertised and represented to her "that it was a national company with substantial experience and expertise in building complex, 'high-end' pools and aquascapes" and that she contracted with BrightView based on that representation. (Doc. No. 1 ¶ 9.) She does not allege that it was false. The plaintiff asserts that she relied on various representations in the Contract itself that ValleyCrest was the entity she was contracting with and this was a licensed contractor in Tennessee. The plaintiff alleges now that this was false, but she has not alleged that she was actually harmed by

---

[6] Although the TCPA claim is also subject to the heightened pleading standard in Rule 9(b), BrightView does not expressly seek its dismissal on this basis.

the fact that ValleyCrest apparently changed its name to BrightView during the course of its dealings with the plaintiff, as discussed below. She also appears to be complaining that she did not approve the assignment of the Contract by ValleyCrest to BrightView, but it appears that no such assignment occurred and that the parties are identical. Finally, the plaintiff claims that she relied to her detriment and contracted with BrightView based on its representations in the Contract that it was a company of integrity and that the parties would proceed with the Project "on the basis of trust, good faith, and fair dealing." (Doc. No. 1 ¶ 14.) To the extent that BrightView violated these representations, such violations may be part of the plaintiff's breach of contract claims but they do not support a fraudulent inducement claim.

BrightView allegedly represented to the plaintiff, at or prior to the time of contracting, that she needed an ozonator and that it would reduce contamination of the pool and reduce her need for chlorine. She alleges that this representation was false when made, that she relied upon it in contracting, and that it unnecessarily cost her $75,000. (Doc. No. 1 ¶ 25.) The court finds that this claim too is insufficiently pleaded, because the plaintiff does not identify who made the false representation or plead the "time or place of the fraudulent statements" as required by Rule 9(b). *Accord Segrist*, 744 F. App'x at 940 (affirming dismissal of fraudulent inducement claim).

The claims for fraudulent misrepresentation and fraudulent omission fare no better. The only conversation with BrightView alleged with any particularity is the conversation that occurred in November or December 2015, when Hinman received an unusually large water bill that caused her to contact BrightView. BrightView told her that "the pool was leaking and suggested that it needed an expansion joint that had not been installed as required by the Contract." (Doc. No. 1 ¶ 23.) Although the conversation is arguably alleged with adequate particularity, nothing about it suggests fraud.

Next, BrightView allegedly represented to her that the new expansion joint would "solve whatever problems existed." (Doc. No. 1 ¶ 24.) The plaintiff does not allege with any particularity any facts suggesting that BrightView had reason to know that the expansion joint was improperly installed, and the statement that it would solve the plaintiff's problems was clearly aspirational— a communication regarding its hope that the problems would be solved rather than an affirmative statement of present fact. Regardless, the plaintiff does not allege when this statement was made or by whom.

The plaintiff next alleges that BrightView "continually reassured" her that the problems with the pool were "maintenance- and not construction-related, and intentionally misled her as to the cause, severity, and requirements to resolve the problems." (Doc. No. 1 ¶ 27.) She identifies the various problems with the Project as a whole, including multiple cracks in the pool shell as well as problems with the landscaping, the sprinkler system, the vacuum system, the waterfalls and the waterfall pumps, the ozone tank and the ozonator, and the electrical system. (Doc. No. 1 ¶ 26(A)–(I).) The plaintiff does not allege when these problems arose, who exactly reassured her that these problems were maintenance issues, or when any of the assurances were made, except to imply that at least some of them occurred within the warranty period. (*See* Doc. No. 1 ¶ 22 ("Ms. Hinman timely brought these problems to the attention of [BrightView] on repeated occasions as warranty items in accordance with the terms of the Contract.").) The court finds that the allegations that BrightView "continually reassured her" that the pool had been properly constructed, in support of both fraudulent misrepresentation and fraudulent omission claims, are not pleaded with the particularity required by Rule 9(b).

Finally, the plaintiff asserts that Ken Martin's letter to Brian Chesnut, which BrightView gave to her at some point, constitutes yet another "example of a recurring pattern of cover-up and

unfair dealing" by the defendants. (Doc. No. 1 ¶ 30.) Again, however, the plaintiff does not allege when or under what circumstances she received this letter, for purposes of satisfying Rule 9(b) or establishing that she relied upon it to her detriment.

The court finds that the Complaint fails to plead fraudulent misrepresentation or fraudulent omission with the requisite particularity. The motion to dismiss these claims will be granted. The motion to dismiss the fraudulent inducement claim, however, will be denied.

### 5.    *Motion to Dismiss on Behalf of ValleyCrest*

BrightView represents that ValleyCrest officially changed its name to BrightView in February 2016 and that only BrightView is an appropriate defendant in this action. In support of its motion to terminate ValleyCrest as a defendant, it also filed a Business Entity Disclosure in accordance with Fed. R. Civ. P. 7.1 and Local Rule 7.02, to which is attached a Certificate of Amendment of Articles of Incorporation filed with the Secretary of State of California on February 16, 2016, showing that ValleyCrest had changed its name to BrightView. The Certificate of Amendment is signed under penalty of perjury under the laws of California by BrightView's President and Secretary. (Doc. No. 21.)

In response, the plaintiff states: "BrightView began performing services under the Contract in place of ValleyCrest in approximately August 2015, *before* the alleged name change in February 2016. . . . Under these circumstances, ValleyCrest should remain a named party defendant." (Doc. No. 27, at 21.)

In other words, the plaintiff's only basis for opposing the motion is that ValleyCrest began doing business as BrightView, even before it officially registered a name change.[7] That fact does

---

[7] It is not illegal in Tennessee for a corporation to operate under an assumed name. *See* Tenn. Code Ann. § 48-14-101(d); *Kemmons Wilson, Inc. v. Allied Bank of Tex.*, 836 S.W.2d 104, 108–09 (Tenn. Ct. App. 1992).

not alter the apparently indisputable fact that BrightView and ValleyCrest are one and the same entity whose official name is now "BrightView Landscape Development, Inc." (*See* Doc. No. 24-2.) There is no apparent reason to maintain the lawsuit against this defendant under both its former and current names. The court will terminate the claims against defendant ValleyCrest and allow the plaintiff's claims to proceed against BrightView. *See* Fed. R. Civ. P. 21 ("[T]he court may at any time, on just terms, add or drop a party.").

## IV. CONCLUSION

For the reasons forth herein, the court will grant in part and deny in part both Motions to Dismiss. Specifically, the court will dismiss all claims against Aquatic except the negligence claim. The court will dismiss the fraudulent inducement, fraudulent misrepresentation, and fraudulent omission claims against BrightView, but will otherwise deny BrightView's motion.

The dismissal of any claims will be without prejudice to the plaintiff's ability to seek leave to amend her pleading under Rule 15(a)(2).

The court will dismiss without prejudice all claims against defendant ValleyCrest and direct the Clerk to terminate ValleyCrest as a defendant.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge