## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JERE HINMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00551** |
| | ) | **Judge Aleta A. Trauger** |
| **BRIGHTVIEW LANDSCAPE** | ) | |
| **DEVELOPMENT, INC. and AQUATIC** | ) | |
| **DESIGN & ENGINEERING, INC.,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BRIGHTVIEW LANDSCAPE** | ) | |
| **DEVELOPMENT, INC.,** | ) | |
| | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **AMERICAN COMMERCIAL** | ) | |
| **INDUSTRIAL ELECTRIC, LLC and** | ) | |
| **GEORGIA GUNNITE AND POOL** | ) | |
| **COMPANY, INC.** | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendant Aquatic Design & Engineering, Inc. ("ADE"). (Doc. No. 73.) For the reasons set forth herein, the motion will be granted.

## I.    PROCEDURAL HISTORY

This lawsuit arises out of the allegedly negligent design and defective construction of an expensive and elaborate pool, described in the Complaint as an "'aquascape' constructed in a

natural setting with waterfalls and extensive landscaping," at plaintiff Jere Hinson's home in Wilson County, Tennessee (the "project" or "pool"). (Doc. No. 1, at 1.) Hinson filed suit in this court, based on diversity jurisdiction, against defendants BrightView Landscape Development, Inc. ("BrightView") and ADE in July 2019. The Complaint purports to assert claims against BrightView for breach of contract and breach of implied and express warranties. It asserts claims against both BrightView and ADE for fraud under various theories, violation of the Tennessee Consumer Protection Act, conspiracy, and negligence. Both defendants filed Motions to Dismiss. As relevant here, in early 2020, the court granted in part ADE's Motion to Dismiss, dismissing all claims against it *except* a common-law negligence claim. (*See* Doc. Nos. 29, 30.)

In March 2022, well before the October 15, 2022 dispositive motion deadline, ADE filed its Motion for Summary Judgment, seeking judgment in its favor on the plaintiff's negligence claim. Although the plaintiff filed an initial Response in opposition to the motion and initial Response to ADE's Statement of Material Facts (Doc. Nos. 78, 79), her position generally was that she needed to conduct additional discovery in order to fully respond to the defendant's Statement of Undisputed Facts and its arguments in support of summary judgment. In August 2022, following closure of the discovery deadlines and the plaintiff's deadline for expert disclosures, the plaintiff was granted leave to file her Amended Response in Opposition to ADE's Motion for Summary Judgment (Doc. No. 91) and Amended Responses to ADE's Statement of Material Facts (Doc. No. 91-1). The court construes these documents as superseding the plaintiff's initial responses. The plaintiff also filed an Additional Concise Statement of Material Facts in Dispute (Doc. No. 91-2), as contemplated by Local Rule 56(c). ADE has filed a "Rebuttal Argument" in further support of its Motion for Summary Judgment (Doc. No. 94) and a late Response to the plaintiff's Statement of Additional Facts (Doc. No. 100).

## II.    FACTS[1]

Hinman entered into a Contract and Addendum with BrightView in 2015 for the design and construction of the project. (*See* Standard Design-Build Agreement, Doc. No. 73-2; Addendum, Doc. No. 73-3.) ADE was not a party to either the Contract or Addendum. Rather, ADE was the designer for the project, pursuant to a written contract between ADE and Brightview. Hinman did not select ADE; BrightView selected and engaged ADE as the designer for the project. Hinman did not hire ADE to perform any work or undertake any activities on the project. Work on the project began in March 2015 and was substantially completed around October 2015.

Shortly after the project was completed, the pool developed significant problems, including water leakage and problems with the pump system, among others. (Doc. No. 1 ¶ 21.) In November or December 2015, BrightView told Hinman that the pool was leaking because it needed an expansion joint, which was part of the original project design but had not been installed. (Doc. No. 1 ¶ 23.)

According to an exchange of emails from early 2016 between Joe Mallon of BrightView and Ken Martin, ADE's founder and principal, ADE became involved in attempting to assist BrightView in remediating problems that Hinman was experiencing at that time, in particular the visible cracks in the pool shell and apparent leaking. (*See* Doc. No. 91-4, at 350.) ADE never sought or received additional pay in connection with these efforts; according to a May 19, 2018 email to BrightView, Martin instead offered his services "pro bono to foster a team effort attitude." (Doc. No. 91-4, at 617.)

---

[1] The facts for which no citation is provided are drawn from the plaintiff's Amended Response to ADE's Statement of Undisputed Facts (Doc. No. 91-1) and ADE's Response to the plaintiff's Statement of Additional Material Facts (Doc. No. 100). Unless indicated otherwise, the facts are either undisputed or viewed in the light most favorable to the plaintiff.

Martin's January 5, 2016 email summarized the contents of a telephone call between Martin and Mallon earlier that day and confirmed the plan for Martin to travel to Hinman's residence to inspect the pool the following week. (*Id.*) In this email, Martin stated his understanding that BrightView had installed "field formed concrete sumps" instead of the fiberglass sumps specified in ADE's plans, that it had not installed the "pool structure's expansion joint," that he did not know whether hydrostatic relief values had been installed, and that any of these issues might be the cause of leaks. (Doc. No. 91-4, at 350–51.) His expectation was that BrightView's team would inspect the pool before Martin's arrival and spend several days "handling any known issues" and that the purpose of his visit would be to inspect the cracks and the drain sumps, and "make a judgment" about the failure to install the expansion joint. (*Id.*)

On January 14, 2016, Martin emailed Mallon confirming that he had inspected the pool on January 13, that he had made some "preliminary notes and marked the approximate crack locations" and which cracks appeared to be "most troublesome," and that he was preparing some recommendations for patching the cracks. (Doc. No. 91-4, at 349.) In a follow-up email sent just a few minutes later, Martin asked Mallon whether "Xypex" admixture was used in the concrete mixture placed in the pool basin. (Doc. No. 91-4, at 347.) He noted that it would be helpful to "know more about the concrete that was actually installed." (*Id.* at 348.) The most obvious inference to be drawn from this question was that he and his team needed to know what type of concrete mixture was used in order to make recommendations as to what type of patching material they would recommend. Mallon responded that Xypex was not used and that he would provide additional information on the exact specifications for the concrete that was used. (*Id.* at 347.) According to Martin, however, Mallon never did so. (Doc. No. 91-4, at 216.)

On January 25, 2016, Martin emailed Joe Mallon and Brian Chesnut, BrightView's Vice President, a document entitled Hinman Pool Engineering Memo, referred to in the email as the final (as opposed to draft) Hinman Observation Report. (Doc. No. 91-4, at 604.) In this Memo, Martin noted that Hinman had had the pool drained in November or December 2015, at which time she noticed that cracks had developed in the "pool basin structure" and also reported that the pool was "losing/leaking a substantial amount of water." (Doc. No. 91-4, at 605.) Martin had learned from Joe Mallon in early January, just before Martin's January 13, 2016 "observation trip," that the underwater pool expansion joint, as detailed in ADE's plans, had not been installed during the construction of the pool. (*Id.* at 605.) He noted that, during the pool inspection on January 13, 2016, he viewed the pool and recorded the "general location of numerous cracks" that "appeared to be allowing water to exit the pool basin." (*Id.* at 605.) During the inspection, Martin indicated to Mallon and to Hinman that his team would "work on some professional design recommendations to assist in restoring the pool." (*Id.*) The purpose of the Memo was apparently to convey those recommendations. Martin's stated goal was to "re-identify procedures that are recognized within the industry as it relates to the repair of concrete cracks in water-containing structures." (*Id.*) The Memo provided "Conclusions and Recommendations" for filling and repairing the cracks and for the "field-installation of the floor/wall expansion joint retrofit in order to attempt to address the omitted designed underwater expansion joint." (Doc. No. 91-4, at 607.) Martin's 2016 recommendations, which the plaintiff calls ADE's "Additional Plans" (*see* Doc. No. 91-2 ¶ 6), do not address the omission of Xypex or call for any repair protocol to address that omission. Despite having several conversations with Hinman during which she expressed her frustrations with the pool, Martin never discussed the omission of Xypex with her. Martin also

testified that, at the time he made these recommendations, he was not aware of all of the ways in which BrightView's construction of the project deviated from his design. (Doc. No. 91-4, at 193.)

It is now undisputed, for purposes of ADE's motion, that BrightView's construction of the pool deviated from ADE's design in many material respects. Martin agreed during his deposition that, "knowing everything [he] know[s] now," the repairs that he recommended in 2016 had "probably about a 50/50 chance" of being successful in remediating the pool's problems. (Doc. No. 91-4, at 195.) He testified that, at the time, he "had every reason to believe that [BrightView] had followed our drawings," with the exception of the Xypex and the expansion joint, "because that's what Joe Mallon had indicated" to him. (*Id.*; *id.* at 217–18 ("[W]e're dealing with a very, very, very experienced pool construction company. They've been doing pools in Las Vegas, some of the largest pools in the world . . . . We had no reason to believe that they weren't following our drawings.").)

A new expansion joint was installed in May 2016, but, according to the Complaint, it was improperly installed and "did not comply with the Contract requirements." (Doc. No. 1 ¶ 24.) ADE was not involved in the actual installation of the expansion joint.

Two years later, on May 16, 2018, Hinman apparently emailed to Martin directly a photograph of a new crack that "[g]oes all the way across the pool" and requested dates for a meeting. (Doc. No. 91-4, at 615.) Martin forwarded this email to BrightView, noting that he and Hinman had corresponded previously regarding this new problem and that Hinman was "currently waiting for us to inform her when ADE and BrightView would be visiting her pool to review the current cracks." (Doc. No. 91-4, at 614.) He believed that it would be very helpful for BrightView to send someone knowledgeable about the installation of the pool to meet with him and Hinman. He recommended that BrightView "hire a local pool service company to dive the pool and

determine the degree/amount of water loss." (Doc. No. 91-4, at 614.) Martin testified that he wanted someone from BrightView there who was familiar with the construction of the project, because he was beginning to suspect that he did not "know the whole picture." (Doc. No. 91-4, at 222.)

Martin, voluntarily and without payment for his services or expenses, traveled to Hinman's residence to inspect her pool on May 29, 2018. (Martin Dep., Doc. No. 91-4, at 205.[2]) No representative from BrightView was present for that inspection. Martin found that the expansion joint was working as it should at that time. (Doc. No. 91-4, at 268.)

He apparently produced a letter to BrightView stating as much around May 29, 2018 and then, at BrightView's request, reproduced the letter on November 1, 2018. (Doc. No. 91-4, at 274–75; Doc. No. 1-7.) The letter, directed to Brian Chesnut as BrightView's Vice President and Branch Manager, identifies Martin's primary objective in visiting the pool in May 2018 as observing the retrofitted expansion joint, which Hinman believed might be leaking. Martin found the joint to be in good condition and also stated that Paige, Hinman's pool operator who was present during his inspection, did not believe that the pool was currently leaking. (Doc. No. 1-7, at 2.) He noted that "occasionally pools experience water leaks" and stated that he had recommended to Hinman and Paige that they have a local technician perform an underwater inspection of the joint on occasion "to discern possible routine maintenance issues." (Doc. No. 1-7, at 1–2.) He stated that underwater expansion joints are a "wear item" that require occasional maintenance or replacement and pointed

---

[2] Because the transcript provided by the plaintiff does not include the original pagination, the court refers to it by CM/ECF's pagination. The lack of pagination further makes it unclear whether the plaintiff filed Martin's entire deposition transcript or excerpts. The court further notes that filing a 620-page exhibit consisting, without differentiation, of Martin's deposition transcript and numerous exhibits is entirely improper, making it time-consuming and difficult to locate the referenced exhibits.

Chesnut to a portion of the General Notes of ADE's engineering drawings from its original plans noting as much. (*Id.* at 2.)

Martin acknowledged during his deposition that, if he had known as much then as he knows now about BrightView's deviation from ADE's plans, he would have "had a different conversation" and "addressed things a little bit differently." (Doc. No. 91-4, at 212–13.) Regarding BrightView's failure to use Xypex, Martin testified that "[c]oncrete by itself is not waterproof." (Doc. No. 91-4, at 36.) He also stated that, "the longer a pool is in, the more that the concrete continues to cure," but also that concrete without Xypex is "never as waterproofed as it is with Xypex," which is why he always recommends it. (Doc. No. 91-4, at 57; *see id.* at 36–37 ("[W]e feel it's of prime importance that . . . the tank itself, the actual concrete, be waterproofed to help protect the reenforcing steel from potential early corrosion.").) Martin agreed that it was "possible" that, without Xypex, water was leaking just by "migration through the concrete shell without even following a particular crack." (Doc. No. 91-4, at 37; *see id.* at 176–78 (acknowledging that, as a result of BrightView's using "dry-mix shotcrete" rather than using wet-mix cement with Xypex, it was "possible" that Hinman's pool is "just losing water that's weeping through the shell, not tied to any particular crack").) In instances when leaking of that type occurs, remediation is "very difficult" and involves draining the pool and making the interior finish waterproof with some kind of cementitious waterproofing material, which "then prevents water from entering the actual concrete itself." (*Id.* at 37.)

The plaintiff's expert David Chapman prepared a preliminary report dated February 26, 2021. (Doc. No. 73-7.) Since that date, Hinman has also produced Chapman's revised report (Doc. No. 91-8), as well as an expert report by Douglas Cook (Doc. No. 91-7) and a report by Luke Brown, of Pool Leak Services of Mid-TN (Doc. No. 91-9).

BrightView's retained expert, Douglas Ferrell, expressly opined that "ADE's design falls within the standard of care for a PIP structural shell." (Doc. No. 73-8, at 8.)

In his revised report, David Chapman provides an overview of the progression of the project, from the inception of negotiations, through the execution of the Contract and Addendum between Hinman and BrightView, BrightView's engagement of subcontractors, and the construction of the pool. (Doc. No. 91-8, at 2–3.) Chapman does not opine that ADE's design was faulty or fell below the standard of care applicable to pool design. Instead, he notes that BrightView did not follow ADE's design. In particular, his revised report alleges that BrightView deviated from ADE's design by (1) "using a shotcrete type construction method" instead of a "cast-in-place construction method" for the pool and waterfalls; (2) failing to install a structural expansion joint; (3) failing to install "no leak PVC flanges"; (4) not including "Crystalline Waterproofing admixture (Xypex C-500 Admixture)" in the concrete, as a result of which the shell of the pool is "materially more permeable than it would have been had the Xypex been included"; (5) failing to install preformed drain sumps; and (6) failing to install a vapor barrier on the outside of the pool shell. (Doc. No. 91-8, at 7–8.) Chapman also observed that BrightView had substituted an inferior product rather than following ADE's recommendation that it use an "Emseal Joint Sealant System" when it retrofitted the expansion joint. (*Id.* at 6.)

Chapman also stated in his final report that Xypex "has been shown to materially reduce the permeability of concrete" and that the failure to include it "may be contributing to leaks in the pool shell." (Doc. No. 91-8, at 7, 8.) He states that the "design waterproofing characteristics of the pool can be partially retrofitted" by removing the pool's plaster finish and replacing it with products containing Xypex, at an estimated cost of over $180,000. (*Id.* at 8.) Chapman's final

report, however, opines that the pool is leaking around the expansion joint. (*Id.* at 10.) He does not appear to opine that water is leaking by migrating through the concrete pool basin.

Cook's "Assessment" purports to compare the pool as designed by ADE to the pool as actually constructed by BrightView. (*See* Doc. No. 91-7, at 2 ("Assessment of Swimming Pool & Water Feature Construction: ADE Designed and Specified Vs. As Built by VC (BrightView)").) Among other things, he opines that the "size of the swimming pool and mechanical equipment was equal to the size and scope of a commercial swimming pool or pond" and that its operation and maintenance "would require the skills of [a] commercial swimming pool service technician." (*Id.* at 3.) He also opined that, although "beautiful," the placement of "long elevated concrete basins and concrete channels in lush landscape" and having "water 'flush' the naturally accumulating debris from the beautiful, designed landscape surrounding these water features back into the pool is a design flaw." (*Id.* at 4.) He does not state that this design flaw is contributing to the pool's leaking problem. He does state that the "finish concrete" on the waterfall features is deteriorating and missing pieces and that the problem is attributable either to a "**design oversight** and or material used were **not appropriate** for this application." (*Id.* (emphasis in original).)

Luke Brown, for Pool Leak Services of Mid-Tn, offered his opinion as to the cause of continued leaks. He found that there were multiple leaks along the retrofitted expansion joint and that the "material used for the expansion joint is failing." (Doc. No. 91-9, at 1.)

## III. STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## IV. DISCUSSION

ADE moves for summary judgment on the negligence claim against it on the grounds that it was hired to provide design services for the project, not to construct it, and that the plaintiff's preliminary expert report from David Chapman does not opine that ADE's design has anything to do with the problems the plaintiff's pool is continuing to experience. Chapman, instead, focuses on all the ways in which BrightView failed to adhere to ADE's design specifications. As a result, ADE argues, Hinman cannot show that ADE deviated from the standard of care or that any such deviation caused Hinman's damages. (Doc. No. 74, at 5.)

The plaintiff responded initially that she needed additional discovery to respond to ADE's motion. Now having conducted that additional discovery, she argues that ADE's involvement occurred over three different phases of the project: the December 2014 plans; the January 2016 inspection and provision of "Additional Plans"; and the May 2018 inspection that yielded the 2018 Letter to BrightView. With respect to the first of these phases, Hinman argues that there is a material factual dispute as to whether ADE was negligent in the preparation of the original design by providing a design for a pool that is "too complicated to maintain and therefore not appropriate for a home (as opposed to commercial) owner in rural Wilson County" (Doc. No. 91, at 10), referencing Cook's report, which states that Hinman's pool is equivalent in size and complexity to a commercial pool (*see* Doc. No. 91-7, at 3.) In addition, she claims that Cook's opinion creates a material factual dispute as to whether the water features were negligently designed.

Regarding the "Additional Plans," Hinman argues that, even if ADE's original design was not defective, ADE voluntarily became involved in providing a corrective "design" that negligently failed to consider all of the then-existing problems with the pool and that such voluntary undertaking to provide additional design services gave rise to a duty to the plaintiff to provide such services in a non-negligent manner. She also maintains that expert testimony is not required to establish ADE's negligence at this juncture, because it is obvious to a layperson and, further, can be established by Martin's own testimony. She also argues that Martin's failure to inform Hinman about BrightView's omission of Xypex from the concrete forming the pool basis constitutes a negligent misrepresentation or a fraudulent omission. She asserts, with no analysis of their elements, that she should be given leave to amend her Complaint to plead or re-plead these claims.

Finally, she maintains that Martin voluntarily involved himself in the project (and its failures) again in May 2018, when he visited Hinman's pool, inspected the expansion joint, and issued a letter downplaying the problems. She claims that the effect of the letter was to further "frustrate and hinder Ms. Hinman's efforts to learn the problems with her pool and to have the pool repaired." (Doc. No. 91, at 14.)

ADE filed a "Rebuttal" to the plaintiff's Amended Response, in which it argues that (1) expert testimony is required to establish that ADE deviated from the standard of care applicable to the provision of professional engineering and aquatic design services; (2) Cook is not qualified as an engineer and his report is conclusory, unsupported by any factual basis, and, in any event, irrelevant to the plaintiff's actual claims against ADE; (3) following submission of its original plans to BrightView, ADE had no further contractual obligation to BrightView and, further, no control, authority, or supervisory capacity over BrightView's implementation of any of its plans or recommendations, and Hinman's characterization of the January 2016 "Observation Report" as "Additional Plans" is inaccurate and unsupported by the record; (4) Martin had no duty to communicate with Hinman about BrightView's failure to use Xypex, and his failure to do so did not give rise to an independent tort that has never been pleaded in this action; and (5) even if she were permitted to amend her pleading, the plaintiff cannot establish a *prima facie* claim of negligent misrepresentation or fraud.

### A.    Legal Standard - Negligence

The elements of a claim for negligence, "basically defined as the failure to exercise reasonable care," are: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). "[T]he question of

whether a defendant owes a duty of care to the plaintiff is a question of law to be determined by the courts." *Id.* (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)). Further, it is well established under Tennessee law that "[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully." *Marr v. Montgomery Elevator Co.*, 922 S.W.2d 526, 529 (Tenn. Ct. App. 1995) (citations omitted).

###### B.      Alleged Negligence in the Original Design

Contrary to the plaintiff's assertion, Cook does not opine that the project was "too complicated to maintain and therefore not appropriate for a home (as opposed to commercial) owner in rural Wilson County." (Doc. No. 91, at 10.) Although Cook indeed states that Hinman's pool is equivalent in size and complexity to a commercial pool (*see* Doc. No. 91-7, at 3), he does not state that this is a design flaw. Indeed, it is obviously a design feature of which the plaintiff, who paid close to $1 million for the installation of this pool, had to have been well aware even before installation began. Nothing in the record suggests that ADE somehow deviated from the requisite standard of care by providing, in accordance with the plaintiff's apparent desires, design plans for an elaborate, expensive installation.

Cook states that the placement of "long elevated concrete basins and concrete channels in lush landscape" was a design flaw, because it allowed the moving water to "flush" debris into the pool. He continues: "This construction of the connecting overflow basis and the descending 3'wide concrete channel/s were not designed or constructed well for use in a swimming pool." (Doc. No. 81-7, at 4.) Even if this is true, the Complaint does not mention this flaw or attribute any damages to the shape of the channels and pools that make up the water feature.

The plaintiff points to one other statement by Cook: that the "waterfalls are deteriorating and are now missing pieces." (Doc. No. 91, at 11 (citing Doc. No. 91-7, at 4.) This statement essentially mirrors a statement in the Complaint: "The waterfalls do not contain rebar and are

breaking apart." (Doc. No. 1 ¶ 26(D).) The court presumes the truth of the statement that the waterfalls are deteriorating. However, even assuming for purposes of the Motion for Summary Judgment that Cook is qualified to reach an opinion about flaws in the design of the waterfalls, which ADE disputes, this statement, accepted at face value, does not establish that a flaw in the *design*—as opposed to the construction or the choice of materials or simple wear and tear—is causing the waterfalls to deteriorate. The plaintiff has the burden of proving ADE's negligence, and Cook's statement does not establish a link between ADE's design and the deterioration of the waterfalls, much less that the design fell below the applicable standard of care.

ADE, therefore, is entitled to summary judgment on the plaintiff's negligence claim, insofar as it is premised upon Cook's report and purported flaws in the original 2014 design of the project's water features.

### C.     Alleged Negligence in Connection with the 2016 Repairs

The plaintiff's position regarding ADE's involvement in the 2016 repairs is, essentially, that Martin voluntarily inserted himself and ADE into the remediation process and that, by doing so, he undertook an obligation to make sure he detected every flaw in the construction and to propose a method to repair or correct BrightView's errors. There is no evidence, however, that Martin undertook such a burden. It appears that he was asked to inspect the cracks, to propose a patch for the cracks, and to present a proposal for retrofitting the omitted expansion joint specified in his design plans. In the course of addressing these issues, he inquired as to what concrete material was used. He never received a complete answer to that question, other than to learn that Xypex was *not* used by BrightView's subcontractor.

The plaintiff faults ADE for not digging further: Martin knew of two errors and therefore, she claims, should have undertaken to ascertain whether there were more. But Martin explained that BrightView was a large, sophisticated pool company that regularly undertook complex

projects and that he had no reason to believe that it had deviated in other material respects from ADE's design. The court finds as a matter of law that Martin did not incur a duty beyond what he was asked to do and voluntarily agreed to do: make recommendations for patching existing cracks and for retrofitting the expansion joint. The plaintiff has not presented any evidence that ADE breached a duty of care in providing recommendations to BrightView regarding those two issues.

The plaintiff has not shown that ADE, through Martin, voluntarily expanded its obligations to the plaintiff to act with due care beyond that scope. Specifically, ADE did not undertake to investigate all the ways in which BrightView might have deviated from ADE's original plans. Because the plaintiff cannot show that ADE had a duty to conduct further investigation, she cannot establish negligence in association with a failure to do so. Because she has not presented any evidence of negligence in ADE's performance of the additional work it did undertake, insofar as the plaintiff's negligence claim is premised upon ADE's involvement in the inspection and repairs conducted in 2016, the claim is subject to summary judgment.

### D. The 2018 Inspection and Letter

The plaintiff does not adequately explain her theory of "negligence" with respect to Martin's visit in May 2018, when he inspected the expansion joint and found that it seemed to be holding up well. At that point, he suspected that Chesnut, at BrightView, was ready to "wash his hands" of the project. (Martin Dep., Doc. No. 91-4, at 223.) However, as in 2016, Martin did not undertake to perform a comprehensive diagnosis of the pool's problems, and he did not incur a duty to perform a detailed inspection of the pool or to verify all the ways in which BrightView might have failed to follow ADE's design plans. According to his letter to BrightView, Paige, employed as Hinman's pool operator, told him she did not think the pool was leaking. As a result, it is unclear that Martin had any reason to believe that the pool was actually still experiencing significant problems.

The court finds as a matter of law that Martin did not incur some new duty to ascertain whether the pool was, in fact, experiencing significant problems or to deduce the cause of such problems. Even if he had, the plaintiff does not explain how she was damaged by any purported negligence by ADE at this juncture, separate and apart from the actual damage caused by the (allegedly) negligent construction of the pool.

The plaintiff, in other words, has not shown the existence of a duty on the part of ADE to do more than it actually did, breach of any duty, or damages resulting from any such purported breach, in connection with Martin's 2018 inspection of the expansion joint.

### E.    Negligent Misrepresentation

Regarding the Xypex issue, the plaintiff seeks to insert a new cause of action, one not encompassed in the Complaint, for negligent misrepresentation. Tennessee courts have adopted the definition of such claims set forth in the Restatement (Second) of Torts § 552 (1977). *John Martin Co., Inc. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991). Liability for this tort is limited to persons "'who, in the course of [their] business, profession or employment, or in any other transaction in which [they have] a pecuniary interest, [supply] *false information* for the guidance of others in their business transactions.'" *Id.* (quoting Restatement (Second) of Torts § 552(1)). To recover on a claim for negligent misrepresentation, a plaintiff must prove that "(1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relied on the information." *Staggs v. Sells*, 86 S.W.3d 219, 223 (Tenn. Ct. App. 2001) (quoting *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn. Ct. App. 1991)).

Aside from whether the other elements of this claim are met, Martin's failure to disclose to Hinman that BrightView had not used Xypex involved an alleged omission, not an affirmative misrepresentation. Section 552 "by its own terms requires an affirmative misstatement, not just a

non-disclosure." *Grogan v. Uggla*, 535 S.W.3d 864, 870 (Tenn. 2017) (referencing the similar provision in Restatement (Second) of Torts § 311, governing "negligent misrepresentation involving risk of physical harm")). The plaintiff, therefore, could not support a negligent misrepresentation claim against ADE, even if she were permitted to amend her pleading.

### F.     Fraud

Finally, insofar as Hinman argues that she should be permitted to amend her Complaint to reinstate a fraudulent misrepresentation or fraudulent omission claim premised upon either the Xypex issue or the 2018 letter, the court finds that a motion to amend for this purpose would also be futile.

For purposes of a fraudulent misrepresentation claim in association with the letter, the plaintiff has not shown that the letter actually contains a false statement of fact. *See Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012) (listing elements of fraudulent omission claim under Tennessee law). Nor has she shown, in connection with the letter, that Martin "concealed or suppressed a material fact" that he had a "duty to disclose" to the plaintiff, for purposes of a fraudulent omission claim. *See Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 527 (6th Cir. 2007) (citing *Justice v. Anderson Cty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997)).

Regarding the Xypex issue, the court finds that ADE did not have a duty to disclose to Hinman that BrightView had not used Xypex in the concrete. Even if it did, the plaintiff has no evidence that Martin intentionally concealed that fact with an intent to deceive Hinman. *See Hodge*, 382 S.W.3d at 343. He apparently presumed that BrightView had used other means to ensure that the concrete was impermeable. (*See* Martin Dep., Doc. No. 91-4, at 249 (noting that there are other products besides Xypex on the market).) Moreover, his focus at the time was on

the presence of actual cracks and the absence of the expansion joint, both of which more readily explained the leakage the pool was experiencing at the time.

The court, therefore, would not be inclined to entertain a motion to amend the Complaint to assert such claims.

## V.    CONCLUSION

For the reasons set forth herein, the court will grant ADE's Motion for Summary Judgment. There are no material factual disputes, and the plaintiff has not established negligence on the part of ADE.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge