# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JERE HINMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00551** |
| | ) | **Judge Aleta A. Trauger** |
| **BRIGHTVIEW LANDSCAPE DEVELOPMENT,** | ) | |
| **INC.; and AQUATIC DESIGN &** | ) | **JURY DEMAND** |
| **ENGINEERING, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

## PLAINTIFF JERE HINMAN'S RESPONSE IN OPPOSITION TO BRIGHTVIEW'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Jere Hinman, pursuant to Fed. R. Civ. P. 56, hereby responds to the Motion for Summary Judgment filed by Defendant Brightview Landscape Development, Inc. ("Brightview"). Ms. Hinman respectfully contends that there are genuine issues of material fact and that Brightview's Motion for Summary Judgment should be denied for the reasons set forth herein.[1] Specifically, Ms. Hinman paid Brightview[2] more than sixty thousand dollars ($60,000) for the creation of very specific plans for her backyard swimming pool and water features. Subsequently, she paid Brightview more than eight hundred thousand dollars ($800,000) to build the pool depicted in those plans. Unbeknownst to her until approximately 2019, Brightview did not build the pool depicted in the plans, nor did it ever intend to.

---

[1] Responses to Brightview's Statement of Undisputed Material Facts ("SUMF") and a Statement of Additional Facts in Dispute ("SAFD") are filed herewith and incorporated.

[2] The relationship between Brightview and Valleycrest was addressed via prior Order (Doc. No. 29, pp. 37-38), and references herein will simply be to Brightview.

## STATEMENT OF FACTS

### A.     Ms. Hinman Hired Brightview to *create plans for* a pool project.

Ms. Hinman hired Brightview to design and build a high end swimming pool for her personal use at her home in Wilson County, Tennessee. She paid Brightview $60,100 just to design the pool. (SAFD 12). Brightview hired Aquatic Design & Engineering, Inc. ("ADE"), a Florida firm that designs pools for the likes of Disneyworld, to design the pool. (SAFD 2-3). On August 24, 2014, Ms. Hinman and Brightview signed a Design Agreement. (SAFD 1). On September 9, 2014, representatives of Brightview and ADE met at Ms. Hinman's home to discuss the Project. (SAFD 5). ADE hired a local geotechnical engineer to perform a "subsurface investigation" to "furnish the design team with recommendations concerning the geotechnical aspects of design and construction." (SAFD 7). Over the next four months, ADE created detailed plans for the Project. (SAFD 6). ADE's final plans were dated December 23, 2014 and consisted of detailed engineering drawings that specifically referenced and incorporated one hundred forty-seven (147) pages of technical specifications that ADE prepared (collectively, these plans and specifications will be referred to as the "Plans"). (SAFD 8-9). The specifications are specifically referenced on page 3 of the Plans (Doc 1-2, page ID 66) and Brightview considered the specifications to be an "*important part* of the plans." (SAFD 10-11, emphasis added.) Brightview had worked with ADE before, and it was typical for ADE to provide specifications along with the drawn plans. (*See* Mallon Depo. p. 69:22-25).

### B.     Brightview contracted to build a pool as per the Plans.

After the Plans were created, Brightview submitted a Proposal dated January 16, 2015, wherein Brightview offered to build the pool for eight hundred twenty-seven thousand five hundred dollars ($827,500), stating "Our pricing *is based on the ADE*

drawings dated December 23, 2014 [i.e., the Plans]" and concluding with "Total price to construct per ADE drawings dated December 23, 2014 ● $827,500.00." (SAFD 13, emphasis added.). Thereafter the parties entered the Contract for Brightview to build the Project as per the Plans. (SAFD 14). The Contract specifically referenced and attached the Plans (and the Plans specifically incorporated the technical specifications). (SAFD 9, 15). Brightview concedes that the Contract incorporated the Plans (Mallon Depo. p. 25:9-11), that the Plans were "quite detailed" (Mallon Depo. p. 24:12-13), that Brightview believed that the Plans were "good plans." (Mallon Depo. p. 24:22-25:15).

The Contract provides that Brightview was to substantially complete the Project within fourteen (14) weeks of construction or pay damages of two hundred fifty dollars ($250) per day for each additional day, and to complete all work within ten (10) days thereafter or to pay damages of two hundred fifty dollars ($250) per day until completion. (Doc. 1-5, p. 2 and Doc. 1-2, Articles 6.2.1; 6.4.1.1; 6.2.3; and 6.4.2). The Contract also provides that Brightview was required to give notice if it deviated from the Plans (SAFD 27) and that Brightview was required to provide Ms. Hinman with a set of "as-built" drawings at the conclusion of the Project to show her, in writing, "how the various elements of the Work including changes *were actually constructed or installed*." (SAFD 30-31, emphasis added.). Thus, as of March 2015, Brightview had contracted to build the project as per the Plans. Unbeknownst to Ms. Hinman, Brightview never intended to build the Project as per the Plans, as she would find out only later.

**C.    Brightview was late in delivering the Project.**

Work on the Project began on or around March 23, 2015. (Hinman Depo. p. 56:1-5). Per the Contract, the Project was supposed to be substantially completed within fourteen weeks thereafter, or June 29, 2015. However, the Project was initially "turned

3

over" to Ms. Hinman no earlier than September 13, 2022. (SUMF Response 4), which is seventy-six days past the Substantial Completion Date. While Ms. Hinman disputes receiving any as-built drawings, Brightview alleges that it provided a set (the "As-Builts"). (SAFD 47-49, Hinman Depo. p. 111:24-112:8). The As-Builts Brightview alleges it provided did not reference any deviations from the Plans in the construction of the pool shell and depicted the placement of an expansion joint. (SAFD 47-49).

### D. Problems arose.

Certain problems arose after Brightview left in September 2015, from equipment leaking to the pool overflowing. (Mallon Depo. p. 106:15-20; *see also* Mallon Depo. Ex. 56). On November 27, 2015, Ms. Hinman notified Brightview via email that the pool had a crack and was losing water, resulting in excessive water bills. (Mallon Depo. Ex. 38). In January 2016, Ken Martin and Brightview visited the pool (Martin Depo. p. 182:2-10) and ADE learned that Brightview had failed to install the required expansion joint (Martin Depo. p. 19:13-19). According to Brightview, an expansion joint was an important part of the Plans, but someone made a mistake, and it was not installed.[3] (Mallon Depo. p. 27:1-13). In a January 15, 2016 email, Mr. Martin wrote to Brightview, recommending the installation of the expansion joint because "the existing pool shell is most assuredly under a great deal of stress as we speak. Hence, it is likely that additional unforecastable issues will develop unless the joint is installed." (Martin Depo. Ex. 25). Subsequently, Brightview installed the expansion joint in the Spring of 2016. (Chesnut Depo. p. 97:20-25, Martin Depo. Ex. 29).

---

[3]     ADE required the installation of an expansion joint based, in part, on Terranova's findings (Martin Depo. p. 29:6-20), the site conditions, and the size of the pool (Martin Depo. p. 29:21-25; p. 26:13-24; and p. 31:1-10).

4

### E.    Ms. Hinman experienced ongoing problems with the pool.

Ms. Hinman continued to experience problems with the pool after the installation of the expansion joint.  (See Mallon Depo, Ex. 56.)  According to Joe Mallon, "[Ms. Hinman] could not find anybody... it became quite evident that nobody could maintain the pool correctly, and it just... kept leading to problem after problem after problem." (Mallon Depo. p. 106:21-107:6). Mr. Mallon believed the pool "was too much for just about everyone that tried [to maintain it]." (Mallon Depo. p. 109:14-15). Brightview admits that the Project "was not a residential application," (Mallon Depo. p. 40:23-41:2) even though Brightview's Operations Manual touts that it only requires normal routine maintenance (Mallon Depo. p. 80:11-82:17).  Ms. Hinman and Brightview's Scott Gross called several pool companies about maintaining the pool but couldn't find anyone. (Hinman Depo. p. 93:11-94:1). In the fall of 2016, Mr. Mallon informed Ms. Hinman on numerous occasions that he was looking for someone to maintain the pool. (Mallon Depo. Ex. 50, 56). Between July 2016 and October 2018, Brightview serviced the pool numerous times (Mallon Depo. Ex. 56, Stauffer Depo. p. 29:7-17).

### F.    Ms. Hinman demanded that Brightview fix the problems.

On May 16, 2018, Ms. Hinman notified Mr. Martin about a crack in the pool (Martin Depo. Ex. 33). Mr. Martin asked Brightview to send someone to meet him at the Project, and asked Brightview for information about how the pool was built as "we now know that evidently there was something going on in the pool that was causing cracks." (Martin depo. p. 222:14-25). At that time, Mr. Martin "had not seen any photos whatsoever," and he "was starting to suspect at this point that – *do I know the whole picture?*" (Martin Depo. p. 222:2-25.  Emphasis added.).  Despite his, Brightview never sent anyone to meet him. (Martin Depo. p. 223:1-5). Mr. Martin suspected that Brightview

was, "trying to wash [its] hands of [the pool project]." (Martin Depo. p. 221:23-222:1). Despite these facts, Brightview and did not tell Ms. Hinman about any of the Deviations (SAFD 42) and ultimately wrote to her in December 2018 that the warranty period was expired. (Mallon Depo. Ex. 56). In a March 14, 2019 email to Brightview, Ms. Hinman's representative asked Brightview remedy the pool defects. (Mallon Depo. Ex. 56; *see also* Hinman Depo. p. 176:22-177:13 (referring to Ms. Nicholson's email)). Brightview never responded.

### G.    Ms. Hinman learned that Brightview did not follow the Plans, that it never intended to, and that it concealed this fact from her.

In 2019 Ms. Hinman obtained counsel and began the investigation that led to the filing of this lawsuit. (Chapman Depo. p. 5:22-6:1). Subsequently, Ms. Hinman has learned that Brightview, in addition to failing to install the expansion joint and other issues, intentionally deviated from the Plans by: (1) failing to install Xypex; (2) using shotcrete rather than cast-in-place concrete; (3) failing to install no-leak PVC flanges; (4) failing to install preformed, fiberglass sumps; (5) failing to install a vapor barrier; and (6) failing to construct a footing or overpour behind the vertical walls and reinforce them with backfill (these six items will be collectively referred to as the "Deviations"). (Doc. 1, (Martin Depo. p. 74:12-18; 38:1-12; Mallon Depo. p. 32:1-5; Martin Depo. Ex. 5). Ms. Hinman was only able to discover the Deviations in 2019 and did not discover the full extent of the Deviations (e.g., the failure to install Xypex) until after taking discovery. (*See* Hinman Depo. p. 72: 3-13; Martin Depo. p. 74:12-18; 38:1-12; Mallon Depo. p. 32:1-5; Plaintiff's 2nd Supplemental Responses to Brightview's Interrogatories). It is now clear that Brightview *never* intended to follow the Plans, a fact that that Brightview concealed from Ms. Hinman. Specifically:

1. Before the Contract was signed, Brightview already had a quote in hand from Georgia Gunite and Pool Company, Inc. ("Georgia Gunite") to install a pool consistent with the Deviations. (SAFD 44). Brightview always "intended on doing shotcrete" (SAFD 44), and Brightview did not ask Georgia Gunite to install the features depicted in the Plans. (SAFD 44). Although Brightview ultimately filed a Third-Party Complaint against Georgia Gunite, Brightview admitted that Georgia Gunite followed the instructions that Brightview gave it. (Mallon Depo. p. 43:22-44:4).

2. Brightview admits that the Plans called for Xypex but that it chose not to install Xypex. (SAFD 33). Brightview takes the position that "all concrete pools leak." (Mallon Depo. p. 67:2-3). Brightview admits that it did not install any other type of crystalline water-proofing additive to the contract (Mallon Depo. p. 60:2-9). Brightview admits that the Plans called, and that it chose not to install, preformed sumps (SAFD 36), "no-leak PVC flanges" (SAFD 35), a vapor barrier (SAFD 37) a footer or extension of the floor behind the vertical walls (Mallon Depo. p. 30:6-32:17), cast-in-place concrete (SAFD 34), or various other features described in the Plans, such as a key stop and a waterstops in the vertical walls (Mallon Depo. p. 36:10-23).

3. Brightview misrepresented the portion of the Addendum discussing changes to the design plans. Specifically, after spending four (4) months on the Plans, when Ms. Hinman went to sign the Contract, which incorporated the Plans, Brightview pressured her to sign the Addendum. When she asked about the wording of the Addendum, Brightview representative Mr. Chesnut told her that the purpose of the Addendum was to make "simplistic" changes and Brightview didn't want to have to run it by her if it wanted to make a minor change. (Hinman Depo. p. 61:17-20). Mr. Chestnut told Ms. Hinman that the Addendum related to changes that would arise "in the field."

7

(SAFD 67-70). However, at the time the Addendum was presented to Ms. Hinman on February 26, 2015 (Chesnut Depo. Ex. 14) and prior to executing the Agreement, Brightview *already knew* that it was not going to follow ADE's plans (as evidenced by described above). In other words, Brightview attempted to use the Addendum to cover deviations that *it already planned on making*, rather than on addressing future, minor changes *that might be called for based on conditions "in the field."*

4.     Brightview never told Ms. Hinman about any of the Deviations or documented its changes via change orders. (SAFD 42). Brightview never told Ms. Hinman that it had not installed Xypex into the pool shell. (SAFD 45).

5.     Furthermore, during construction, Brightview never told ADE about any of the Deviations. (Mallon Depo. p. 35:8-10; 75:14-23, 50:4-5). Although the $60,100 paid by Ms. Hinman included 3 site visits by ADE during the construction process, Brightview never utilized ADE's site visits. (SAFD 41). Brightview never sought or obtained ADE's, or any other engineer's, approval for the Deviations (SAFD 40), even though the Plans stated that no substitution or deviation should be made without ADE's approval and even though the Plans contemplated ADE's involvement at various times (see Mallon Depo. p. 55:24-58:10, 61:4-12). Brightview never told ADE it was going to do a shotcrete installation with no Xypex (see Mallon Depo. p. 75:11-76:1). When ADE discovered that no Xypex had been used in January 2016 and asked Brightview for the mix tickets, Brightview did not provide them. (See Mallon Depo. p. 44:19-45:18, Ex. 5). Indeed, ADE only discovered many of Brightview's deviations after this lawsuit was filed, and ADE was "incredulous," "surprised," and "dismayed" that Brightview made the Deviations without consulting or notifying ADE. (SAFD 52).

6. Brightview never gave Ms. Hinman a proper instruction manual. In September 2015, Brightview delivered to Ms. Hinman a 315-page Operation Manual. (Mallon Depo. Ex. 13). However, there is no section that applies to the operation and maintenance of the expansion joint. No one instructed Ms. Hinman on how to maintain the expansion joint after it was put in. (Hinman Depo. p. 207:7-208:2; 208:20-21).

7. Brightview was obligated by the Contract and the Addendum to provide detailed as-builts to Ms. Hinman. (SAFD 30-31). The Plans specified that the as-builts would reflect all as-installed deviations in red ink. (SAFD 31). However, Brightview never complied with these requirements. (SAFD 46-49). Brightview's own testimony is that the As-Builts it delivered to Ms. Hinman did not reflect the Deviations, and, in fact, even showed that an expansion joint had been installed. (SAFD 46-49). Significantly, during this litigation, Brightview assembled, years after the fact, *a new set* of as-built drawings, which it delivered during discovery. (SAFD 50-51). Brightview admitted that these drawings were made after the lawsuit was filed. (SAFD 51). Brightview's expert, Douglas Ferrell, actually assisted Brightview in preparing these after-the-fact drawings (SAFD 51).

### G. The product delivered by Brightview is not the product that Ms. Hinman bargained for.

Ms. Hinman's pool is overly complicated, is not workable for a consumer application in rural Wilson County, and has had numerous maintenance and equipment issues. As Brightview's representative testified, "it became quite evident that nobody could maintain the pool correctly, and it just… kept leading to problem after problem after problem." (Mallon Depo. p. 106:21-107:6). The pool "was too much for just about everyone that tried [to maintain it]." (Mallon Depo. p. 109:14-15; *see also* Doug Cook Depo. p. 181:17-182:13). In addition, certain aspects of the Project were not performed

9

correctly, such as the failure to properly install the concrete over the waterfalls[4] and the failure to install the expansion joint. *Most importantly*, though, there are the significant Deviations that Brightview concealed. Certain of these issues obviously cannot be remedied without removing the entire pool, while others, such as the retroactive installation of Xypex, can be addressed, although at great expense.[5] In other words, Ms. Hinman did not receive the pool for which she bargained. She received a pool that is too complicated to maintain, that cracks, that leaks,[6] and that has concrete breaking apart over the water features. (SAFD 56). Because of the Deviations, she received a pool that was constructed without the high-end features designated by ADE in the Plans.

## STANDARD OF REVIEW

"The central issue on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. City of Memphis*, 928 F.3d 481, 487 (6th Cir. 2019) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute

---

[4]     Brightview's expert and Ms. Hinman's expert agree that the concrete over the waterfalls was incorrectly applied and needs to be redone. (Ferrell Depo. p. 126:21- 127:5, p. 127:12-15, 127:19-128:1, 128:18-25, 130:23-131:12; Ex. 8; *see also* Hinman Depo. p. 157:13-15); Cook Depo. p. 112:25-113:10 and Cook Report (Doc. 89-8), videos (Doc. 101).

[5]     Expert Doug Cook provided an estimate for pool removal, while he and David Chapman have both provided various repair estimates to address certain of the issues.

[6]     In November 2018, Ms. Hinman and her employee, Paige Herriges, dye tested the pool and discovered the expansion joint was leaking. (Hinman Depo. p. 136:4-24; Mallon Depo. Ex. 56). Ms. Hinman's expert witness, David Chapman, performed a water loss test in November 2019, and the test results confirmed significant water loss. (*See* Chapman's report, Doc. 89-9, p. 37). Ms. Hinman's expert witness, Luke Brown, testified that there are active leaks along the expansion joint based on his and his team's observations during the summer of 2022. (Brown Depo. p. 40:2-4, 10-16).

10

as to any material fact and the movant is entitled to judgment as a matter of law." *Westfield Ins. Group v. Chattanooga Fire Protection, Inc.,* No. 1:19-CV-36-SKL, 2021 WL 2015527, slip copy (E.D. Tenn. May 20, 2021) (citing *Liberty Lobby*, 477 U.S. at 248 (1986). "The court must view the facts and all inferences that can be drawn from those facts in the light most favorable to the non-moving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In this case, taking the facts and the inferences that can be drawn therefrom in the light most favorable to Ms. Hinman, there are genuine issues of material fact for resolution at trial, and Brightview is not entitled to judgment as a matter of law. Therefore, Brightview's motion for summary judgment should be denied.

## DISCUSSION

### A. Brightview breached the Contract.

The central issue in this case is whether Brightview breached the Contract. Under Tennessee law, to state a claim for breach of contract, a plaintiff must show (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of the contract; and (3) resulting damages. *Ingram v. Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). In considering a swimming pool breach of contract case, the Tennessee Court of Appeals in *Archer v. Noonan*, 2021 WL 3662357 (Tenn. Ct. App. 2021), held that "'Whether a party has fulfilled its obligations under a contract or is in breach of the contract **is a question of fact**." *Archer* at *3, quoting *Carter v. Krueger*, 916 S.W.2d 932, 934-35 (Tenn. Ct. App. 1995) (emphasis added). In *Archer*, the Court of Appeals ultimately affirmed the Trial Court's holding that the pool builder had breached the contract because "the pool was not constructed such as was contracted for by the parties." *Archer* at *3.

11

In the instant case, the record demonstrates that there is an enforceable contract, that Brightview breached it in each of the ways described in this Response, and that Ms. Hinman was damaged. In the 2020 case of *Liberty Construction Company, LLC v. Curry*, 2020 WL 6158461 (Tenn. Ct. App. 2020), the Tennessee Court of Appeals quoted the Illinois Court of Appeals for the proposition that a "contractor has a duty to carry out the construction ***in accordance with the plans and specifications agreed upon*** and can depart from them ***only at its peril***." *Liberty* at *13 (internal citation omitted, emphasis added). One of the ways that Brightview breached the Contract in this case is by ignoring the Plans that form the very heart of the Contract.

In *Archer*, the Tennessee Court of Appeals quoted *M&M Elec. Contractor Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 424 (Tenn. Ct. App. 2016) for the proposition that "'[t]he existence of an uncured material breach by one party gives the non-breaching party the ability to rescind or 'terminate' the contract[.]'" The pool in *Archer* was "partially usable" but the pool owners in that case, like Ms. Hinman, were "'deprived of the benefit which [they] reasonably expected,'" *Archer* at *4. In the instant case, Ms. Hinman's pool is of lesser quality than the pool described in the Plans (see, for example, SAFD 52, 53, 58, 59, 66, and see also Ken Martin's Deposition testimony regarding sumps (SAFD 21, 36), and the vapor barrier (SAFD 22, 27). The waterfall concrete is breaking apart (SAFD 56, 57). In addition, the pool is too complicated to maintain, it cracks, it loses water, and it was not timely delivered even though the Contract provides that time is of the essence. (Doc. 1-2, p. 14, Section 6.2.2).

In the 2021 case of *Jones v. Reda Homebuilders, Inc.*, 2021 WL 2375883 (Tenn. Ct. App. 2021), the Tennessee Court of Appeals discussed the issue of damages, holding, in a home defect case, that "In breach of contract cases, such as this, the purpose of

12

assessing damages is to place the plaintiff in the same position as he or she would have been in had the contract been properly performed." *Jones* at *3 (internal citation omitted). "Damages for breach of contract may be awarded even where it is impossible to prove the exact amount of damages." *Jones* at *3 (internal citation omitted). "Uncertain or speculative damages are prohibited only when *the existence of* damages is uncertain, not when *the amount of* damages is uncertain." *Jones* at *3 (internal citation omitted, emphasis added). In other words, since the record in this case establishes the *existence of damages*, even if Brightview disputes the amount of damages in the record, that would not be a basis for summary judgment.

Brightview rests much of its argument in large part on the Addendum to the Contract (Doc. No. 1-5). However, Ms. Hinman has testified that the Addendum was misrepresented to her. (See SUMF Responses 12, 14, 15). Furthermore, the relevant passages in question are directly contradicted by Sections 3 and 8 of the Contract, which require written notice to Ms. Hinman even in regard to minor changes in the work (Doc. No. 1-2, p. 17). Even the Addendum requires that Ms. Hinman shall receive a "complete set of as-built drawings" (Doc. 1-5, p. 1, Section 3.1.2.1)). Likewise, the passages in the Addendum regarding changes are directly contracted by the Plans, which state in the specifications that changes must be approved by ADE. (SAFD 28). On its face, the Addendum suggests that it concerns *future changes* – specifically, the relevant passage on Doc. 1-5, p. 1, Section 3.1.2.1 begins with the language "As construction is progressing..."). This is how Brightview represented the Addendum to Ms. Hinman – that the Addendum pertained to future changes "in the field." Brightview even quotes Mr. Chestnut on page 11 of its Memorandum as testifying that the Addendum was to address the "constant, constant change" "in the field" relating to "operational" or "logistic" or

13

"weather" or "unforeseen circumstances." Later in his deposition, Mr. Chestnut stated that "the intent of the paragraph [in the Addendum]" was "if we are changing something in the field to get it built." (SAFD 67-70). None of this is consistent with how Brightview is now trying to use the Addendum. Specifically, the record demonstrates that Brightview already intended to make the Deviations at the time the Addendum was signed.

Brightview's interpretation of the Addendum – that it can be used to justify significant changes that were already made but not disclosed, when its purpose was to allow future changes "in the field" - is incompatible with the Tennessee Supreme Court's holding that "[in] Tennessee, the common law imposes a duty of good faith in the performance of contracts" and "'...there is implied in every contract a duty of good faith and fair dealing...' *Wallace v. National Bank of Commerc*e, 938 S.W.2d 684 (Tenn. 1996) at 686 (internal citations omitted). In short, summary judgment would be inappropriate based on what is, at best, an ambiguously worded provision that was misrepresented and that conflicts with numerous other provisions of the Contract and Plans.

Finally, while Brightview makes conclusory allegations that Ms. Hinman's claims are barred by the statute of limitations, this argument is without merit. As this honorable Court stated in its January 28, 2020 Memorandum (Doc. No. 29), the applicable statute of limitations for breach of contract is six (6) years, as discussed in the 2015 Tennessee Supreme Court case *Benz-Elliott v. Barrett Enterprises, LP*, 456 S.W.3d 140, 141 (Tenn. 2015). The gravamen of Ms. Hinman's breach of contract claim is breach of contract. She has identified the contract at issue and described the breaches and her damages in detail. Ms. Hinman brought her Complaint within four (4) years of the date of Substantial Completion, and within one (1) year of her discovery of the Deviations. Accordingly, Brightview' motion should be denied with respect to the breach of contract claims.

14

**B.     Brightview breached its express and implied warranties.**

Brightview, in a section of the Contract entitled "Warranty," expressly warranted that "all materials and equipment furnished under this Agreement ***will be…in conformance with the Contract Documents***." (Doc. 1-2, Section 3.7.1.). In its Memorandum, Brightview cites Section 3.7.2, but fails to address the wording of Section 3.7.1. (*See Memorandum*, pp. 14-15). The law cited by Brightview states "'A breach of warranty occurs when the warranted fact or condition is in reality not as it was represented.'" (*See Memorandum*, p. 14, citing *Sikora v. Vanderploeg*, 212 S.W.3d 277, 285-86 (Tenn. Ct. App. 2006). In this case, Brightview breached its *express warranty* by making the Deviations from the Plans. Furthermore, under Tennessee common law, in every construction contract, there is an implied warranty of good workmanship and materials. *Dewberry v. Maddox*, 755 S.W.2d 50, 53-54 (Tenn. Ct. App. 1988). Brightview's disclaimer in Section 3.7.2 only applies to items "specified and purchased by Owner" or "specified by the Owner but purchased" by Brightview. (Doc. 1-2, Section 3.7.2.) The Deviations (and other items, such as the concrete over the water features) concern items specified by Brightview (through its designer, ADE). On its face, Brightview's disclaimer of implied warranties does not apply with respect to Ms. Hinman's claims. In Tennessee, "The buyer must be given 'adequate notice of the implied warranty protections he that he is waiving by signing the contract.'…" [Internal citation omitted.] and, "In addition, such a 'disclaimer' must be strictly construed against the seller…. [Internal citation omitted.]" *Dewberry* at 55. By ignoring the clear provisions of Section 3.7.1 (regarding express warranty) and mischaracterizing the waiver in Section 3.7.2 (regarding implied warranty), Brightview is essentially arguing that the "Warranty" section in the Contract is meaningless, and that Ms. Hinman has no warranty. In fact, the

Warranty section in the Contract requires Brightview to conform to the Plans, and to warrant all items other than those specified by Ms. Hinman. Ms. Hinman timely brought her warranty claims within four years of substantial completion and within one year of discovering the Deviations. See *Dewberry* at 52-53. For all of these reasons, Brightview's motion should be denied.

### C. Brightview violated the Tennessee Consumer Protection Act.

Brightview charged Ms. Hinman more than sixty thousand dollars ($60,000) for the Plans, made a written proposal based on the Plans, and signed a Contract incorporating the Plans. However, it is now clear that Brightview never intended to construct the pool in accordance with the Plans, made numerous Deviations from the Plans, did not tell ADE about its Deviations, did not tell Ms. Hinman about the Deviations, and took steps to conceal the Deviations. The Tennessee Consumer Protection Act specifically prohibits a party from representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have…" (Tenn. Code Ann. §47-18-104(b)(5)) and from representing that "goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." (Tenn. Code Ann. §47-18-104(b)(7)). In this case, Brightview misrepresented that the Project had the "sponsorship and approval" of ADE, a high-end design firm from Florida – specifically, it had ADE create the Plans and agree to provide site visits, but then Brightview ignored the Plans (which required ADE's approval of changes) and told ADE not to visit. (SAFD 39, 41, 42). It misrepresented the characteristics of the goods and services provided, promising Xypex and various extremely detailed design features but then making the Deviations. The Tennessee Supreme Court has held that a deceptive act or practice "is a material representation,

16

practice or omission likely to mislead a reasonable consumer..." and that "'[w]hether a particular act is unfair or deceptive is a question of fact...'" *Davis v. McGuigan*, 325 S.W.3d 149, 162 (Tenn. 2010) (all internal citations omitted, emphasis added). Viewing all the evidence in a light most favorable to Ms. Hinman and drawing all reasonable inferences in Ms. Hinman's favor, a reasonable person could conclude that Brightview's actions were unfair and deceptive. (See discussion of these criteria, *Davis* at 162.) According to the Plans and ADE, Ms. Hinman should have received a pool with a variety of high-end, specialty features that are not typical in residential pools. Instead, she received a very generic shotcrete pool shell with which she has had numerous problems. This is precisely the sort of conduct addressed by Tenn. Code Ann. §47-18-104(b)(5) and (7). Likewise, Brightview's conduct amounts to fraudulent inducement, and Ms. Hinman respectfully contends that this claim should proceed forward. (The Court's previous Memorandum Opinion states that Brightview's motion to dismiss the fraudulent inducement claim *will be denied* (Doc. No. 29, p. 37), but its Order (Doc. No. 30) states that the fraudulent inducement claim *is dismissed*.)

While Brightview argues that Ms. Hinman's TCPA claims are time-barred, Tennessee courts apply the discovery rule to claims under the TCPA. Specifically, Tenn. Code Ann. §47-18-110, on its face, specifies that actions under the TCPA "shall be brought within one (1) year ***from a person's discovery of the unlawful act or practice***, but in no event shall an action... [under the TCPA] ...be brought more than five (5) years after the date of the consumer transaction giving rise to the claim for relief." (Emphasis added.) In other words, the TCPA, on its face, contemplates the discovery rule. In *Chambers v. Airport Toyota*, Inc., 1994 WL 48984 (Tenn. Ct. App. 1994), the Tennessee Court of Appeals considered a case where the plaintiff purchased a truck from the

defendant, *was on notice of various defects within the first year*, but did not learn until more than a year that the Defendant had misrepresented that the truck had never been in an accident. The Trial Court granted summary judgment, finding that the defects in the first year put the plaintiff on notice. However, the Tennessee Court of Appeals reversed, holding that *"the question of when a plaintiff should have discovered a cause of action is a factual issue for the trier of fact."* *Chambers* at *1 (emphasis added). The Court of Appeals found that "it is not uncommon for the owners of new vehicles to experience mechanical and other problems with such vehicles shortly after purchase and *merely experiencing mechanical problems with a vehicle would not as a matter of law charge the owner with knowledge that such problems arise from the fact that the vehicle had been wrecked and previously repaired*." *Chambers* at *1 (emphasis added). Therefore, the Court of Appeals held, "it is for the trier of fact to determine whether the plaintiffs reasonably should have known from the problems they were experiencing with their vehicle that the problems were due to the vehicle's having been wrecked and repaired prior to purchase." *Chambers* at *1.

In the instant case, while Ms. Hinman had various issues with the pool in the time following the substantial completion of the pool, it was not until 2019 that Ms. Hinman discovered Brightview's Deviations. Brightview does not dispute that it did not tell Ms. Hinman or ADE about these Deviations. Finally, the record makes clear that Brightview concealed these Deviations For all of these reasons, Brightview's motion should be denied.

### D. Brightview was negligent.

While Ms. Hinman's primary claim against Brightview is for breach of contract, she can also show that Brightview was negligent in its construction of the Project. "A

18

negligence claim requires proof of the following familiar elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Biscan v. Brown*, (160 S.W.3d 462, 478 (Tenn. 2005) (citation omitted). See also *Giggers v. Memphis Housing Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). Under Tennessee law, "all persons have a broad duty to exercise reasonable care to avoid causing foreseeable injury to others." *Draper v. Westerfield*, 181 S.W.3d 283, 291 (Tenn. 2005) (citing *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992)). While this case is grounded primarily in contract, Brightview was also negligent in materially deviating from the Plans, as described herein. Brightview was further negligent in its retrofitting of the expansion joint, in that it should have undertaken to address (and disclose) all of its deviations at that time, and it should have used the recommended materials in that retrofit. (See David Chapman Report, Doc. 89-9, page 6).

Despite having a contractual duty to disclose these deviations to Ms. Hinman, Brightview fraudulently concealed these deviations, as described in this Response. The Tennessee Supreme Court, in *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436 (Tenn. 2012), held that "Following our decision in *Teeters v. Currey*, this Court refined the discovery rule to make clear that it included not only the discovery of the injury but also the discovery of the source of the injury….[internal citation omitted]…" and, citing *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982), stated that "'no judicial remedy [is] available to [a] plaintiff until he [or she] discover[s], or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his [or her] injury; and (2) the identity of the defendant who breached the duty." *Redwing* at 458-459. Put another way, "Under the current discovery

rule, a cause of action accrues and the statute of limitations begins to run only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of 'facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct.' [Internal citation omitted.]" *Redwing* at 459. In this case, summary judgment is inappropriate as the discovery rule presents a question of fact that must be resolved by the trier of fact.

In its motion, Brightview argues that certain of Ms. Hinman's non-contract claims are barred by the economic loss doctrine. In support of this argument, Brightview cites cases from 2001, 2005, 2009, and 2012. It also cites the 2022 case of *Commercial Painting Co. v. Weitz Co. LLC*, 2022 WL 737468 (Tenn. Ct. App. 2022). However, it fails to point out that the Tennessee Supreme Court addressed this very issue in 2021 in the case of *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125 (Tenn. 2021), and that both the *Milan* Court, and the *Commercial Painting Court*, held that the economic loss doctrine only applies in Tennessee to contracts "between sophisticated commercial business entities" (*Milan* at 153; see also *Commercial Painting* at *24). In this case, Ms. Hinman is an individual and a consumer, purchasing a pool for her backyard. She is not a sophisticated commercial business entity. Therefore, the economic loss doctrine does not apply. For all of these reasons, Brightview's motion should be denied with respect to Ms. Hinman's negligence claims.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this honorable Court deny Brightview's Motion for Summary Judgment.

**RESPECTFULLY SUBMITTED,**

**BELCHER SYKES HARRINGTON, PLLC**

By:     */s/ John O. Belcher*
        John O. Belcher (BPR #018335)
        Katherine Garro McCain (BPR #032459)
        320 Seven Springs Way, Suite 110
        Brentwood, TN  37027
        Telephone: 615.810.8777
        Fax: 615.810.8770
        jbelcher@bshlawyers.com
        kmccain@bshlawyers.com
        *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of this pleading has been served upon counsel of record by CM/ECF on November 22, 2022 as follows:

Brian S. Spitler, Esq.
Angela Cirina Kopet, Esq.
COPELAND, STAIR, VALZ & LOVELL, LLP
735 Broad Street, Suite 1204
Chattanooga, TN  37402
bspitler@csvl.law
akopet@csvl.law
*Attorneys for Defendant Aquatic Design & Engineering, Inc.*

W. Douglas Kemper, Esq.
James M. Burd, Esq.
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
100 Mallard Creek Road, Suite 250
Louisville, KY  40207
Douglas.kemper@wilsonelser.com
james.burd@wilsonelser.com
*Attorneys for Brightview Landscape Development, LLC*

Isaac S. Lew, Esq.
Reba Brown, Esq.
40 S. Main St., Ste. 2900
Memphis, TN 38103
ilew@lewisthomason.com
rbrown@lewisthomason.com
*Attorneys for Third-Party Defendant Georgia Gunite and Pool Co., Inc.*

21

Vic L. McConnell, Esq.
SMITH CASHION & ORR, PLC
One American Center
3100 West End Ave., Suite 800
Nashville, TN 37203
vmconnell@smithcashion.com
*Attorney for Third-Party Defendant*
*American Commercial Industrial Electric, LLC*

/s/ John O. Belcher
John O. Belcher