# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION
### *Electronically Filed*

| | | |
|---|---|---|
| JERE HINMAN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:19-cv-00551 |
| | ) | |
| v. | ) | HON. ALETA A. TRAUGER, |
| | ) | Presiding |
| VALLEYCREST LANDSCAPE | ) | |
| DEVELOPMENT, INC.; BRIGHTVIEW | ) | JURY DEMAND |
| LANDSCAPE DEVELOPMENT, INC.; and | ) | |
| AQUATIC DESIGN & ENGINEERING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF BRIGHTVIEW'S MOTION FOR SUMMARY JUDGMENT

Defendant Brightview Landscape Development, Inc. ("Brightview"), by counsel, states as follows in further support of its Motion for Summary Judgment [DN 114].

Plaintiff's overall position is that BrightView did not build the pool depicted in the Plans. She claims that she has never had an operational pool, as there have been constant "problems" with it from the day it was turned over to her in September 2015. Amazingly, however, at the same time she also argues that she was unable to determine the scope of BrightView's alleged breach of contract until she retained counsel and a civil engineer in the summer of 2019. She claims that it was only then that she could make a determination that BrightView failed to abide by the contract, and she outlines the familiar litany of complaints related to the so-called "deviations," and seems to be of the opinion that if she repeats the refrain frequently enough it may become true. It is not true, as BrightView constructed the project outlined in the contract and drawings, and even continued to help Plaintiff with maintenance, which it was not contractually obligated to do, far beyond the 1-year warranty period set forth in the contract. Try as she might, Plaintiff has come

forward with no expert opinions to substantiate her claims. As such, BrightView is entitled to judgment in its favor as a matter of law and respectfully requests that this Honorable Court **GRANT** its motion for summary judgment.

## 1. Plaintiff's Claims Are Barred by the Statute of Limitation

Plaintiff's Response asserts that BrightView's statute of limitations defense is "without merit," and posits that her claim should be governed by the six (6) year statute of limitations applicable to traditional breach of contract claims. This argument is unavailing, and contrary to Tennessee law. Rather, the abundance of authority in Tennessee has disagreed with Plaintiff's argument, and instead holds that the three (3) year statute of limitations is applicable to breach of contract claims related to construction defects.

It is well-settled in Tennessee that "the gravamen of an action, rather than its designation as an action for tort or contract, determines the applicable statute of limitations." *Kirby Farms Homeowners Assoc. v. Citicorp*, 773 S.W.2d 249, 251 (Tenn. Ct. App. 1989) (citing *Pera v. Kroger Co.*, 674 S.W.2d 715, 719 (Tenn. 1984)). Indeed, the word "actions" contained in T.C.A. § 28-3-105 refers to the subject matter of the controversy, and not the remedial procedure. *Kirby Farms,* 773 S.W.2d at 251. "Whether an action for the recovery of damages to personal or real property results from a breach of contract or from a tort, independent of contract, is immaterial." *Id.* (citing *Williams v. Thompson*, 443 S.W.2d 447, 449 (Tenn. 1969)). Tennessee courts have long held that the "gravamen" of breach of contract claims in the construction defect context is tied to the injury to real property, and thus are governed by the three-year statute of limitations in T.C.A. 28-3-105.

In the early case of *Williams v. Thompson*, 443 S.W.2d 447 (Tenn. 1969), the plaintiffs sued the builders of their residence, complaining of cracks, door frame alignment issues, foundation settling, and sinking. *See id.* at 448. Plaintiffs alleged in their complaint that the builders breached certain duties in the construction contract. *See id.* The builders argued that the three-year statute of limitations applicable to damages to real or personal property governed the breach of contract action, rather than the six-year statute of limitations applicable to contract actions. *See id.* at 449. In holding that the three-year statute of limitations applied to the action, the *Williams* Court stated: "although complainants' bill sounds in contract

2

. . . the only injury alleged in the bill is physical injury to the residence which allegedly occurred and was known to the complainants more than three years prior to commencing the action." *Id.* at 449.

In *Kirby Farms, supra*, a case involving a breach of contract claim due to the defective construction of a condominium project, the determinative issue before the court was "whether the three-year statute of limitations for injury to real property (T.C.A. § 28-3-105) or the six-year statute of limitations for contracts not otherwise covered (T.C.A. § 28-3-109) applies to the facts of this case." *Id.* at 251. Indeed, the *Kirby Farms* Court found that the "gravamen of plaintiffs' complaint is for injury to real property" and thus was governed by the three-year statute of limitations in T.C.A. § 28-3-105. *See id.* at 251. The court further explained that, "[w]hen the damages for which recovery is sought represent the cost of repair or the replacement cost of property and such accrued damages are the result of negligent acts, the action is for damage to property and covered by T.C.A. § 28-3-105." *Id.* at 251 (citing *Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727, 729 (Tenn. App. 1980)).

Additionally, in *Liggett v. Brentwood Builders, LLC*, 2008 Tenn. App. LEXIS 184 (Tenn. Ct. App. Mar. 27, 2008), the Tennessee Court of Appeals affirmed the above reasoning. In *Liggett*, the plaintiffs discovered water leaks in their newly constructed home. *See id.* at *2. Over the course of three years, the builder attempted repairs on the house. *See id.* at *2-5. Eventually, the plaintiffs filed suit against the builder asserting multiple legal theories, including breach of contract. *See id.* at *5. The builders defended on the grounds that the plaintiffs' claims, including the breach of contract claim, was time barred by the three-year statute of limitations applicable to damage to real property found in T.C.A. § 28-3-105. *See id.* The *Liggett* Court agreed and granted summary judgment to the builders. *See id.* Importantly, the court found unpersuasive plaintiffs' argument that their breach of contract claim was governed by the six-year statute of limitations in T.C.A. § 28-3-109(a) applicable to contract actions, expressly "conclud[ing] that this argument must fail." *Id.* at *9.

As seen by the above cases, the Tennessee judiciary's consistent rulings on this issue have been firmly established. *See also, Simpkins v. John Maher Builders, Inc.*, 2022 Tenn. App. LEXIS 175 (Tenn. Ct. App. May 4, 2022); *Molin v. Perryman Constr. Co.*, Tenn. App. LEXIS 143 (Tenn. Ct. App. Feb. 27,

3

1998); *Conley v. Jim Wright Constr. Co.*, 1991 Tenn. App. LEXIS 501 (Tenn. Ct. App. Jun. 21, 1991). There is no reason for this Court to deviate from these rulings in the case at bar. Plaintiff's breach of contract claim is clearly derivative of and based upon the alleged defective construction of her pool, and thus the "gravamen of the action" is real property damage which is governed by T.C.A. § 28-3-105. Plaintiff's breach of contract claim is time-barred, and Plaintiff's hopeful argument to the contrary does not prevail.[1]

Moreover, Plaintiff's attempt at utilizing the discovery rule to toll the statute of limitations fails, too. As noted in BrightView's initial Motion, "accrual" in T.C.A. § 28-3-105 in a property damage action occurs upon discovery. *See Damron v. Media Gen. Inc.*, 3 S.W.3d 510, 512 (Tenn. Ct. App. 1999). The phrase "from the accruing of the cause of action" in the statute "means from the time when plaintiff knew or reasonably should have known that a cause of action existed." *Stone v. Hinds*, 541 S.W.2d 598, 599 (Tenn. Ct. App. 1976). "[O]nce a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." *Simpkins v. John Maher Builders, Inc.*, 2022 Tenn. App. LEXIS 175, at *42-43 (Tenn. Ct. App. May 4, 2022).

*Simpkins* is instructive here. In that case, the plaintiffs averred in their complaint that they were shown mold in the crawl space of their newly built home on August 3, 2017, the day before they were scheduled to purchase the home. *See id.* The *Simpkins* plaintiffs further stated in their complaint that they subsequently sent letters to the builder-defendants in August, September, and November of 2017, notifying the defendants of the mold on the property. *See id.* at *43. In these letters, the plaintiffs further detailed their concerns with the house, identifying mold on the walls, ceilings, and flooring; moisture issues; and moldy scents. *See id.* at *44. The plaintiffs in *Simpkins* chose not to file their complaint until December of 2020, more than three years following accrual, and in violation of T.C.A. § 28-3-105. The Tennessee Court of

---

[1] Plaintiff also argues that the Court already decided that the applicable statute of limitations is six years in its Memorandum ruling on BrightView's Rule 12 motion. However, this particular issue was not before this Court at that time, and the Court did not consider the above arguments relating to the specific nature of Plaintiff's breach of contract claim. The prior ruling was in a motion to dismiss before any discovery had taken place, so the Court had to rely on just the pleadings. There has now been extensive discovery that has helped flesh out the full nature of Plaintiff's claims, and the contract claim clearly relates to alleged construction defects. Additionally, in ruling on Georgia Gunite's motion for summary judgment, it appears this Court determined that the nature of a construction defect claim predominates over issues of breach of contract in the present set of circumstances.

4

Appeals held that, given the facts as alleged in the complaint, plaintiffs were not permitted to utilize the discovery rule to toll the statute of limitations. *See id.* at *44. Specifically, the *Simpkins* Court stated:

> The facts alleged in the complaint clearly demonstrated that Plaintiffs' cause of action accrued well before December 30, 2017; however, Plaintiffs did not file their complaint until December 30, 2020, more than three years following accrual. Based on the factual averments in their complaint, there can be no question that Plaintiffs possessed actual knowledge of facts sufficient to put a reasonable person on notice that [they had] suffered an injury as a result of the wrongful conduct" by Defendants in August, September, and November of 2017. As such, the trial court correctly concluded that the discovery rule did not operate to toll the statute of limitations herein.

*Id.* at *44-45 (internal quotations omitted).

Like in *Simpkins*, Plaintiff's own concessions negate any application of the discovery rule. Plaintiff has testified that BrightView came back several times over the time period of 2015 through 2018 to work on pumps and other issues with the pool. [J. Hinman Dep., P. 150]. She has repeatedly claimed that she was never given an operational pool, and that it was defective from the very beginning. The "accrual" of any cause of action would have occurred in 2015, when Plaintiff began contacting BrightView expressing her concerns with her pool. Indeed, as seen in *Simpkins*, "there can be no question that Plaintiff[] possessed actual knowledge of facts sufficient" to put her on notice that she had suffered an alleged injury to her real property. *Simpkins*, at *45. Put simply, Plaintiff's cause of action accrued in 2015, as that is when she discovered the alleged issues with her pool.

Additionally, Plaintiff's attempt at leaning on her expert's 2019 investigation to toll the statute of limitations, as alleged in her complaint, is unpersuasive. Plaintiff cannot rely on her expert's investigation and purported discoveries that occurred *nearly four years later* to establish the point of accrual under the limitations period. At the very least, even if Plaintiff did not know the extent of any alleged damage before her expert conducted the inspection in 2019, the law clearly discourages plaintiffs from sitting on their hands until discovering the extent of their claims and damages. *See Simpkins*, at *42 (holding that the discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of damages); *see also Burk v. RHA/Sullivan, Inc.*, 220 S.W.3d 896, 902 (Tenn. Ct. App. 2006) (stating that "the discovery rule was not meant to allow a party to

5

delay filing his claim until after he has completed the process of discovering all the factors that affects its merits"); *B&B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 849 (Tenn. 2010) (holding that the plaintiff cannot delay filing suit "until all injurious effects or consequences of the actionable wrong are fully known"). This is precisely what Plaintiff did in this case. Armed with sufficient knowledge as early as 2015, Plaintiff decided to sit idly by *for four years* until a retained expert witness told her the extent of her claims and damages in 2019. Plaintiff cannot now utilize those four years to her advantage; that is not the law, nor should it be.

Any application of the discovery rule to toll the statute of limitations would be inherently improper in this case. As such, Plaintiff's negligence and breach of contract claims are barred by the relevant statute of limitations, as the claims and remedies sought are indistinguishable.

## 2. Plaintiff has Failed to Offer Expert Testimony in Support of Her Claims[2]

In order for Plaintiff to succeed in proving negligence against BrightView, she must prove five elements: (1) that BrightView owed a duty of care to her; (2) that BrightView's conduct was below the standard of care such that it amounted to a breach of that duty; (3) injury or loss; (4) cause in fact; and (5) proximate, or legal cause. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). Absent proof that BrightView's performance in constructing the subject pool project fell below the appropriate standard of care, Plaintiff cannot sustain her burden of proof in proving her negligence claim against BrightView. Similarly, such expert testimony would be necessary to establish Plaintiff's breach of contract claims, as these two claims are basically indistinguishable – as Plaintiff argues that BrightView did not deliver the pool she bargained for, whether intentionally or negligently breaching the contract.

---

[2] In making the present argument, BrightView does not waive or seek to diminish the arguments made in its Daubert motion challenging Plaintiff's expert witnesses, but seeks to make the point that even those expert witnesses identified by Plaintiff do not provide sufficient support for her position.

Whether expert testimony is necessary to establish a standard of care depends on the subject matter of the inquiry. *Kinley v. Tenn. State Mut. Ins. Co.*, 620 S.W.2d 79, 81 (Tenn. 1981). Expert testimony is necessary when the subject matter requires highly specialized scientific or technical knowledge, and not likely to be within the realm of common knowledge or experience. FRE 702; *Bank v. Riddle*, 621 S.W.2d 735, 727 (Tenn. 1981). Determining whether a professional's conduct complies with the applicable standard of care requires expert testimony. *Martin v. Sizemore*, 78 S.W.3d 249, 272 (Tenn. App. 2001). Similarly, the claims for breach of contract are based on the same shortcomings – what Plaintiff repeatedly calls the "deviations." Specifically, the alleged failures include: (1) failure to install Xypex; (2) using shotcrete rather than cast-in-place; (3) failure to install no-leak PVC flanges; (4) failing to install performed, fiberglass sumps; (5) failing to install vapor barrier; and (6) failing to construct a footing or overpour behind the vertical walls to reinforce them.[3] A review of testimony of Plaintiff's experts, as well as Ken Martin, ADE's corporate representative, amply demonstrates that there is no admissible evidence that proves BrightView's performance in constructing the pool project fell below the standard of care.

**Industry standards to not require the use of Xypex**: Plaintiff makes much of the fact that BrightView did not include Xypex in the shotcrete used to form the pool shell. It is undisputed that ADE's Plans made part of the contract between Plaintiff and BrightView do not specifically mention or require the use of Xypex; however, Plaintiff argues that the Specs that are incorporated into the Plans call for Xypex. However, it is undisputed that Section 2.05 of the Specs, which deals with shotcrete wet mix (the product used) does not mention Xypex by name. D. Chapman Dep.

---

[3] Plaintiff's own expert, David Chapman, took all the wind out of Item 6 with his testimony that the failure to install the footing per plans is not a deviation at all because the wall is still "capable of supporting loads that are on it as constructed." Chapman Dep., p. 218. As such, it would be impossible for Plaintiff to prove that she sustained any damages as a result of not including this footing, which was rendered unnecessary due to the use of shotcrete (i.e., no need for a flat surface for forms for cast-in-place concrete) and the shallowness of the pool. D. Ferrell Dep., pp. 91-91.

pp. 214-215. Plaintiff's expert testified that concrete with Xypex is still permeable, and not impermeable. Id., pp. 57-58. Moreover, he opined that there is no evidence that the absence of Xypex has led to leaks in the pool, and he also admitted that there is no evidence of corrosion of the reinforcing steel in the pool shell, one of the reasons mentioned for the addition of Xypex. Id., pp. 204-205. Furthermore, it is undisputed that Xypex won't stop a crack, and water generally doesn't even get past the plaster. For that reason, Xypex generally is use only for above grade pools in buildings. D. Ferrell Dep., p. 63. "You never put Xypex in an in-ground pool, there's no need for it and it's a waste of money." Further, he stated that it would serve no purpose in this project because it's in-ground and has a maximum depth of 2 ½ feet. He added that "[i]n 40 years I have never seen Xypex used in an in-ground pool." Id., p. 123. Ferrell noted that Xypex is not specifically referenced in the Plans, and that the referenced Specs refer to emseal and Deckoseal as alternative products. D. Ferrell Dep., p. 101.

ADE's representative, Ken Martin, testified that Xypex does not affect the strength of shotcrete. K. Martin Dep., p. 36. And it is undisputed that ADE approved Deck-o-Seal used in retrofit. D. Chapman Dep., p. 208.[4] Moreover, it is undisputed that the American Concrete Institute (ACI), the professional organization for the industry, does not require that shotcrete contain Xypex, and there is no industry standard or set of best practices that requires the use of Xypex in shotcrete that is used in pools. Id., pp. 70-71. It comes as no surprise, then, that Doug Cook, Plaintiff's expert, testified that he has never used Xypex or seen it used in a pool that's totally in-ground, like the present pool. D. Cook Dep., p. 144.

It is undisputed that there is no industry standard or standard of care that requires the use of Xypex in shotcrete, and Plaintiff has come forward with no expert testimony that proves otherwise. In fact, her own experts found that the pool shell, including all piping penetrations and sump drains, were operating exactly as designed – with no leaks (other than the alleged leak of the

---

[4] It should also be noted that this product was recommended/approved in ADE's Specs.

retrofitted expansion joint). Ultimately, Plaintiff's unjustified over-reliance on the absence of Xypex in the shotcrete is exposed by her own expert, Doug Cook, as the waterproofing product he recommends for the repair of the pool shell is **not** Xypex. Rather, he recommends PermaCoat – because he knows that to be compatible with the plaster he would use in a repair / replacement of the pool shell. D. Cook Dep., pp. 228 – 230.

*Using Shotcrete Was Not a Material Deviation*: Plaintiff fails to prove that the use of shotcrete rather than cast-in-place concrete for the pool shell had a detrimental effect on the shell. Her own expert, David Chapman, admitted that the basic difference between shotcrete and cast-in-place concrete is how the two are placed. D. Chapman Dep., p 28. "Shotcrete is still concrete. It still has the same basic ingredients and it still cures over a period of time." *Id*., p. 30. Another of her expert witnesses, Doug Cook, agreed that there's no difference between shotcrete and concrete. "It's just a means and method approach of getting the concrete product into and intermingled with the steel." "They're both just basically different means to same end, and that is get the concrete in place." D. Cook Dep. pp. 129-130. Doug Ferrell stated that cast-in-place will render concrete just like shotcrete, but that shotcrete is a better look and is better for a pool environment. But he explained that contractors can't always find a good shotcrete company that knows pools. He added that shotcrete is preferable to create a good natural look for a water feature like this, and the flow of a shotcrete pool is far better. D. Ferrell Dep., pp. 73-75.

Plaintiff's expert, Doug Cook, was asked to review a position statement of Genesis, the company he works for, regarding the application of shotcrete, and he admitted that he had no evidence that the shotcrete in this instance was not installed in strict accordance with those guidelines. He also agreed with the position paper's definition that shotcrete watertightness shall mean "impermeable to measurable flow of water except under conditions of high hydrostatic pressure." Moreover, based on that definition, he stated that he was not aware of any evidence that

9

the pool shell here is not watertight. D. Cook Dep., pp. 249 -251. Additionally, Chapman agrees with Luke Brown's opinion that the pool shell does not leak, and he testified that he is not aware of any leaks other than the alleged leak of the expansion joint. D. Chapman Dep., pp. 203-204. Plaintiff makes much of alleged cracks in the pool (identified elsewhere as hairline cracks), but Chapman testified that there is no evidence any such cracks are leaking. Id., pp. 207-208.

Doug Ferrell provided a thorough explanation of why there's no evidence this pool is leaking. He explained that in order to determine if there is a leak, one would have to go down below the mastic joint (top covering where we see caulking, the only area that Brown examined) and see if there's a hole in the waterstop. "You've got to chase the leak until you find it." It is undisputed that no one has been willing to go down and find the joint and/or expose any alleged leak. He explained that the way it may be leaking is if there is a hole in the waterstop, and if that's the case it can be patched in place. He explained that the waterstop "doesn't stop leaking and then start and then stop again. It's either breached or it's not." D. Ferrell Dep., pp. 140-141. Here, Plaintiff has never offered any evidence that the waterstop has been inspected, or that it is breached or otherwise leaks. As such, there is no admissible evidence to support the heart of Plaintiff's claim that the expansion joint is leaking.

***It is Undisputed that Field-formed Sumps Are Not Leaking***: It is undisputed that there is no evidence the sumps as installed by BrightView are leaking. D. Chapman Dep., p. 212. Ken Martin testified that it is just their preference to use prefabricated sumps due to possible cracking issues with field formed sumps. K. Martin, p. 37, 39. Here, however, Plaintiff's experts are in agreement that there is no leak in the pool shell (other than the alleged expansion joint), which means that there is no leaking being caused by BrightView's decision to use field-formed sumps, which was its preference.

***Use of Vapor Barrier is Not Industry Standard***: This issue can be dispatched with relative ease, as Plaintiff's expert stated that placing a vapor barrier is not a normal practice, which logically means it is not industry standard nor can its absence be a violation of the standard of care.

10

Moreover, Chapman offers no opinion regarding its absence being responsible for leaking. *Id.*, p. 206.

**Plaintiff Offers No Expert Testimony on Standard of Care**: Here, Plaintiff's expert, David Chapman, has done nothing more than play a big game of "gotcha" by pointing out ways in which the pool as constructed differed from the plans. Ultimately, however, he does not offer any opinions that BrightView deviated from the standard of care in its performance or that it violated any industry standard. The contract does not set the standard of care; industry standards and best practices do. Ultimately, what Chapman doesn't say speaks far more loudly than what he does say, and means that he offers nothing to support Plaintiff's claims. Specifically:

- He offers no opinion regarding electrical issues or the grounding system in the vicinity of the pool yard. Id., pp. 90-91.

- He offers no opinion regarding the cause of water allegedly being lost from the pool as a result of the November 2019 leak test. Id., p. 131.

- He offers no opinion regarding the equipment or filtration system.[5] *Id.*, pp. 179, 186.

- His opinions related to the expansion joint are based solely on a review of the topical surface of the joint, and he did not do any testing or examination of anything under the surface of the caulking. Further, he conceded that the water stop seals the joint and seals the gap between the two sides of the expansion joint and that for water to escape the pool, it would have to get past the water stop. He relied on Luke Brown's examination and Report, and the only leak testing done by Brown examined the activity at the top of the joint and did not involve anything below the surface or the water stop. Id., pp. 209 – 211.[6]

**Industry Practice Allows Contractor to Choose Means and Method**: But perhaps the most significant concession Chapman offers is that standard industry practice is that a contractor in BrightView's positon is given the ability to use means and methods to accomplish a project, and that the contractor is generally responsible for its own means and methods. He also testified that it

---

[5] Importantly, Plaintiff's expert Luke Brown inspected the pool and found the equipment to be in good working order. See L. Brown Report.
[6] As part of this argument, BrightView adopts and incorporates arguments set forth in its *Daubert* Motion [DN 125].

11

is appropriate for a contract to give a contractor an outline of the plan of what is to be accomplished, and give it flexibility to decide on the means and methods of implementing that in the field. *Id.*, pp. 15 – 16.

Ken Martin agreed that it is wholly appropriate and customary to allow a contractor to have the flexibility to choose its own means and method. "Well, it's concrete. See, we don't put quite the emphasis on the method of installing the concrete that maybe perhaps you are. We're fine with poured-in-place. If the contractor would have called us and said that they want to shotcrete or actually shoot in the floor, we probably would have approved it.  Again, we look at the – we look at the finished product. So the fact that they used concrete sumps, they formed them themselves without using the precast or the preformed fiberglass sumps, doesn't really matter whether they pumped it in or poured it in or shot it in." K. Martin Dep., p. 25. Martin added that the materials as between the two methods are the same, and that only criteria in the design was "[j]ust to get the Redimix into the pool basin the best way they could. They would – we leave that up to the contractors' means and methods. They could have poured it into wheelbarrows. We had a zero entry on this particular pool, and they could have wheelbarrowed in the concrete one wheelbarrow at a time. But most contractors nowadays use concrete pumps to actually pump the concrete, to transport it from the truck location to the actual pool floor itself." Id., pp. 32-33.

Doug Ferrell testified that it is standard that an agreement between an engineer and customer specify that the constructor will use means and methods that work the best, and everybody understands that is how the project will proceed. He added that change orders are not usually associated with means and method choices. D. Ferrell Dep., p. 77. Ferrell testified that by allowing the contractor to choose means and methods and means of placement, some of details generally change – but there's no substantive difference. The shell is still getting the same amount of concrete (thickness) and same amount of steel (strength) – which are the key elements – but that there are some requirements in cast in place that can't be used with

shotcrete. Specifically, he stated that no-leak flanges can't be used with shotcrete – "it doesn't work." He also testified that a vapor barrier which is an uncommon element, is not required with shotcrete as it "would get blown to pieces because shotcrete comes out under pressure." Id., p. 122. While Plaintiff makes much of those items, it is undisputed that those elements were not necessary with shotcrete, and there is no evidence that their omission caused the pool shell to be materially different than the one promised in the contract.

Ferrell stated that in a design-build environment, there's usually an understanding that the job is going to get done, not necessarily the means and method. D. Ferrell Dep., pp. 74, 99. Ferrell added that the standard approach in a design-build allows the contractor an opportunity to look at different methods and means as long as it's something that is heading the owner towards an equal product or better. He added that the Addendum here is pretty standard in that regard, in allowing the contractor to choose its means and methods. Id., p. 109.

That is an important point, as it fully supports BrightView's position that the Addendum was appropriate, and gave it the ability to accomplish the means and method of constructing this project. In addition to the language in the body of the Addendum cited by Plaintiff, the Addendum, which was agreed to by Plaintiff, prominently states as a "CLARIFICATION" that:

> Exhibit B ADE Drawings dated December 23, 2014 are for reference only and to denote the final look and function of the water feature. Design-Builder has the authority to make changes to drawings during the construction without notification or approval, provided that such change does not change the final approved function and architectural look of the project as shown in Exhibit C.

Plaintiff agreed to the Addendum, but she now tries to wiggle out of it by offering inadmissible extrinsic evidence to alter the plain language of the contract. The language is quite clear in its import and impact. It is well settled in Tennessee that where the terms of an agreement are unambiguous, the parol evidence rule bars extraneous evidence used to alter, vary, or qualify the plan meaning of an unambiguous written contract. *Staubach Retail Servs.-Se., LLC v. H.G. Hill*

*Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005). See also *Dick Broadcasting Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 673 (Tenn. 2013) (opining that it would be inadvisable for a trial court to consider extraneous evidence where a written agreement clearly and unambiguously supports a contrary conclusion). Here, the contact language is clear, and its result – allowing BrightView to determine its own means and methods of constructing the project – is supported by Plaintiff's own expert.

Plaintiff's argument that there should be change orders also misses the mark, as the contract clearly states that change orders are required only for changes that result in adjustment of the contract price or date of substantial completion. [DN 1-2, Page 16 of 43]. Here, the only change order that was made was based on Plaintiff's unilateral decision to withhold $10,000 based on her dissatisfaction with certain landscaping, which complies with the contract because it was a change to the contract price.

### 3. The Problems Plaintiff Had Were Maintenance Issues That Were Not Covered Under the Contract.

Ultimately, what this case boils down to is that Plaintiff has had problems maintaining the pool she got – and at the same time it is undisputed that it was entirely consistent with the pool she wanted and for which she contracted. From the beginning, BrightView put her on notice that maintenance would be an important issue. The very first page of the Plans states: The system requires normal, routine maintenance provided by the owner to maintain an operational system and a high quality water environment. BV 4533. She admitted that BrightView told her on more than one occasion that maintenance of the pool was not covered under the contract, and she understood that. J. Hinman Dep., p. 92. Yet, despite the fact that it was not contractually obligated to do so, BrightView continued to try to help her find a maintenance company even after it had turned over the project to her. Id., pp. 92-3. BrightView helped her find two companies: Precision,

14

which she fired shortly after hiring them [Id., p. 125] and Sweetwater, which refused to continue dealing with her and they parted ways in July 2016. Id., pp. 128-129. She admitted that BrightView had trained the technician from Sweetwater. Id., pp. 130-131. Significantly, it is undisputed that she had no pool maintenance company after July 2016. Id., pp. 134-5. Plaintiff testified that her assistant Paige's job was to manage the horse barn, not to maintain the pool. But in a continued effort to help Plaintiff, BrightView employee Jeff Stauffer continued to help, and trained Plaintiff's employee, Mark Primm – and continued to do so until 2018. Id., p. 135.

Ken Martin visited the pool project on May 29, 2018 for an on-site observation and meeting with Ms. Hinman to observe the structural expansion joint, as she indicated to him on numerous occasions that she felt the joint may be leaking. On that occasion, he was able to view the expansion joint and he confirmed there were no irregularities. "The joint appeared to be in good condition." Moreover, Plaintiff's assistant, Paige, told him she did not believe the pool was leaking at that time. [DN 1-7, Page ID 107-108]. BrightView's expert witness testified that when he visited the project in July 2021, he couldn't see any water going out of any cracks, as they weren't near big enough to leak. "They're just little hairline cracks which are different than full-through cracks." He also observed that the expansion joint was not leaking at that time. D. Ferrell Dep., p. 140.

Martin reiterated that underwater expansion joints are a "wear item" and require occasional maintenance/or replacement of the joint material (which would include a re-caulking of the joint expansion material especially with the winter freezing temperatures occurring in her locale)." Id. He also referred to ADE General Note B.3.h on Sheet XG102 of the drawings, which states: UNDERWATER EXPANSION JOINTS WILL REQIRE FREQUENT AND REGULAR

MAINTENANCE TO MAINTAIN THE WATER-PROOFING AND AESTHETIC QUALITY OF THE JOINTS. Id.[7]

On December 3, 2018, more than three years after BrightView had completed the project, Brian Chesnut advised Plaintiff that on each occasion BrightView has observed the expansion joint since its installation in April 2016 it (the expansion joint) has complied with performance expectations. He reminded her that in May 2018 Ken Martin's observation was that the pool and expansion joint were performing well and that a June 2018 dye test indicated there were no leaks. Chesnut advised her that the Warranty expired in September 2016, and reminded her that expansion joints require routine maintenance which is clearly noted on the Drawings. "Care and maintenance of the joints will be an ongoing exercise that needs to be part of your routine maintenance program. " J. Hinman Dep., Exhibit 11.

Shortly afterwards, Plaintiff provided BrightView with a comprehensive and exhaustive list of communication with BV regarding the "problems" with the pool. Id., p. 178. She stated that she wanted to give a view of what she'd been going through and how many visits BrightView made to try to fix what was wrong. She then continued to maintain that the pool had never worked properly so she felt she had no duty to maintain it if it wasn't working properly. Id., p. 99. A review of the list provided by Plaintiff's representative at that time demonstrates that the "problems" were, in fact, maintenance related issues.

---

[7] Doug Ferrell testified that the thematic coat of the water feature is not structural, it's just for looks and has to withstand the elements. He stated that Plaintiff's streams don't run very often, so they're open to elements too much. It is undisputed that there is no leaking in the water features, and Plaintiff offers no evidence to the contrary. Ferrell testified that's why liner is there, to make sure that anything on top is just "window dressing." The lack of use contributes to the flaking /spalling of the thematic coat, which itself is subject to maintenance, and has to be updated or re-done every ten years or so because that coat is subject to the elements. Further, he added that is not a particularly difficult or expensive thing to do. D. Ferrell Dep., pp. 128-131, 146.

Joe Mallon testified about the so-called "problems" and issues BrightView continued to try to assist with were all maintenance related. He stated that it's a commercial grade pool, and explained that maintenance would require someone looking at it if not on a daily basis, maybe every other day, running eyes over the pump room, looking for red flashing lights, which indicate equipment is in alarm mode. J. Mallon Dep., p. 41. He added that it needs a professional pool maintenance person [Id., p. 42], required normal routine maintenance [Id., p. 80], but that was not difficult for someone that knows what they're looking at. Id., pp. 80-82. Mallon stated that Derek stayed behind to train those who would be maintaining the pool, but nobody could maintain the pool correctly, leading to "problem after problem." He clarified what he meant:

> "They tried to maintain it on coming by one day a week. The pool needed to be looked at – at least looked at. I'll – an example is if there was a windstorm came through in the middle of the night, and, you know, it – the pool got overly dirty or the skimmers got full, or the strainer baskets on all the pumps got clogged, that would reduce the flow in the pool. There were sensors, flow meters. Once one mechanism sensed something was wrong, it would start to shut down other components. So one storm could shut the system down, and somebody was coming by once a week.

Id. p. 108. In summary, it became clear when BrightView returned each time that the pool was very poorly maintained. Id., p. 109. The criteria of what she wanted to use the pool for drove the design, specifically her intent was to use the pool for her dogs. Mallon testified that it's not a typical pool application. Id., p. 110. He added that it was "not part of our scope to stay there and maintain the pool, so we were trying to help her with getting someone lined up to do that. It wasn't our job to do that, but we did help – and found Sweetwater for her." Id., p. 112.

The following excerpts from Mallon's deposition demonstrate that the "problems" were maintenance related. Mallon testified that drips / leaks in equipment is very common. Mallon Dep., p. 118. This was confirmed by Luke Brown, Plaintiff's expert, who reported one of water feature pumps has a slow drip at the pump pad when pump is running, but added that it simply would need

17

to be addressed as a maintenance item, not a problem or malfunction of the pump. L. Brown Dep., p. 34. Mallon also testified that the problems with and need to replace the ozone tank was due to complete lack of maintenance J. Mallon Dep., p. 118. Mallon testified that after the retrofit in Spring 2016, BrightView was out there many times for different issues, and continued with maintenance problems. "The only issues we ever had was maintenance, just maintenance issues. Things would go wrong, but they were – they were – you know, they were because of the complete lack of maintenance and – that was the things that would go wrong. Id., p. 129.

Another example Mallon gave of the lack of maintenance was Plaintiff not cleaning out strainer baskets in front of the pumps and not cleaning out skimmers. He explained that there are flow sensors all over the place, so when you have a dirty filter, it slows down the flow of water, so the flow meters and flow sensors sense that they not getting any water.

> And that, in turn, would turn off pumps, it would turn off chemical systems, and it would just sit there. For as long as nobody came around, it would just sit there. So the water kind of looked pretty bad, the – there was always debris floating on top of the water. I mean, there was just constantly something that was causing the system just to shut down.
>
> Q: If those items aren't cleaned, can that cause pressure within the system and cause items to break, like had been complained about?
>
> A: If the filters are not cleaned, you're right; the pressure builds on the front side of the filters, which, yeah, causes the pressure to raise on the ozone systems. And one of the – you know, even one of the things we looked at today where I said it looked like somebody had taken the pro by and hadn't put it back in correctly, hadn't put it back in tightly enough, as the pressure would build up, due to the dirty filters, then, yeah, that would be a result of something happening and why there's water squirting all over the place.
>
> Q: And each time you went out to the pool, did you see these maintenance issues that they were just not being taken care of by the owner?
>
> A: I've seen them when I was there. I think I heard about them more. It seemed like it was just – it was just ongoing, the phone calls, and, you know, this has stopped working, this is broke, this. And it seem like

18

> every time we sent people out, be it Derek or Jeff, it was – the fix always,
> kind of, was, well, nobody had taken care of this or nobody had taken
> care of that.

Id., pp. 196-199. This lack of maintenance was in full force when Mallon visited the project in July

2021. He testified that he went into the pump room and it "looked real bad, everything was offline.

Looked like people were just hand-dosing the chemicals, putting chlorine tablets in the skimmers,

chemical controller was offline, ozone was offline. Looked like waterfall pumps were not being

used." These were all maintenance issues. Id., pp. 196-199. Mallon testified that most residentials

of this type have a maintenance person on staff that comes and does the day-to-day cleaning,

including basic backwashing and doing the basic items, and also has a service that comes once a

week to check calibrations and check some of the other higher-end stuff to make sure the

automation is all working. Id., pp. 131-132. It is undisputed that Plaintiff had no maintenance

person on staff or under contract after July 2016.

## CONCLUSION

Plaintiff has come forward with a litany of complaints, but has fallen far short of proving

that her complaints and perceived "deviations" from the Plans rendered the pool project that

BrightView delivered was materially different from the project set forth in the contract. It is

undisputed that industry standards allow a contractor in BrightView's position flexibility in

choosing the means and method of construction, so long as the project meets what is in the contract

documents. The primary issue in this case is that Plaintiff has been unwilling to keep the beautiful

project maintained, and has thus experienced "problems" that she now tries to use to argue that the

project was deficient. Despite the fact that maintenance was not a contract item, BrightView

continued to work with Plaintiff several years past the warranty period to try to help her with

continued maintenance shortcomings. When BrightView finally put its foot down and told Plaintiff

that it would no longer assist her, she retained an expert witness that simply pointed out nothing

19

new. Yet, she now tries to turn that into support for her claims. She has come forward with no expert testimony to support her claims, and she has failed to prove how the alleged "deviations" made the pool project materially different from the project for which she contracted.

**THEREFORE**, BrightView is entitled to judgment in its favor as a matter of law, and respectfully requests that the Court GRANT its motion for summary judgment.

Respectfully submitted,

*/s/ W. Douglas Kemper*
James M. Burd (BPR #34940)
W. Douglas Kemper (PHV86761)
Marcia L. Pearson
WILSON ELSER MOSKOWITZ EDELMAN &
   DICKER, LLP
100 Mallard Creek Road, Suite 250
Louisville, KY 40207
james.burd@wilsonelser.com
doug.kemper@wilsonelser.com
marcia.pearson@wilsonelser.com
Phone: (502) 238-8500
*Counsel for Defendant,*
*Brightview Landscape Development, Inc. f/k/a*
*ValleyCrest Landscape Development, Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and accurate copy of the foregoing was filed this the 12th day of December, 2022, with the Court utilizing the CM/ECF e-filing system, which will give electronic notification to counsel of record registered to receive said notices, listed below:

John O. Belcher
Katherine Garro McCain
BELCHER SYKES HARRINGTON, PLLC
320 Seven Springs Way, Suite 110
Brentwood, TN 37027
jbelcher@bshlawyers.com
kmccain@bshlawyers.com
*Counsel for Plaintiff Jere Hinman*

COPELAND, STAIR, KINGMA &
LOVELL, LLP
735 Broad Street, Suite 1204
Chattanooga, TN 37402
bspitler@csvl.law
akopet@csvl.law
*Counsel for Defendant,*
 *Aquatic Design & Engineering, Inc.*

Brian S. Spitler
Angela Cirina Kopet

Vic L. McConnell
Smith Cashion & Orr, PLC
One American Center

3100 West End Avenue, Suite 800
Nashville, TN 37203
vmcconnell@smithcashion.com
*Counsel for Third-Party Defendant*
*American Commercial Industrial*
*Electric, LLC*

40 S. Main Street, Suite 2900
Memphis, TN 38103
sbarton@lewisthomason.com
ilew@lewisthomason.com

and

Reba Brown
Lewis Thomason, P.C.
424 Church Street, Suite 2500
P.O. Box 198615
Nashville, TN 37219-8615
rbrown@lewisthomason.com

Stephen C. Barton
Isaac S. Lew
Lewis Thomason, P.C.

*Counsel for Third-Party Defendant*
*Georgia Gunite and Pool Company,*
*Inc.*


*/s/ W. Douglas Kemper*
James M. Burd (BPR #34940)
W. Douglas Kemper (PHV86761)
*Counsel for Defendant,*
*Brightview Landscape Development, Inc. f/k/a*
*ValleyCrest Landscape Development, Inc.*