# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **JERE HINMAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:19-cv-00551** |
| ) | **Judge Aleta A. Trauger** |
| **BRIGHTVIEW LANDSCAPE** ) | |
| **DEVELOPMENT, INC.** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Before the Court is the Motion for Summary Judgment (Doc. No. 114), filed by defendant BrightView Landscape Development, Inc. ("BrightView"), seeking summary judgment on all remaining claims in this lawsuit. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.  FACTS AND PROCEDURAL BACKGROUND

Plaintiff Jere Hinman filed this suit against defendants BrightView, ValleyCrest Landscape Development, Inc. ("ValleyCrest"), and Aquatic Design & Engineering, Inc. ("ADE") on July 1, 2019, asserting numerous claims in connection with the defendants' design and construction of a $1 million pool and associated hardscaping and other landscaping at Hinman's home in Lebanon, Tennessee in 2015 (the "pool" or "pool project"). Because it was established early in these proceedings that ValleyCrest and BrightView are the same entity, the claims against ValleyCrest were terminated, and the plaintiff's claims were permitted to proceed against BrightView. (*See* Doc. No. 29, at 37–38; Doc. No. 30.) All claims against ADE have now been dismissed upon the court's orders disposing of that defendant's Motion to Dismiss and subsequent Motion for

Summary Judgment. (*See* Doc. Nos. 30, 104.) The court also dismissed the claims against BrightView for fraudulent inducement, fraudulent misrepresentation, and fraudulent omission.[1] (Doc. No. 30.) In addition, the indemnity claims asserted by BrightView against third-party defendants Georgia Gunite and Pool Company ("Georgia Gunite") and American Commercial Industrial Electric, LLC have now been dismissed. (Doc. Nos. 106, 149.) The claims that remain pending in this case are those asserted by Hinman against BrightView for breach of contract (Count One), breach of express and implied warranty (Count Two), violation of the Tennessee Consumer Protection Act ("TCPA") (Count Three), and negligence (Count Seven).[2]

BrightView seeks summary judgment on all of the remaining claims, in support of which, in addition to the Motion itself, it has filed a Memorandum of Law (Doc. No. 115), Statement of Undisputed Material Facts ("SUMF") (Doc. No. 115), and a substantial quantity of evidentiary material. The plaintiff has filed a Response in Opposition to the Motion for Summary Judgment

---

[1] The court's opinion addressing these claims contained an inconsistency, insofar as it stated in one place that "[t]he motion to dismiss the fraudulent inducement claim . . . will be denied" (Doc. No. 29, at 37) but also stated, when addressing the specific allegations supporting the claim, that they were not sufficient to "support a fraudulent inducement claim" (*id.* at 35). The finding implicit in the latter statement was reconfirmed in the concluding paragraph of the Memorandum and in the accompanying Order, both of which stated that the fraudulent inducement claim was dismissed. (*Id.* at 38; *see also* Doc. No. 30, at 1 ("BrightView's motion (Doc. No. 24) is **GRANTED** with respect to the claims against it for fraudulent inducement, fraudulent misrepresentation, and fraudulent omission.").) The plaintiff never sought reconsideration or clarification of the ruling, and the court finds now that the dismissal of the fraudulent inducement claim, despite one confusing sentence, was clear. Moreover, although the fraud claims were dismissed without prejudice, the plaintiff has never sought to amend the Complaint to plead these claims with the particularity required by Rule 9 of the Federal Rules of Civil Procedure.

[2] The Complaint also sets forth a claim of conspiracy against both ADE and BrightView (Count Six). The court granted ADE's Motion to Dismiss with respect to that claim. BrightView now asserts that there is no legal support for this claim in light of the fact that the substantive claims against the alleged co-conspirator, ADE, have been dismissed. (Doc. No. 114-1, at 20 n.14.) The plaintiff does not address this argument and appears to have abandoned the claim, as she makes no reference to it in her Response to the Motion for Summary Judgment. This claim will be dismissed without discussion based on lack of evidence of a conspiracy and abandonment.

(Doc. No. 126) and a Response to the SUMF, in which she objects to the SUMF on the basis that thirty-one of the defendant's fifty-five numbered statements are not supported by a citation to the record, other statements consist of legal argument rather than fact, and others are compound in nature, setting forth more than one fact (Doc. No. 127, at 2). In light of the defendant's disregard of the Local Rules[3] and its decision not to seek to revise its SUMF in response to the plaintiff's objections, the court has largely disregarded those statements of fact for which the defendant has not provided evidentiary support, unless the plaintiff does not dispute or object to the statement.

The plaintiff also filed a Statement of Additional Facts in Dispute ("SAFD") and her own evidentiary material.[4] The defendant filed a Reply and a Response to the SAFD. (Doc. Nos. 136, 137.) The plaintiff, with permission, has filed a Surreply. (Doc. No. 143.) From these materials, the court has attempted to glean the relevant facts, as follows.[5]

---

[3] This court's Local Rules expressly require that each fact set forth in the statement of undisputed facts must be "supported by specific citation to the record." L.R. 56.01(b).

[4] The court has a preference for complete deposition transcripts rather than multiple filings of multiple excerpts of the same transcript. Accordingly, where there are multiple filings of the same transcript or parts thereof, the court will cite the CM/ECF number for the complete deposition transcript, regardless of which party filed or cites it. Because some of the transcripts are condensed, with four transcript pages per standard page, and others were filed in more than one volume or contain cover pages that make their pagination inconsistent with the page numbers assigned by the court's electronic docketing system, the court cites the docket number where the transcript can by located but uses the original deposition transcript pagination.

[5] The facts for which no citations are provided are drawn from the plaintiff's Response to the Defendants' Statement of Undisputed Material Facts (Doc. No. 127) or the defendants' Response to the plaintiff's Statement of Additional Facts in Dispute (Doc. No. 138) and are undisputed for purposes of the Motion for Summary Judgment. All statements of fact recited herein are either undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

### A. The Contract

On August 24, 2014, Hinman and BrightView[6] entered a Standard Form of Preliminary Agreement Between Owner and Design- Builder ("Preliminary Agreement") for the design of an elaborate pool to be constructed at Hinman's residence in Lebanon, Tennessee. (Doc. No. 114-4, at 10.) BrightView then hired ADE to create a proposed design and engineering plans for the pool project.

ADE spent approximately four months creating a detailed set of plans. Its final set of plans ("Plans) is dated December 23, 2014. One note included in the General Notes section of the Plans incorporates by reference certain technical specifications ("Specifications") prepared by ADE. (*See* Doc. No. 1-2, at 35 ("The following technical specifications shall apply to this Project: 13 11 00.").) ADE delivered the referenced Specifications to BrightView on January 8, 2015 (*see* Doc. No. 130-5), and it is undisputed for purposes of the Motion for Summary Judgment that the Specifications were "an important part of the plans" prepared by ADE (Doc. No. 129-1, Mallon Dep. 55–56).

BrightView submitted a written Pricing Proposal to Hinman on January 16, 2015, offering to build the pool for $827,500. (Doc. No. 130-2, at 2.) The pricing was "based on the ADE drawings dated December 23, 2014." (*Id.* at 1.)

On March 19, 2015, Hinman and BrightView entered into a Design-Build Contract ("Contract") for the construction of the pool. (Doc. Nos. 1-2 through 1-4.) The Plans are attached as Exhibit B to the Contract, and the Contract expressly incorporates them as part of the "Agreement" and within the definition of "Contract Documents." (*See* Doc. No. 1-2, at 4, 29,

---

[6] The contract was actually executed by the defendant as ValleyCrest, but the record establishes that ValleyCrest formally changed its name to BrightView in 2016 and that these entities are one and the same. (*See* Doc. No. 29, at 37.)

Contract §§ 2.3.1, 14.2; *see also id.* at 33, Contract Ex. B.) Article 3.1.2 of the Contract states:

"Construction shall be in accordance with the approved Construction Documents." (*Id.* at 6.) The

Contract also specifies that the owner (Hinman) would receive written notice of any changes to

the Plans. (Doc. No. 1-2, at 6, 16, Contract § 3.1.2 ("When the Design-Builder submits the

Construction Documents, the Design-Builder shall identify in writing all material changes and

deviations that have taken place from the Design Development Documents or the Contract

Documents in existence at the time of the execution of this Agreement."); *id.* § 8.1 ("Change

Orders"), § 8.3 ("Minor Changes").). However, at the same time they signed the Contract, the

parties also signed an Addendum to the Contract, which incorporates a new § 3.1.2.1 stating:

> As construction is progressing, Design-Builder shall be entitled to make changes to
> the design, materials, means and methods, and details, without notific[a]tion and
> without any required approval. Changes shall be in any form that does not change
> the final approved function and architectural look of the project as shown in Exhibit
> C [to the Contract].

(Doc. No. 1-5, at 1.) The Addendum also includes the following "Clarification":

> Exhibit B ADE Drawings dated December 31, 2014 are for reference only and to
> denote the final look and function of the water feature. Design-Builder
> [BrightView] has the authority to make changes to the drawings during the
> construction without notification or approval, provided that such change does not
> change the final approved function and architectural look of the project as shown
> in Exhibit C.

(*Id.* at 3.) The Contract and Addendum both require the delivery of "as-built" drawings to the

plaintiff documenting any deviations from the Plans. (Doc. No. 1-2, at 8, Contract § 3.2.9; Doc.

No. 1-5, at 1, Addendum § 3.1.2.1.)

The Plans incorporated by the Contract include, among others, the following requirements:

(1) the placement of an expansion joint across the middle of long side of the pool
(*see* Doc. No. 1-2, Contract Ex. B, at 34, 35, 36);

(2) the addition of Xypex in the concrete mixture used to construct the pool shell
(*see* Doc. No. 130-5, at 38–39, Specifications § 2.04(R) ("Crystalline Water-
Proofing Additive" defined as "Xypex Admix C-500 by Xypex crystalline

waterproofing materials," noting "Substitutions: Not permitted," and specifying precise dosage to be "added to concrete mix at time of batching"); *id.* § 2.05(A)(6) (specifying the Shotcrete Wet-Mix materials should include "Crystalline Concrete Waterproofing Admixture as specified"); § 2.06 (specifying the addition of "Cementitious Crystalline Concrete Waterproofing" as a "Mandatory Component" of the cast-in-place concrete mix, specifying that Xypex Admix C-500 "shall be provided in the concrete mix at a dosage rate as specified in 2.04S, Crystalline Waterproofing"); *see also* Doc. No. 91-8, at 7);

(3) the use of cast-in-place concrete for the pool floor and the use of wet-mix shotcrete for the pool walls (Doc. No. 91-8, at 5; Doc. No. 131-6, Chapman Dep. 201); and

(4) the use of "no-leak PVC flanges," preformed fiberglass drain sumps, a vapor barrier, and a nine-inch overpour, also referred to as a footer or an extension of the floor beyond the vertical walls (Doc. No. 91-8, at 6–7).

The parties agree that none of these features is typical in a residential pool. (*See* Doc. No. 137, Def.'s Resp. ¶ 25.)

### B.    Deviations from the Contract

There is no dispute, for purposes of the Motion for Summary Judgment, that BrightView materially deviated from the Plans when it failed to install an expansion joint. However, there is also no dispute that BrightView installed a retrofitted expansion joint in the Spring of 2016, pursuant to plans developed by ADE.

There is also no dispute that BrightView (1) did not include Xypex Admixture in the concrete used for the pool shell walls or floor; (2) did not use cast-in-place concrete for the pool floor and instead used shotcrete for both the walls and the floor; (3) did not install no-leak PVC flanges; (4) did not install pre-formed fiberglass sumps but instead used field-formed concrete sumps; (5) did not include a nine-inch overpour, also referred to as a footer or an extension of the floor beyond the vertical walls (hereafter, "nine-inch footer"); and (6) did not install a vapor barrier. These omissions (or construction decisions) are referred to by the plaintiff collectively as

the "Deviations." BrightView did not seek approval from ADE for these Deviations or tell the plaintiff about them.

BrightView does not dispute that the pool as built does not incorporate the above-referenced features. It disputes whether it was actually required by the Contract to include them and, further, whether the failure to do so, even if technically required by the terms of the Contract, constitutes a material breach of the Contract. Hinman asserts that the Deviations were material, citing the report of its proposed expert, David Chapman, and the deposition of ADE's representative, Ken Martin.

In his Report, Chapman opines, in relevant part, that (1) the retrofitting of the expansion joint "created two construction joints parallel to the expansion joint that may be susceptible to leaking in the future," but this problem would not exist if the expansion joint had been "installed as shown in the plans"; (2) the failure to install "no-leak PVC flanges" at pipe penetrations in the pool shell "more likely than not result in an increased risk of leaks at plumbing penetration in the future"; (3) the failure to use Xypex Admixture "has resulted in the pool shell being materially more permeable than it would have been had the Xypex been included and may be contributing to leaks in the pool shell"; (4) the failure to use "preformed drain sumps" "may have caused or contributed to leaks in the pool shell"; (5) the absence of a vapor barrier on the outside of the pool shell "has more likely than not resulted in increased expos[ur]e to subsurface moisture that may increase the likelihood of rebar deterioration"; and (6) together, the failure to use Xypex and no-leak PVC flanges has "resulted in a pool shell that is materially less waterproof than the pool described by the Plans and Specifications." (Doc. No. 91-8, at 7–8.)

At the same time, Chapman agrees with the findings of another of the plaintiff's proposed experts, Luke Brown, that there is no evidence that the pool shell itself is leaking,[7] no evidence that the rebar or reinforcing steel is corroding because of the lack of a vapor barrier, no evidence that the pool is losing water at the sumps or the places where the plumbing penetrates the shell, and no evidence that the lack of Xypex is contributing to leaks. (Doc. No. 131-6, Chapman Dep. 157; *see id.* at 203–04 ("I agree with you that [Brown's report] says that he did not observe leaking anywhere other than the . . . expansion joint."), 204 ("I don't know of any leaks . . . . I know that [Brown] did not find any evidence of any leaks. . . . I don't have any evidence that any leaks can be directly attributed to the lack of Xypex."), 204–05 (confirming he had no evidence of corrosion of the reinforcing steel), 207 (confirming he had no opinion as to whether the absence of the vapor barrier was contributing to the leaking of the expansion joint or the shell), 208 (confirming that he had no opinion as to whether the cracks he observed in the pool shell were causing any leaking), 212 (confirming he had no "evidence . . . that the sumps or drains in this pool are causing any leak in the pool shell").)

In other words, Chapman does not purport to opine that any of the Deviations, individually or collectively, is currently causing leakage. He states that the Deviations have increased the risk of future leaks, but he has not quantified what the risk of future leaks would be if BrightView had followed the Plans and Specifications to the letter or to what degree its failure to do so has increased that risk.

Ken Martin, who at the time of his deposition was designated as then-defendant ADE's 30(b)(6) witness, testified that he believed that the "nine-inch overhang" incorporated in ADE's Plans was "important" for "retaining wall purposes." (Doc. No. 130-1, Martin Dep. 174–75.)

---

[7] Aside from the possible leaks along the expansion joint, which is addressed below.

Chapman, however, testified regarding the absence of the nine-inch footer that, although this constituted a "deviation of the plans," the "structure" of the pool was nonetheless "capable, in [his] opinion, of supporting the loads that are on it as it has been constructed." (Doc. No. 131-6, Chapman Dep. at 218.) Regarding the absence of Xypex, Martin testified that it was "possible that the Hinman pool is just losing water that's weeping through the shell," possibly exposing the reinforcing steel to moisture, which would leave to corrosion and failure. (Doc. No. 130-1, Martin Dep. at 176–77.) Martin, however, has not been designated as an expert, and Chapman and Brown, as set forth above, did not find that the shell was leaking or any evidence of corroding steel.[8]

There is a dispute about whether the "as-built" plans BrightView delivered to the plaintiff in 2015 show the Deviations. The plaintiff claims they do not, while the defendant claims they do, both citing Joe Mallon's deposition. Mallon, BrightView's Operations Manager (Doc. No. 129-1, Mallon Dep. 14), testified that, although the Contract called for the delivery of as-built drawings to be delivered to Hinman, the set that was delivered did not note each of the Deviations at issue here (*id.* at 40, 77). However, BrightView prepared and delivered new as-built drawings during the course of this litigation. (*Id.* at 78–79; Doc. No. 131-9, Ferrell Dep. 38–40, 109–10.)

---

[8] Although not relevant for purposes of the defendant's Motion for Summary Judgment, the defendant's designated expert, Douglas Ferrell, opines that the shotcrete floor of the pool is eight inches thick while the walls are nine inches thick, both with reinforcing steel, and that this the structure "meets and exceeds a typical commercial-grade thickness for shotcrete water features and pools"; there was no cost-saving to BrightView in using shotcrete rather than cast-in-place concrete, as it is typically more expensive per yard to place; the use of shotcrete was a better choice for the "natural appearance Ms. Hinman desired, and would be of equal quality and strength" as a cast-in-place construction; he has never seen Xypex (or any other crystalline admixture) used for an in-ground residential or commercial grade swimming pool or water feature and, instead, has only seen it used in elevated vaults encasing above-ground pools in high-rise buildings; there is no industry requirement for the use of an admixture like Xypex to be added to an in-ground pool; the use of shotcrete obviated the need for a nine-inch overpour or footer, no-leak flanges, and preformed sumps; the use of a vapor barrier would have been completely unnecessary and in any event would not have survived the placement of the shotcrete; and he has never seen a vapor barrier used beneath a pool in this manner. (Doc. No. 114-7, at 62–66.)

## C.     The Current Problems With the Pool

As for ongoing problems, there are visible cracks in the plaster surface of the pool shell. (Doc. No. 131-6, Chapman Dep. 207–08; Doc. No. 148-1, Hinman Dep. 156, 165.) There is no evidence that these cracks are leaking. (Doc. No. 91-9, at 2; *see also* Doc. No. 131-7, Brown Dep. 11 (agreeing with the statement in his report "[i]nspected shell; no leaks found; cracks in plaster not leaking"); Doc. No. 131-6, Chapman Dep. 208.)

According to the plaintiff, rebar was not properly installed in the pool. This assertion is based on Cook's observation of photographs taken during the pool construction. (*See* Doc. No. 131-3, Cook Dep. 147–52.) Cook did not include that information in his Report, but he testified that it was the basis for his statement in his Report that he agreed with Chapman's opinion that the pool could continue to crack. (*Id.* at 152–53.) Chapman testified that his statement in his Report about the rebar referred to his finding that there was no evidence that the rebar extended outside the perimeter of the pool floor, as was called for by the Plans specifying the inclusion of the nine-inch footer at the base of the pool walls. (Doc. No. 131-6, Chapman Dep. 149–50.) As set forth above, however, there is no evidence either of problems with the rebar or with the structural integrity of the walls.

It is undisputed that the concrete finish over the manmade waterfalls that constitute part of the pool project ("water features") is chipping and cracking in multiple places. According to the defendant, the concrete that is cracking is the "thematic coating," not a structural part of the water features and, as such, is a purely cosmetic maintenance item that may have been caused by the plaintiff's failure to use the water features. BrightView's designated expert, Douglas Ferrell, explained that the top layer of the water features is called a "thematic coat." (Doc. No. 131-9, Ferrell Dep. 127.) The thematic coat is applied over a "PVC liner," which is applied over the concrete and rebar structure of the water feature. (*Id.* at 128, 130; *see also* Doc. No. 131-6,

Chapman Dep. 154.) Ferrell explained that the thematic coat for the water features is made of concrete with "large aggregate . . . that creates the look of the stream." (Doc. No. 131-9, Ferrell Dep. 143–44.) Ferrell opined that the "thematic coat here wasn't thick enough. It should have been thicker," at least in some places. (*Id.* at 127–28.) He stated that the remedy for this problem would be to reapply the thematic coating, which would not be expensive. (*Id.* at 128–29, 146).) He testified that this was not a structural problem but simply a cosmetic issue. (*See id.* at 129.) The plaintiff's damages expert, Douglas Cook, opined that removing the failing concrete would damage the liner underneath and that the rough concrete (which he characterized as a design flaw) should be replaced by "smooth and appropriate river stones . . . covering a pond liner," at a cost of approximately $90,000 to $100,000 to repair all three water features. (Doc. No. 125-7, at 4.)

The plaintiff has presented evidence that the pool is losing water over and above the loss that would be expected from evaporation alone and, more specifically, that the pool is leaking in several places along the retrofitted expansion joint. (*See* Doc. No. 91-8, at 37; Doc. No. 131-7, at 39–40; Doc. No. 91-9, at 1.) One of Hinman's expert witnesses, David Chapman, performed a water loss test in November 2019, and the test results confirmed significant water loss. (Doc. No. 91-8, at 10.) Another expert, Luke Brown, performed a dye test in the summer of 2022 and confirmed that the pool was leaking in several places along the expansion joint. (Doc. No. 91-9, at 1, 2; Doc. No. 131-7, Brown Dep. 42–43, 47, 51.) BrightView contends that the plaintiff does not have competent evidence of such water loss or that the pool is leaking along the expansion joint, for the reasons set forth in its *Daubert* motion (Doc. No. 125).[9]

---

[9] Contemporaneously with this ruling, the court is issuing a Memorandum and Order granting in part BrightView's Motion to Exclude the Testimony of Plaintiff's Expert Witnesses (Doc. No. 125). As relevant here, the court denies that motion, insofar as it seeks to exclude Brown's opinion that the pool is leaking along the expansion joint and Chapman's opinion that the

The plaintiff's estimated cost to replace the expansion joint is $12,000. (Cook Report, Doc. No. 125-7, at 6, 13.) Based on the bid submitted, it is unclear whether this cost includes actually replacing the expansion joint or entails simply resealing it. (*See id.* at 13.) The estimated cost to retroactively add Xypex to the pool, according to Chapman, is $181,995. (Doc. No. 91-8, at 8, 43; *see also* Doc. No. 125-7, at 6.) BrightView also objects to this evidence in its *Daubert* motion.

It is undisputed that the operation and maintenance manual Brightview provided to Ms. Hinman does not include information on maintaining an expansion joint. No one instructed Hinman on how to maintain the expansion joint after it was installed. (Doc. No. 148-1, Hinman Dep. 207–08.)

### D. The Plaintiff's Knowledge of the Problems

The pool was substantially complete and turned over to Hinman on September 13, 2015. Hinman submitted her final payment for the pool on October 6, 2015, along with a letter documenting that Hinman had withheld $10,000 from the amount reflected in the final invoice and would remit the final $10,000 upon the defendant's "contacting [her] regarding plant care as well as giving an allowance for the dead and dying plants." (Doc. No. 148-6; Doc. No. 148-1, Hinman Dep. 105.)

According to Hinman, however, the pool never reached a "final" date of completion, because she "had issues" with the pool from the time it was turned over to her in September 2015. (*See, e.g.*, Doc. No. 148-1, Hinman Dep. 106–07 ("[T]he pump area wasn't completed. Derek [a BrightView employee] stayed on after September 13th because it wasn't working. . . . It must have been [working when he left]. [S]everal days later, it wasn't. It has never worked properly. So it

---

pool, as of the testing he had performed in November 2019, was losing a substantial quantity of water.

may have worked for 24 hours."); *id.* at 109 ("The boulders have never been correct."); 148–49 (describing the "vacuum system" as "impossible to use" and a "piece of junk" and stating she knew about the problems with it the first time they tried to use it in 2015).)

In November 2015, Hinman discovered that the pool was leaking. BrightView immediately investigated and it was at this time that BrightView discovered that it had failed to install the expansion joint. As set forth above, BrightView worked with ADE to come up with a plan to install a retrofitted expansion joint and to repair the cracks. BrightView performed this work in April and May 2016.

The plaintiff maintains that, as of December 2017, the pool was "still" losing water. (*See* Doc. No. 136-3, at 32, Mallon Dep. Ex. 56.)

In May 2018, Ken Martin of ADE visited Hinman's pool at her request, as she was still complaining of ongoing problems with the pool. (*See* Martin Dep. Ex. 31, Doc. No. 114-5, at 69–70.) He later wrote up an "Observation Report," which he apparently provided to Brian Chesnut of BrightView.[10] (*Id.* at 72–73.) He reported that Hinman suspected at that time that the pool was leaking around the expansion joint, and the primary purpose of Martin's visit was to inspect the expansion joint. (*Id.* at 72.) Martin reported that the joint appeared to be in good condition and that Hinman's employee, Paige Herriges, told him and Hinman that, although there had been suspected leaks in the past, she did not believe the pool was currently leaking. (*Id.* at 73.) According to Martin, he told Hinman and Herriges that they "might have a local pool technician perform an underwater observation of the underwater joint to discern possible routine maintenance issues." (*Id.*)

---

[10] Chesnut's role in BrightView has not been made clear. Ken Martin's Observation Report is addressed to Chesnut as "Vice President/Branch Manager" of BrightView. (Doc. No. 114-5, at 72.)

On October 31, 2018, Hinman wrote to BrightView stating that the pool had lost six inches of water in six days, despite rain for part of that period. She wrote, "The pool is leaking, as we have explained repeatedly for the past three and a half years." (*Id.* at 67.) Hinman also testified that she and Herriges performed a dye test in November 2018 and discovered the expansion joint was leaking. (Doc. No. 148-1, Hinman Dep. 136, 206.)

For purposes of the Motion for Summary Judgment, Hinman does not dispute BrightView's (unsupported) assertion that it came back "several times over the time period of 2015 through 2018 working on the pumps and other issues." (Doc. No. 127, ¶ 19 and Response.)

For purposes of the Motion for Summary Judgment, Hinman does not dispute BrightView's (unsupported) assertion that it assisted her in finding two different pool maintenance companies. According to the plaintiff, however, neither was able to maintain the pool. (*See* Doc. No. 129-1, Mallon Dep. 106–09.) According to Joe Mallon, Hinman "was having problems getting maintenance people. She could not find anybody. . . . [I]t became quite evident that nobody could maintain the pool correctly, and it just . . . kept leading to problem after problem after problem." (*Id.* at 106–07.) Joe Mallon believed the pool "was too much for just about everyone that tried [to maintain it]." (*Id.* at 109.) Although the plaintiff agreed, in principal, that "poor or improper maintenance" is not covered by the pool's warranty and was not BrightView's responsibility, she also believes that the pool as built was "impossible to maintain" because it never worked properly. (Doc. No. 148-1, Hinman Dep. at 98–99.) Hinman concedes that she has not employed a pool maintenance company since July 2016. In the absence of a pool maintenance company, Hinman has had various employees assist her with trying to maintain the pool. (Doc. No. 148-1, Hinman Dep. 135, 150–51.) She asserts that, despite having tried repeatedly, she has been unable to employ a pool maintenance company that is both knowledgeable and familiar with the equipment and

operations of a complex pool like hers and willing to make multiple weekly service trips to her home in rural Wilson County. (*See* Doc. No. 127, Pl.'s Resp. ¶ 43.)

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific

facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.   ANALYSIS

BrightView argues that it is entitled to summary judgment on all remaining claims, on the grounds that: (1) all remaining claims are barred by the three-year statute of limitations governing "actions for injuries to . . . real property," Tenn. Code Ann. § 28-3-105(1); (2) the breach of contract claims fail for lack of evidence that the purported breaches are material or gave rise to any damages or, with respect to some of the alleged breaches, that any breach of contract occurred; (3) the breach of warranty claims are barred by the express waiver language in the Contract; (4) the TCPA claim, besides being barred by the statute of limitations, fails for lack of evidence of any misrepresentation, deception, or unfairness; (5) the negligence claim, aside from being barred by the statute of limitations, fails for lack of evidence that BrightView breached any duty to the plaintiff and, in any event, is barred by the economic loss doctrine. Hinman maintains that material factual disputes preclude summary judgment.

### A.   Breach of Contract Claim

#### 1.   *Statute of Limitations*

BrightView argues that the breach of contract claims are barred by the three-year statute of limitations found at Tenn. Code Ann. § 28-3-105(1), which governs tort "actions for injuries to . . . real property." As the plaintiff correctly points out, this provision does not apply to her breach of contract claim which, instead, is governed by the six-year limitations period that pertains to "[a]ctions on contracts not otherwise expressly provided for." Tenn. Code Ann. § 28-3-109(a)(3).

As this court already held in denying BrightView's Rule 12(b)(6) motion seeking dismissal of the breach of contract claims on the same basis, BrightView's arguments to the contrary rely on outdated caselaw that has been clearly superseded by the Tennessee Supreme Court's decision in *Benz-Elliott v. Barrett Enterprises*, 456 S.W.3d 140 (Tenn. 2015). In that case, the court clarified, as relevant here, that, "in choosing the applicable statute of limitations, courts must ascertain the gravamen of each claim, not the gravamen of the complaint in its entirety." *Id.* at 149, *quoted in Simpkins v. John Maher Builders, Inc.*, No. M2021-00487-COA-R3-CV, 2022 WL 1404357, at *11 (Tenn. Ct. App. May 4, 2022).[11] The test for determining the gravamen of a particular claim requires the court to "first consider the legal basis of the claim and then consider the type of injuries for which damages are sought." *Id.* at 151. This court has already conducted that analysis and concluded that the six-year statute of limitations applies to Hinman's breach of contract claims. It adopts and reaffirms that conclusion here:

> In support of the [breach of contract claim], the plaintiff alleges the existence of an enforceable contract, a copy of which was filed as an exhibit to her Complaint and substantial portions of which are quoted in the Complaint. She alleges numerous specific ways in which BrightView breached the Contract. (Doc. No. 1 ¶¶ 17(A)–(D), 31(A)–(N).) And she asserts that she suffered damages arising from BrightView's breaches of the agreement. (Doc. No. 1 ¶ 35.) Under Tennessee law, all a plaintiff is required to allege to state a claim for breach of contract is (1) the existence of an enforceable contract, (2) non-performance amounting to breach thereof, and (3) resulting damages. *See, e.g.*, *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). The plaintiff has clearly alleged those elements here.

> For damages related specifically to the alleged non-performance amounting to breach of the Contract, the plaintiff seeks rescission, damages related to the cost of removing the non-conforming pool and replacing it with a "pool conforming to the

---

[11] BrightView's reliance on *Simpkins* is curious, because it clearly relies on *Benz-Elliott* and rejects the other opinions cited by BrightView in light of the clarification offered by *Benz-Elliott*. In addition, *Simpkins* holds that the plaintiffs' breach of contract and breach of warranty claims related to the purchase of a newly constructed home were subject to the six-year statute of limitations, even though their tort claims for "injury to their real property" were subject to a three-year limitations period. *Simpkins*, 2022 WL 1404357, at *13, 25.

Contract," liquidated damages resulting from the failure to meet the contractual Date of Substantial Completion, plus other "incidental and consequential damages" arising from the alleged breach of contract. Although the plaintiff also seeks other damages that are not available as remedies for breach of contract, these particular damages clearly arise from, and are related to, the alleged breach of contract. . . . The court concludes that "the legal basis of the claim is breach of contract and the damages sought . . . are for breach of contract." *Benz-Elliott*, 456 S.W.3d at 152. Consequently, the breach of contract claim is governed by the six-year statute of limitations applicable to "[a]ctions on contracts not otherwise expressly provided for." Tenn. Code Ann. § 28-3-109(a)(3).

*Hinman v. ValleyCrest Landscape Dev., Inc.*, No. 3:19-CV-00551, 2020 WL 434161, at *17 (M.D. Tenn. Jan. 28, 2020).

In short, the breach of contract claims, including claims for breach of express or implied warranty, are subject to the six-year limitation period provided by Tenn. Code Ann. § 28-3-109(a)(3), not the three-year limitations period set forth in Tenn. Code Ann. § 28-3-105(1). *Accord Benz-Elliott*, 456 S.W.3d at 152; *Simpkins*, 2022 WL 1404357, at *13. They are not time-barred.

## 2. Merits of the Claim

Under Tennessee law, "[t]he essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (citation omitted). Here, the parties do not dispute the existence of an enforceable contract. BrightView contends that Hinman cannot establish that some of the alleged nonperformance on which her claim is premised either were not part of the contract at all or were not material parts of the contract or did not cause damages (precisely because they were not material).

Tennessee courts look to § 241 of the Restatement (Second) of Contracts to determine whether a breach of contract is material. *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211,

225 (Tenn. Ct. App. 2009) (citations omitted). The factors identified by the Restatement as "significant" include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241, *quoted in Archer v. Noonan*, No. M2020-01266-COA-R3-CV, 2021 WL 3662357, at *4 (Tenn. Ct. App. Aug. 18, 2021).

As now relevant, Hinman claims that BrightView breached the Contract by failing to construct her pool in accordance with ADE's Plans and Specifications (Art. 3.1.2); by failing to give her change orders and the "as-built" documents showing its deviations from the Plans and Specifications until this lawsuit was underway (Art. 3.2.9); by failing to complete the pool in accordance with the schedule provided by the Contract (Art. 3.2.4) and failing to pay liquidated damages for each day it failed to reach substantial completion of the project after the projected completion date (Art. 6.4.1.1); by failing to perform its warranty obligations (Art. 3.7.1); and by failing to promptly correct defective work (Arts. 3.8.1 and 3.8.2).

It is unclear whether the plaintiff is still pursuing a claim based on BrightView's failure to provide her with change orders. Regardless, there is no evidence of the existence of actual change orders that were not provided. (*See, e.g.*, Doc. No. 129-1, Mallon Dep. 35, 42, 45–46, 75–76, 124–25.) Likewise, it appears to be undisputed that BrightView delivered a set of as-built Plans during

the course of discovery in this case. (*Id.* at 78–79; Doc. No. 131-9, Ferrell Dep. 38–43.) While actual as-builts might have revealed the Deviations, Hinman has not shown, as discussed below, that the Deviations materially altered the pool or that she was in any way harmed by not having received more accurate as-built plans sooner than she did. It is unclear, therefore, how she was harmed by not timely receiving accurate as-built Plans.

It is clear, in any event, that the Deviations are now the primary focus of the plaintiff's breach of contract claim. Regarding BrightView's use of shotcrete instead of cast-in-place concrete, the plaintiff has not shown that this change impacted the aesthetic appeal of the pool, impacted its functioning, diminished its value, made the pool more difficult to maintain, or otherwise resulted in any diminution in the value of the pool. Her own expert testified that the "basic distinction" between the two was in "how the concrete is placed." (Doc. No. 131-5, Chapman Dep. 28.) "Shotcrete is still concrete. It still has the same basic ingredients and it still cures over a period of time . . . ." (*Id.* at 31.) According to Chapman, even before the parties finalized the Contract, BrightView had received a bid from Georgia Gunite to perform the concrete work on the pool shell, and BrightView specifically requested a proposal that included a "monolithic shotcrete pool shell" with no expansion joint, instead of a pool with shotcrete walls but a cast-in-place floor, with an expansion joint. (*See* Doc. No. 91-8, at 5.) Chapman is of the opinion that the Contract, because it incorporated the Plans and Specifications, required a cast-in-place concrete floor. (*Id.* at 5; *see id.* at 8 ("[BrightView] deviated from the requirement of the plans by using a shotcrete type construction method in-lieu of a cast-in-place construction method for the pool and the waterfalls.").) He also conceded, however, that a contractor's pricing proposal to Hinman is generally based on the bids it received from its subcontractors. The bid from Georgia Gunite, did not mention Xypex or cast-in-place construction. (Doc. No. 131-6, Chapman Dep.

184–85.) There is no actual evidence in the record that BrightView charged Hinman a higher price for cast-in-place concrete but used a less expensive shotcrete method of installation (or, in fact, that shotcrete is less expensive). Moreover, although Chapman opines that the use of shotcrete for the pool floor constituted a deviation from the Contract, he does not state that the use of shotcrete, *per se*, resulted in any diminution in the value of the pool or that shotcrete made the pool less structurally sound, more difficult to maintain, or more likely to leak in the future. In short, neither his testimony nor that of Hinman suggests that the use of shotcrete gave rise to any damages. The plaintiff has not shown that the use of shotcrete in any sense deprived her of the benefit of the bargain with BrightView. This deviation was not material.

Likewise, regarding the footer, Chapman testified that, although its absence was a "deviation from the plans," the structure was nonetheless "capable, in [his] opinion, of supporting the loads that are on it as it has been constructed," particularly because "[t]he loads are so small with respect to the capacity of what was built." (Doc. No. 131-6, Chapman Dep. 218.) In other words, the absence of the footer did not materially affect the structural integrity of the pool and has not given rise to damages.

As for the other Deviations, Chapman's Report, as set forth above, states that the absence of no-leak flanges gives rise to an "increased risk of leaks at plumbing penetration in the future"; the failure to install preformed drain sumps "may have caused or contributed to leaks in the pool shell"; and the absence of a vapor barrier "has more likely than not resulted in increased expos[ure] to subsurface moisture that may increase the likelihood of rebar deterioration." (Doc. No. 91-8, at 8.) However, Chapman also testified that he accepted Luke Brown's conclusion that the pool shell is not currently leaking, so there is no pool shell leakage to be linked to the absence of preformed drain sumps. He agreed that there is no evidence of rebar deterioration and, in fact, no evidence

that the pool shell is leaking. Perhaps in recognition of these deficiencies, Chapman emphasizes that, among all of the noted Deviations, "the failure to include the waterproofing admixture Xypex and the failure to install the 'no leak PVC flanges' have resulted in a pool shell that is materially less waterproof than the pool described by the Plans and Specifications." (*Id.*)

The problem with that assertion is that Chapman conceded in his deposition that there is no evidence that the absence of Xypex is actually causing any leaks in the pool. (*See* Doc. No. 131-6, Chapman Dep. at 204 ("No, I don't have any evidence that any leaks can be directly attributed to the lack of Xypex.").) He also is not able to meaningfully quantify how waterproof the pool is now, without Xypex, or how much *more* waterproof it would have been with the addition of Xypex products. He does not attempt to quantify the likelihood of future leaking. He simply indicates that there is some nebulous increased future risk of leakage. In his deposition, he testified that concrete with Xypex is "much less permeable, and much more waterproof than concrete is without it." (Doc. No. 131-5, Chapman Dep. at 57.) The court finds that the conclusory nature of Chapman's testimony—that there is an increased risk of possible future leaks associated with the all of these various Deviations from the Plans and Specifications—is insufficient to establish that the identified Deviations individually or collectively amount to a material breach of the contract or gave rise to actual damages.

The plaintiff herself does not claim that any of the Deviations has resulted in a visually less appealing or less functional pool, or that they made the pool more difficult to maintain. She has not presented any evidence that the value of the pool has been significantly reduced or, indeed, that the cost of the pool was in any way premised upon the items that BrightView left off. In other words, she has not shown that she was deprived of any actual benefit expected under the terms of the Contract. The court finds, based on a review of all of the evidence in the light most favorable

to the plaintiff, that no reasonable jury could find that the Deviations from the contract constitute material breaches thereof or that they gave rise to anything other than entirely speculative damages. To the extent her breach of contract claim is premised on the Deviations, BrightView is entitled to summary judgment on the claim. In addition, BrightView's failure to notify her or ADE about these changes or to obtain ADE's approval of them is also not material and does not constitute a material breach of contract.

However, the plaintiff points to other alleged breaches of the Contract in her Responses to the Motion for Summary Judgment and the SUMF: "The waterfall concrete is breaking apart. In addition, the pool is too complicated to maintain, it cracks, it loses water, and it was not timely delivered even though the Contract provides that time is of the essence." (Doc. No. 126, at 12; *see also* Doc. No. 127, Resp. ¶ 14 ("Brightview delivered a pool that is unworkably complicated. . . . Brightview improperly installed the concrete on the waterfalls. . . . BrightView did not deliver the project on time. . . .").)

Regarding the maintenance of the pool, the plaintiff cannot establish that BrightView contracted to build a pool that would be easy to maintain or that it contracted to assist with the maintenance of the pool (even though it apparently tried to assist the plaintiff with maintenance) or that the complex nature of the pool in any sense constitutes a breach of the Contract. In addition, there is no evidence in the record establishing that the cracks of which the plaintiff complains are causing the pool to lose water or that they are anything other than a cosmetic or maintenance issue.

There is evidence, however, that the water features were poorly installed, with the top layer of concrete not being sufficiently thick and now chipping or crumbling. (Doc. No. 131-9, Ferrell Dep. 127–28.) Thus, there is (at least) a question of fact as to whether, as the defendant claims, this is simply a maintenance issue for which the plaintiff bears responsibility or whether, instead,

the defendant is responsible for the problem.

Regarding the timeliness issue, the Contract provides for liquidated damages in the amount of $250 per day for "each Day that Substantial Completion extends beyond the Date of Substantial Completion." (Doc. No. 1-2, at 15.) The plaintiff asserts that the Contract called for completion of the pool within fourteen weeks after construction began, or June 29, 2015, but the pool was not substantially completed until September 13, 2015, at the earliest, or seventy-six days past the Substantial Completion Date. (Doc. No. 148-1, Hinman Dep. 56; Doc. No. 1-2, at 15, Contract art. 6.4.) BrightView argues that the plaintiff waived her right to enforce this provision by submitting final payment without reference to her right to liquidated damages under the Contract. Waiver is the intentional, voluntary relinquishment of a known right. *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751, 757 (6th Cir. 1999) (citing *Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984)). In addition, "a waiver of a contractual right must be clear and unequivocal," and Tennessee law further requires either consideration or an element of estoppel for a contractual waiver." *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (citations omitted). The court finds that there is a question of fact as to whether the plaintiff waived enforcement of this provision.

Perhaps most importantly, irrespective of the lack of evidence that the pool shell itself is leaking or that the alleged contract deviations have contributed to or caused leaks, the plaintiff has presented competent evidence that the pool is leaking and has been leaking for sometime and that, despite notice, BrightView has failed to correct the problem. The pool began losing water in late 2015, shortly after its completion. Although the problem seemed to have been ameliorated with the installation of the retrofitted expansion joint in the spring of 2016, the plaintiff provided notice in the fall of 2017 that the pool was "still leaking." (*See* Doc. No. 114-4, at 33.) By the spring of

2018, when the pool was reopened, the plaintiff suspected, but had not verified, that the leaking was related to the expansion joint. In the fall of 2018, Hinman again notified BrightView that the pool was still leaking. Jeff Stauffer advised her to use the dye test kit he had left for her to try to find out where it was losing water. She did and concluded that the expansion joint was leaking. (Doc. No. 148-1, Hinman Dep. 136, 206.)

The plaintiff paid for a pool that does not leak. The evidence she has presented suggests that the pool has leaked on and off since it was installed. Although the defendant contests the ability of the plaintiff or her designated experts to testify regarding the source of the leak or even that the pool is leaking, the plaintiff herself is competent to testify that the pool is losing water, and her experts' testimony simply serves to further corroborate her first-hand observations regarding her water bills and the constantly lowering water level. There is, at the very least, a question of fact as to whether the pool is leaking, and no evidence that anything other than faulty pool construction would be to blame for the water loss.

In sum, the defendant is not entitled to summary judgment on the plaintiff's breach of contract claim related to the damaged water features, the timeliness of completion, or the pool's continued leaking problem. In other respects, however, the plaintiff's breach of contract claim fails for lack of evidence of materiality or damages.

## B.     Breach of Implied and Express Warranties

The plaintiff claims that BrightView breached an express warranty in the Contract by "using equipment and material that was not in conformance with the Contract, including, but not limited to, using material that was not of good quality, including the sprinkler system, pump system, electrical system, and other equipment, and by failing to replace dead plant life as required." (Doc. No. 1 ¶ 38.) She also asserts that the defendant breached implied warranties of

merchantability and fitness for a particular purpose regarding the pool system. The defendant seeks summary judgment on the warranty claims on the grounds that the Contract expressly waives them.

The Contract contains the following language under the heading "Warranty":

3.7.1. The Design-Builder warrants that all materials and equipment furnished under this Agreement will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials. Warranties shall commence on the date of Substantial Completion of the Work. Design-Builder will replace any plant life that dies or is in distress and repair erosion that occurs during the warranty period.

3.7.2. . . . To the extent products, equipment, systems, or materials incorporated in the Work are specified by the Owner but purchased by the Design-Builder and are inconsistent with selection criteria that otherwise would have been followed by the Design-Builder, the Design-Builder shall assist the Owner in pursuing warranty claims. ALL OTHER WARRANTIES EXPRESSED OR IMPLIED INCLUDING THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED.

(Doc. No. 1-2, at 10, Contract § 3.7.1, 3.7.2.)

The plaintiff now argues that BrightView "breached its *express warranty* by making the Deviations from the Plans" and that the "disclaimer of implied warranties does not apply with respect to Hs. Hinman's claims." (Doc. No. 126, at 15.) In other words, the plaintiff is simply recasting her breach of contract claims as breach of warranty claims. To that extent, they are redundant of the breach of contract claims, and the court has already found that the plaintiff's breach of contract claims arising from the Deviations fail for lack of evidence that the Deviations are either material or gave rise to actual damages.

The plaintiff has made it clear that she is no longer complaining—as she did in the Complaint—about the dead landscaping. In any event, with regard to the landscaping, the record establishes that Hinman "elected to accept Defective Work rather than require its removal and correction," when she unilaterally adjusted the Contract Price to "equitably adjust[] for any diminution in the value of the Project caused by such Defective Work." (Doc. No. 1-2, at 11–12,

Contract § 3.8.7.)

With regard to the plumbing and mechanical equipment, David Chapman did not purport to offer any opinion regarding the functioning of that equipment, and Douglas Cook testified that the equipment conformed with the Plans and was of good quality. (Doc. No. 131-4, Cook Dep. 178; *see id.* at 182 (agreeing that "all of [the mechanical equipment BrightView installed was] called out in the design").) Cook did not indicate that the equipment was of poor quality or improperly installed, only that it needed to be maintained by a full-time, properly trained technician. (*Id.* at 176, 179.) Although he stated that the equipment when he viewed it was in poor condition, he also could not say when the alleged damage occurred or how, and he agreed that many of the things he described as being damaged were maintenance items. (*Id.* at 187–88.) Although the plaintiff has apparently continued to complain about the mechanical equipment, in response to the defendant's assertion that she has no evidence of a breach of warranty regarding the functioning of the equipment, the plaintiff has not pointed to the existence of any such evidence. The court finds that the defendant has satisfied its obligation under Rule 56 of supporting its assertion that a "fact cannot be genuinely disputed" by showing that the plaintiff "cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). The defendant is entitled to summary judgment on the claim for breach of express warranties related to the pool's mechanical, electrical, and plumbing equipment.

To the extent the plaintiff is alleging a breach of the implied warranties of merchantability and fitness for a particular purpose, the Contract expressly waived such warranties. Under Tennessee's enactment of the Uniform Commercial Code, any waiver of the implied warranties of merchantability or fitness for a particular purpose generally must be in writing and "conspicuous." Tenn. Code Ann. § 47-2-316(2). A waiver of the implied warranty of merchantability must

"mention merchantability." *Id.* The Contract in this case contains express language, under the Article of the Contract entitled "WARRANTY," that states, in capitalized letters:

> ALL OTHER WARRANTIES EXPRESS OR IMPLIED INCLUDING THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED.

(Doc. No. 1-2, at 10, Contract § 3.7.2.) The other parts of the same section (and article), aside from the title of the article, are not capitalized.

The statute defines "conspicuous" as used in the UCC to mean

> so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
> (A) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (B) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language. . . .

Tenn. Code Ann. § 47-1-201(10).

The language of the warranty waiver at issue here was incorporated into the Contract that was signed by Hinman. The court finds that the language of the waiver was clear, as it expressly disclaimed all other warranties other than those provided by the Contract. It was also sufficiently conspicuous. *Accord Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, No. 3:08-0368, 2009 WL 2983035, at *7 (M.D. Tenn. Sept. 14, 2009) ("Words 'hidden in fine print' are generally not 'conspicuous,' but, logically, a disclaimer that is 'stated in capital letters' and is, therefore, readily apparent to the reader, is conspicuous." citations omitted)). The court finds that the Contract effectively waived the implied warranties of merchantability and fitness for a particular purpose.

The defendant is entitled to summary judgment on the plaintiff's claim for breach of the implied warranties of merchantability and fitness for a particular purpose. It is also entitled to summary judgment on the claim for breach of express warranties, except insofar as this claim overlaps with those parts of the breach of contract claim that will be permitted to proceed.

### C. TCPA Claim

#### 1. Statute of Limitations

An action for damages or other relief under the TCPA must be brought "within one (1) year from a person's discovery of the unlawful act or practice." Tenn. Code Ann. § 47-18-110. By expressly employing the word "discovery" in the statute, the Tennessee legislature made it clear that the limitations period does not begin to run until the plaintiff discovers—-or reasonably should have discovered—the unlawful practice on which her claim is premised. *See Robinson v. Baptist Mem'l Hosp.*, 464 S.W.3d 599, 608 (Tenn. Ct. App. 2014) ("Under the current discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has either actual or constructive knowledge of a claim." (citing *Redwing v. Catholic Bishop*, 363 S.W.3d 436, 457 (Tenn. 2012)); *Ne. Knox Util. Dist. v. Stanfort Constr. Co.*, 206 S.W.3d 454, 459 (Tenn. Ct. App. 2006) ("A cause of action accrues for either intentional or negligent misrepresentation when a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof." (quoting *Med. Educ. Assistance Corp. v. State*, 19 S.W.3d 803, 817 (Tenn. Ct. App. 1999)).

"Under the discovery rule, the statute of limitations will only begin to run when the plaintiff has actual knowledge of the claim, or when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that she has suffered an injury as a result of wrongful conduct." *Coffey v. Coffey*, 578 S.W.3d 10, 22 (Tenn. Ct. App. 2018). Generally, "the inquiry of when a plaintiff knew of or should have discovered a cause of action is a question of fact not properly

decided on summary judgment." *Id.* at 21 (citing *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996)); *see id.* at 22 ("[W]hether a plaintiff exercised reasonable care and diligence in discovering her injury is usually a fact question for the trier of fact to determine."). However, if the material facts are undisputed and "clearly show that a cause of action has accrued and that the statute of limitations has run, a summary judgment may be entered." *Id.*

The Tennessee Supreme Court has explained that "inquiry notice charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed. . . . [O]nce a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." *Redwing*, 363 S.W.3d at 459 (internal quotation marks and citations omitted).

In this case, the plaintiff's TCPA claim, as set forth in the Complaint, is premised upon BrightView's allegedly

> concealing the fact that the contract was priced on the basis of expensive cast-in-place construction when in fact utilizing much less expensive shotcrete construction; concealing the fact that the pool was leaking because [BrightView] failed to install an expansion joint in the first instance; and concealing the fact that the expansion joint installed in May 2016 was improperly installed, in violation of Tenn. Code Ann. § 47-18-104(b)(5) [and] § 47-18-104(b)(7).

(Doc. No. 1 ¶ 44(1) & (2).)[12]

In her Response in opposition to the Motion for Summary Judgment, Hinman incorporates into this claim her allegations regarding the plan Deviations, BrightView's alleged failure to tell her or ADE about the Deviations, and its purportedly taking steps to "conceal" the Deviations.

---

[12] The Complaint also alleged that ValleyCrest transferred its contractor license to BrightView while ValleyCrest was still obligated to fulfill its obligations under the Contract. Any claim based on this allegation was obviated by the conclusion that ValleyCrest essentially changed its name to BrightView.

(*See* Doc. No. 126, at 16.) She argues that BrightView "misrepresented that the Project had the 'sponsorship and approval' of ADE" but ignored ADE's detailed Plans and mispresented the "characteristics of the goods and services provided" by promising Xypex and other "extremely detailed design features but then making the Deviations." (Doc. No. 126, at 16, 17.)[13] Specifically regarding the statute of limitations issue, Hinman asserts that she did not discover the Deviations until 2019 and that the "record makes clear that BrightView concealed these Deviations." (*Id.* at 18.)

Specifically regarding the TCPA claims as actually articulated in the Complaint, it is beyond clear that the plaintiff knew about the omission of the expansion joint in early 2016. Any TCPA claim relating to the original omission of the expansion joint was clearly discovered more than one year prior to the plaintiff's filing of her Complaint in July 2019. In addition, to the extent the plaintiff intends to premise her TCPA claim on BrightView's failure to reveal to her how difficult it would be to train and retain a pool maintenance company, the plaintiff was admittedly on notice of that fact no later than the fall of 2016, more than one year before she filed suit in July 2019. (*See* Doc. No. 127, Pl.'s Resp. ¶ 43.) The defendant is entitled to summary judgment on the TCPA claim, on statute of limitations grounds, insofar as the claim is premised upon these alleged failures and omissions.

Regarding the allegedly incorrectly installed expansion joint, the plaintiff claims that she discovered that the pool was leaking along the expansion joint when she used the dye test kit provided to her by BrightView in the fall of 2018—less than a year before she filed suit. Whether

---

[13] She also invites the court to reconsider the dismissal of the fraudulent inducement claim. The court declines that invitation.

a reasonable person would have discovered it sooner is a jury question. BrightView has not established that that claim is time-barred.

Regarding the purported Deviations, BrightView argues that the plaintiff's frequent contacts with it and her repeated complaints about the pool, from shortly after its completion through early 2019, belie her attempts now to claim that she did not "discover" the "source" of her injuries until the summer of 2019, when she obtained counsel and "began the investigation that led to the filing of this lawsuit." (Doc. No. 126, at 6.) The court is not persuaded. The relevant inquiry for purposes of the TCPA claim is what a reasonable person in the plaintiff's position should have known by July 1, 2018. Aside from other problems with the TCPA claim based on the Deviations, the court finds that there is a question of fact as to when Hinman acquired "actual knowledge of facts sufficient to put a reasonable person on notice that she has suffered an injury as a result of wrongful conduct." *Coffey*, 578 S.W.3d at 22. Although Hinman obviously knew that the pool had issues and knew or suspected no later than late 2017 that it was continuing to leak, despite the installation of the retrofitted expansion joint, given that BrightView allegedly did not provide her with accurate as-built construction plans until discovery in this case and that most of the construction Deviations are literally concealed by a layer of concrete, her notice of problems in general did not necessarily put her on notice of the Deviations. The defendant has not shown that it is entitled to summary judgment on the TCPA claim arising from the Deviations on the basis of the statute of limitations.

### 2. Merits of TCPA Claim

The TCPA prohibits the use of "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a); *Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*, 446 F. Supp. 3d 258, 271–72 (M.D. Tenn. 2020) (Campbell, J.). A "deceptive" act or practice is one that causes or tends to cause a

consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact. *Id.* at 272 (citing Audio *Visual Artistry v. Tanzer*, 403 S.W.3d 789, 810 (Tenn. Ct. App. 2012)). The TCPA lists certain acts considered to be "unfair or deceptive," including the following provisions cited by Hinman in her Complaint:

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have; . . .

> (7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another . . . .

Tenn. Code Ann. § 47-18-104(b)(5), (7).

In order to recover under the TCPA, a plaintiff must prove that (1) the defendant engaged in an unfair or deceptive act and (2) the defendant's conduct caused an ascertainable loss of money or property. *Best Choice*, 446 F. Supp. 3d at 272 (citing *Tanzer*, 403 S.W.3d at 810). "As to the second element, 'the alleged unfair or deceptive act or practice must in fact cause the damages of which the plaintiff complains.'" *Id.* (quoting *White v. Early*, 211 S.W.3d 723, 743 (Tenn. Ct. App. 2006)). Because the TCPA is remedial, it is to be construed liberally in order to protect the consumer. *Miolen v. Saffles*, No. E2018-00849-COA-R3-CV, 2019 WL 1581494, at *8 (Tenn. Ct. App. Apr. 12, 2019). Whether a particular representation or act is "unfair" or "deceptive," within the meaning of the TCPA, is a generally a question of fact. *Id.* at *9.

As set forth above, the TCPA claim as articulated in the Complaint is based upon allegations (that are not time-barred) that the pool project was "priced [on] the basis of expensive cast-in-place construction," despite BrightView's intention from the outset to use shotcrete construction; and (2) BrightView "conceal[ed] the fact that the expansion joint installed in May 2016 was improperly installed." (Doc. No. 1 ¶ 44(1), (2).)

The plaintiff has not presented any evidence suggesting that the pricing of the pool project was actually premised upon cast-in-place construction as opposed to shotcrete, or even that cast-in-place construction is more expensive than shotcrete. More to the point, the plaintiff has not established that the use of shotcrete gave rise to "an ascertainable loss of money or property." *Best Choice*, 446 F. Supp. 3d at 272. To the contrary, her expert, David Chapman, did not attribute any damages to the use of shotcrete *per se*, or opine that it made the pool less valuable than it otherwise would have been. The defendant is entitled to summary judgment on the TCPA claim based on the use of shotcrete instead of cast-in-place concrete for the pool floor.

To the extent the plaintiff believes that BrightView "concealed" defects in the expansion joint installed in May 2016, the plaintiff has not pointed to any actual omissions, concealment, or deception related to the installation of the retrofitted expansion joint, *per se*. Instead, in her Response to the Motion for Summary Judgment, the plaintiff argues about the Deviations and the steps BrightView allegedly took to conceal the Deviations. The defendant is entitled to summary judgment on the TCPA claim based on the alleged concealment of defects related to the installation of the retrofitted expansion joint.

Finally, insofar as the TCPA claim is now based primarily on the Contract Deviations, even if the court presumes that BrightView had a duty to disclose these Deviations, Hinman has not shown that she suffered "an ascertainable loss of money or property," *Best Choice*, 446 F. Supp. 3d at 272, as a result of the specific Deviations already discussed—the failure to use no-leak flanges, a vapor barrier, preformed fiberglass sumps, or Xypex. The defendant, therefore, is entitled to summary judgment on the plaintiff's TCPA claim related to the Deviations as well.

In sum, no part of the plaintiff's TCPA claim survives on the merits. The defendant is entitled to summary judgment on the TCPA claim in its entirety.

**D.      Negligence**

*1.      Statute of Limitations*

Negligence claims resulting in injury to property must be "commenced within three (3) years from the accruing of the cause of action." Tenn. Code Ann. § 28-3-105(1). As discussed in connection with the TCPA statute of limitations, "[u]nder the current discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has either actual or constructive knowledge of a claim." *Robinson*, 464 S.W.3d at 608. A plaintiff has constructive knowledge when she has "actual knowledge of facts sufficient to put a reasonable person on notice that she has suffered an injury as a result of wrongful conduct." *Coffey*, 578 S.W.3d at 22. "[T]he inquiry of when a plaintiff knew of or should have discovered a cause of action is a question of fact not properly decided on summary judgment." *Id.* at 21.

The negligence claim as set forth in the Complaint is premised upon BrightView's allegedly

> not using proper waterproofing techniques; by not installing an expansion joint in the first instance; by not properly installing an expansion joint after admitting that the expansion joint had not been originally installed; by not properly grounding electrical equipment; by not properly installing pumps; and by not procuring the proper equipment.

(Doc. No. 1 ¶ 64.)

BrightView argues, again, that the plaintiff's frequent contacts with BrightView and repeated complaints about the pool, from shortly after its completion through early 2019 belie her attempts now to claim that she did not "discover" the "source" of her injuries until the summer of 2019, when she obtained counsel and "began the investigation that led to the filing of this lawsuit." (Doc. No. 126, at 6.) In particular, BrightView points to a March 14, 2019 email to Brian Chesnut, BrightView's CEO, from Jamie Nicholson, one of Hinman's financial advisors, acting on behalf of Hinman, providing a timeline of the plaintiff's discovery of various problems and her attempts

to get BrightView to fix them ("Nicholson email"). (Doc. No. 114-4, at 32–35.) As with the TCPA claims, the plaintiff's Response to the statute of limitations argument focuses on the alleged Contract Deviations rather than on the actual issues raised in her Complaint.

The relevant inquiry for purposes of the defendant's statute of limitations argument is what the plaintiff knew or reasonably should have known by July 1, 2016. Again, with respect to the omission and retrofitted expansion joint, the plaintiff knew about that problem no later than January 2016, more than three years before she filed suit. The claim, insofar as it is premised upon that negligent omission, is clearly time-barred.

To the extent the plaintiff's negligence claim is premised upon BrightView's building a pool that was too complicated for the residential, rural setting of the plaintiff's home, that claim is time-barred, as the plaintiff was clearly on notice well before July 2016 of how complicated the maintenance of the pool was and the difficulties she was already having in training and retaining a company to help her with pool maintenance. (*See, e.g.*, Doc. No. 148-1, Hinman Dep. 93–94 (stating that she became discouraged after calling virtually every company within a thirty-mile radius during the summer of 2015 and learning that none was willing to take on a pool as complicated as hers).)

Otherwise, however, insofar as her claim arises from the other issues with the pool and the specific Deviations the plaintiff claims not to have discovered until she retained an engineer, the court finds that there is a question of fact as to when Hinman acquired "actual knowledge of facts sufficient to put a reasonable person on notice that she has suffered an injury as a result of wrongful conduct." *Coffey*, 578 S.W.3d at 22. That is, although the plaintiff had knowledge of myriad problems with the pool, particularly as pertains to the expansion joint and the problems with specific pieces of equipment, well before July 2018, a fact question exists as to whether a

reasonable person would have been on notice that BrightView's intentional or negligent Deviations from ADE's Plans and Specifications were the source of the leak problem.

        2.     *Merits*

The elements of a general negligence claim in Tennessee are (1) a duty of care owed by the defendant to the plaintiff; (2) breach of the applicable standard of care; (3) injury to the plaintiff; and (4) the defendant's conduct is both a "cause in fact" and "proximate cause" of the injury. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009).

BrightView argues that this claim is not supported by the evidence and, in any event, is barred by the economic loss doctrine. The plaintiff responds that (1) "[w]hile the case is grounded primarily in contract, BrightView was also negligent in materially deviating from the Plans, as described herein"; (2) BrightView was further negligent in its retrofitting of the expansion joint; and (3) the economic loss doctrine does not apply.

Tennessee law on the applicability of the economic loss doctrine in this context is unsettled. In 2021, the Tennessee Supreme Court explicitly noted that it had "never applied the economic loss doctrine outside the products liability context, in which it originated." *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 153 (Tenn. 2021).[14] In 2022, the Tennessee Court of Appeals held that the "economic loss rule is applicable to construction contracts negotiated

---

[14] BrightView does not contend that this case qualifies as a product liability action. The only case remotely on point that this court has located held that "policy reasons do not justify characterizing" the custom-built in-ground pool at issue in that case as a "product" for purposes of product-liability law, where it had "not been shown to be a standardized model constructed, assembled, or manufactured by a mass-production process analogous to the tract homes in [*Schipper v. Levitt & Sons, Inc.*, 207 A.2d 314 (N.J. 1965)], and [*Kriegler v. Eichler Homes*, 74 Cal. Rptr. 749 (Cal. Ct. App. 1969)]," or "analogous to the prefabricated fiberglass pool designed, manufactured, and distributed for installation by the defendant in [*Duggan v. Hallmark Pool Mfg. Co.*, 398 N.W.2d 175, 178 (Iowa 1986)]." *Menendez v. Paddock Pool Const. Co.*, 836 P.2d 968, 977 (Ariz. Ct. App. 1991).

between sophisticated commercial entities." *Commercial Painting Co. v. Weitz Co.*, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at *1 (Tenn. Ct. App. Mar. 11, 2022), but the Tennessee Supreme Court granted an appeal of that decision, specifically to address the issue of whether the Court of Appeals "erred in applying this Court's holding in *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125 (Tenn. 2021), and expanding the application of the economic loss doctrine to the circumstances of this case," No. W2019-02089-SC-R11-CV, 2022 WL 3149615 (Tenn. Aug. 4, 2022). In light of that pending appeal, the court will not grant summary judgment on the basis of the economic loss doctrine at this juncture.[15]

Regardless, insofar as the plaintiff's negligence claim is premised upon the alleged Deviations, the court has already found, as set forth above, that, irrespective of whether BrightView deviated from the standard of care by failing to follow the Plans and Specifications provided by ADE, the plaintiff cannot establish damages arising from BrightView's failure to use Xypex, no-leak flanges, a vapor barrier, preformed sumps, or the nine-inch footer.

Regarding the installation of the retrofitted expansion joint, the plaintiff has established that there is at least a question of fact as to whether the defendant incurred a duty to her when it undertook that repair and as to whether the expansion joint, due to a negligent or faulty installation, has been leaking since no later than sometime in 2017. The plaintiff has also presented evidence suggesting that the water features were negligently constructed. The court will not grant summary judgment to BrightView on the negligence claim insofar as it is based on these issues. Insofar as

---

[15] The plaintiff argues that, even if the Tennessee Supreme Court affirms the appellate court's holding, the decision would not apply here, because the Contract is not between "sophisticated commercial entities." The plaintiff, however, is clearly sophisticated, and she appears to have involved her lawyer and financial advisor in most of her dealings with BrightView. Although there is perhaps a question of fact as to the parties' respective sophistication, it is not likely that this distinction would bar the application of *Commercial Painting* to the particular facts of this case, if the opinion is affirmed.

the negligence claim is based on any other allegations, however, BrightView is entitled to summary judgment.

**IV.     CONCLUSION**

For the reasons set forth herein, the court will grant in part and deny in part BrightView's Motion for Summary Judgment (Doc. No. 114). The breach of implied warranty, TCPA, and conspiracy claims will be dismissed in their entirety. The breach of contract, breach of express warranty, and negligence claims will be dismissed in part.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge