IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **JERE HINMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00551** |
| | ) | **Judge Aleta A. Trauger** |
| **BRIGHTVIEW LANDSCAPE** | ) | |
| **DEVELOPMENT, INC. and AQUATIC** | ) | |
| **DESIGN & ENGINEERING, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM and ORDER

Before the Court is the Motion to Exclude Opinion Testimony of Plaintiff's Expert Witnesses (Doc. No. 125), filed by defendant BrightView Landscape Development, Inc. ("BrightView"), in which BrightView, citing Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), asks the court to exclude the opinions and testimony of plaintiff's expert witnesses Luke Brown, David Chapman, and Doug Cook, both from trial and from consideration in the context of ruling on the defendant's also-pending Motion for Summary Judgment. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.    BACKGROUND

As this court has had previous occasion to explain, plaintiff Jere Hinman filed this suit against several defendants on July 1, 2019, asserting numerous claims in connection with the defendants' design and construction of a $1 million pool and associated hardscaping and other landscaping at Hinman's home in Lebanon, Tennessee in 2015. The only remaining defendant now is BrightView, and the substantive claims remaining against BrightView are those for breach of

contract (Count One), breach of express warranty (Count Two), and negligence (Count Seven).[1]

In support of her claims, Hinman relies upon the proposed testimony of three different experts: Luke Brown, David Chapman, Ph.D., P.E., and Douglas Cook. Luke Brown, the owner of Pool Leak Services of Middle Tennessee, proposes to offer his opinion that the subject pool has "multiple leaks along the expansion joint." (Doc. No. 136-4, at 1.) Chapman, a civil engineer with Construction Engineering Consultants, was retained "to evaluate the condition and construction of the pool in light of certain allegations related to deficiencies in the construction of the pool" (Doc. No. 91-8, at 2), and he primarily offers opinions related to the ways in which the pool as constructed deviates from the construction contract, as well as an opinion regarding the amount of water the pool is losing on a daily basis, over and above simply evaporation, presumably as a result leaks. Douglas Cook, the owner of Net Zero Pools & Designs, offers opinions related primarily to the cost of repairing or removing the pool. (Doc. No. 125-7.) BrightView argues broadly that the plaintiff's experts are unreliable and unqualified to offer opinions on the issues for which the plaintiff offers them, primarily because they lack the "requisite reliability and qualifications to opine on the complex issues surrounding this case because none of them understand[s] the intricate design and working of the expansion joint that is at the center of the claim in this case." (Doc. No. 125-1, at 1–2.)

## II.    LEGAL STANDARD

The defendant seeks to exclude the plaintiff's three proposed experts, arguing that their opinions do not meet the standards of *Daubert* and Rule 702 of the Federal Rules of Evidence. Rule 702 "obligates judges to ensure that any scientific testimony or evidence admitted is relevant

---

[1] Contemporaneously with this opinion, the court is issuing a Memorandum and Order granting in part and denying in part the defendant's Motion for Summary Judgment.

and reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509

U.S. at 589). Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court explained that a district court, when evaluating evidence

proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony

or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The *Daubert*

standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence

on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's*

*Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony include "whether a

method is testable, whether it has been subjected to peer review, the rate of error associated with

the methodology, and whether the method is generally accepted within the scientific community."

*Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (citing *Daubert*, 509

U.S. at 593–94). The Rule 702 inquiry is "a flexible one," and the *Daubert* factors do not constitute

a definitive test or checklist. *Kumho Tire*, 526 U.S. at 138–39 (citing *Daubert*, 509 U.S. at 593);

*see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors

"are simply useful signposts, not dispositive hurdles that a party must overcome in order to have

expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire* Co., 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 970–71 (quoting *Daubert*, 509 U.S. at 593–94). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *7 (E.D. Penn. Feb. 1, 2001) (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Id.* (other citations omitted).

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Grp.*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other citations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional

and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

## III.    ANALYSIS

### A.    Luke Brown

As indicated by his Report, Brown owns a company called Pool Leak Services of Middle Tennessee. He and his technicians visited the pool in June 2022 and reviewed the pool shell and its operating systems. (Doc. No. 131-7, Brown Dep. 7.)[2] Based on the findings derived from these inspections, Brown issued his Report on June 19, 2022. (Doc. No. 91-9.) Brown's findings, as set forth in his Report, are that: (1) "[e]very line to the pool held pressure and there were no leaks on any of the lines" (Doc. No. 91-9, at 1); (2) there were no leaks at the skimmer mouths and housings, main drain housings, lights, return fittings, skimmer equalizer housings, wall drain fitting, or water feature returns (*id.* at 2); (3) there were no leaks in the pool shell (*id.*; *see also* Doc. No. 131-7, Brown Dep. 11 (agreeing with the statement in his report "[i]nspected shell; no leaks found; cracks in plaster not leaking")); (4) one of the "water feature pumps has a slow drip at the pump pad when the pump is running" (Doc. No. 91-9, at 2), but this was a "maintenance item" (Doc. No. 131-7, Brown Dep. 7, 62–63); and (5) Brown's inspection of the expansion joint indicated "multiple leaks along the expansion joint[, w]ith one spot on the expansion joint being a hole around 4 inches

---

[2] The court has a preference for complete deposition transcripts rather than multiple filings of multiple excerpts of the same transcript. Accordingly, where there are multiple filings of the same transcript or parts thereof, the court will cite the CM/ECF number for the complete deposition transcript. Because some of the transcripts are condensed, with four transcript pages per standard page, and others were filed in more than one volume or contain cover pages that make their pagination inconsistent with the page numbers assigned by the court's electronic docketing system, the court cites the docket number where the transcript can be located but uses the original deposition transcript pagination.

long" that was "leaking aggressively" (Doc. No. 91-9, at 1, 2).

Brown's company's test to confirm the location of leaks is a "dye test." (Doc. No. 131-7, Brown Dep. 42.) Brown explained that they use a needle to inject fluorescent dye, which allows a viewer to "seek the leak taking the dye." (*Id.*) The videos that he appended as exhibits to his Report show his technician (employing an underwater Go-Pro camera) injecting dye into a gap in the caulking over the expansion joint. As Brown explained, the video shows the dye flowing into the gap: "you're seeing the water escape . . . . So it's showing you the flow of the water going through." (*Id.* at 43.) According to Brown, the dye test showed that the water was "evacuating the pool at that point." (*Id.* at 47; *see id.* at 51 ("I would say that that water is exiting the pool.").) He also stated he did not think water could move about in the area beneath the caulking on the surface of the joint. (*Id.* at 50.) He conceded that he could not know where the water goes, but he thought "it's probably going straight down into the earth." (*Id.*)

BrightView concedes that Brown is a "'pool leak' guy who is qualified to render most of the opinions he has offered in this litigation" (Doc. No. 125-1, at 8), and BrightView offers no objection to most of his opinions—particularly those that favor BrightView. It contends, however, that Brown is not qualified to offer any opinions related to the expansion joint or its purported leakage, because his deposition testimony showed that Brown "has no fundamental understanding of the structure of the [expansion] joint or how it is designed to operate." (*Id.*) In support of this assertion, BrightView points to Brown's statements that (1) he did not know who had applied the caulking used on the expansion joint or how long it had been there (Doc. No. 131-7, Brown Dep. 43); (2) he was not familiar with the term "mastic" (*id.* at 45);[3] (3) he has never been involved in pool construction (*id.*); (4) he did not look at any plans related to the construction or design of

---

[3] BrightView has not defined this term or explained why it matters.

Hinman's pool or showing how the expansion joint was constructed and, in fact, did not look at any documents in connection with this case in formulating his opinions (*id.* at 45–46, 51); (5) he was unaware of what lay beneath the caulking covering the expansion joint and specifically was not aware of what was between the exterior surface of the pool shell and the ground below the pool (*id.* at 46); (6) when describing the process of using dye to verify the presence of a leak, he opined that the dye shows that water is "evacuating the pool" at a particular point, but, when questioned about this, he admitted he did not have "any way of knowing where [the water] is going" or how fast (*id.*);[4] (7) he was not familiar with the term "backer rod" as it related to the expansion joint (*id.* at 51); (8) he and his technicians did not examine the spacer between the two sides of the expansion joint underneath the surface, because they did not look at anything underneath the surface (*id.* at 52 ("We can't get underneath the surface.")); and (9) consequently, he and his technicians were not able to examine the "dumbbell water stop" (*id.* at 52).

Brown also testified, however, that he had examined expansion joints "10 to 15 times," always in a commercial pool setting rather than residential, and had found leaks two or three other times. (*Id.* at 55–56.) He agreed that it was unusual for a residential pool to have an expansion joint. He also confirmed that, although his company generally repairs pool leaks, it does not do repairs on expansion joints. (*Id.* at 60.) Brown also did not offer an opinion as to the cause of the purported leaks along the expansion joint. (*Id.* at 65.)

---

[4] BrightView seems to be implying that the water flow indicated by the dye being sucked into the gap was simply flowing in the space under the caulk but above the dumbbell water stop and not actually exiting the pool. But neither BrightView nor its expert addresses the fact that dye (and hence water) was flowing into the "hole" (as described by Brown) at a marked rate, suggesting that it was going somewhere. As a matter of common sense, if the space between the caulk and the expansion joint had already filled with water, it seems there would not have been marked flow in that direction.

Based upon his lack of knowledge regarding the construction of expansion joints and the fact that he had not actually inspected the expansion joint, BrightView contends that Brown's testimony "about the expansion joint" does not meet the "stringent requirements of *Daubert* and its progeny." (Doc. No. 125-1, at 10.) It insists that Brown is not qualified by training or experience to offer an opinion about the expansion joint and that his opinion would not be reliable, based on sufficient evidence, or helpful to the trier of fact. *(Id.)*

In response, Hinman argues that even BrightView acknowledges that Brown is "perfectly capable of diagnosing leaks in every part of the pool except along an expansion joint" and that its objections to his testimony regarding the leaks around the expansion joint are "better left for cross-examination." (Doc. No. 138, at 7, 8.) It also points out that BrightView does nothing to attack the validity of dye tests generally or to show that they are not industry standard for detecting pool leaks. In its Reply, BrightView continues to insist that Brown's fundamental lack of understanding of the functioning of the expansion joint requires exclusion of his testimony, and it further points out that Chapman himself, another of the plaintiff's experts, agreed that the expansion joint would not be leaking unless the dumbbell waterstop had been breached. (Doc. No. 139, at 10; *see also* Doc. No. 131-6, Chapman Dep. 210–11.) But neither Brown nor Chapman inspected the waterstop or verified whether it was "assaulted." (Doc. No. 131-6, Chapman Dep. 211.)

BrightView, however, does not dispute the proposition that Brown is qualified by training and experience to testify about detection of pool leaks, and it certainly adopts and relies on Brown's opinions that the pool shell and other pool components were *not* leaking. It also does not contest, as a general matter, the validity of dye testing to detect leaks. Hinman points out that Cook has also used dye tests to detect leaks and that BrightView itself provided Hinman with a dye test sometime in 2018 for her to use to see if the expansion joint was leaking. (*See* Doc. No. 148-1,

Hinman Dep. 136–37.) The evidence of their pervasive use suggests that dye tests for leak detection have "general acceptance" among pool leak detection and repair technicians. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529.

Moreover, BrightView has not actually established that an in-depth understanding of the inner workings of the expansion joint is required in order for Brown to offer an opinion that the pool is leaking along the expansion joint, based on the direction of the dye flow as revealed by the dye tests administered by his technicians. Brown was not asked to opine about the expansion joint. He was asked to determine whether the pool was leaking and, if so, where.

The court finds, in sum, that Brown is qualified by skill, experience, and training to offer testimony about pool leaks; his testimony is relevant, as it will "assist the trier of fact to understand the evidence or to determine a fact in issue"; and his testimony is sufficiently "reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528–29; Fed. R. Evid. 702. The factual basis for Brown's opinion may be weak, but this does not provide a basis for excluding it. *Andler*, 670 F.3d at 729. Rather, BrightView can challenge the correctness of Brown's opinion and cross-examine him on all of the weaknesses in his understanding of the expansion joint that BrightView has highlighted. As set forth above, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The motion to exclude Luke Brown's testimony, therefore, will be denied.

**B.     David Chapman, Ph.D., P.E.**

*1.     Chapman's Report and Opinions*

Chapman, on behalf of his company, Construction Engineering Consultants, investigated the pool at Hinman's residence and produced a report "delineating [his] observations and findings." (Doc. No. 91-8, at 2.) His Report sets forth a history of the parties' relationship

(beginning in mid-2014), the bidding and contracting process, the finalization of the design, the construction of the pool, and the history of Hinman's myriad reported problems with the pool. Chapman offers detailed observations about the terms of the Contract between Hinman and BrightView and the ways in which, in his opinion, the pool as constructed deviates from the terms of the Contract, including the following, under the heading "Pool Construction Observations":

> 3. The Contract [signed by Hinman and BrightView] defines the Construction Documents as those enumerated in Section 14.1[, including] Exhibits A (Scope of Work), B (the Plans) and C (Renderings) . . . . Contract Section 3.1.2 indicates that the construction documents set forth the requirements for the project. Contract Section 3.7.1 provides a warranty that all materials and equipment will be in conformance with the contract documents, among other requirements. The General Notes contained in Exhibit B reference The Technical Specifications as part of the Plans.
>
> . . . .
>
> 7. The plans and specifications require that the pool floor be constructed of concrete using cast-in-place type construction methodology which is evident from the structural details and cross sections. The Specifications require that the walls be constructed of wet-mix shotcrete.
>
> 8. The plans require that the pool shell be waterproof. Ken Martin (Representative of ADE) indicated that the intent of ADE was for the pool shell to be waterproof to protect the reinforcing steel from corrosion and that the plans required the shell to be waterproof.
>
> 9. The plans require a 9" footing projection along the bottom perimeter of the pool. No footing projection appears to have been installed.
>
> 10. The pool shell and water features were constructed using a shotcrete type construction methodology.
>
> 11. The plans require that "no leak PVC flanges" be installed at floor inlets and other penetrations through the shell of the pool. No flanges appear to have been installed. . . .
>
> 12. The plans require the installation of an expansion joint near the middle of the pool shell. None of the water stops, caulking, thickened slab cross section, additional rebar, or dowels were installed during the initial construction of the pool shell.
>
> . . . .

14. [BrightView] returned to the site in May of 2016, to repair cracks and construct the proposed expansion joint as described in the ADE Report of 1/21/16. . . .

15. Numerous cracks are present in the floor and wall of the pool shell.

16. In April of 2016, [BrightView] retrofitted the pool shell by constructing an expansion joint, repair[ing] cracks, and reapply[ing] the plaster. The ADE Report dated 1/21/16 requires that the installation of a "Emseal joint sealant system". . . , but Deck-O-Seal caulk was the actual product installed. ADE Approved the substitution but advised that the products were not equal. The joint was deteriorated and detached from the pool shell in April of 2019 and was replaced by Hinman in August of 2020.

17. The plans require the installation of a vapor barrier on the outside of the pool shell . . . . No vapor barrier can be seen in any of the pictures taken during the construction of the pool and does not appear to have been installed.

18. [BrightView] appears to have cast the pool drain sumps with the pool shell . . . . ADE noted that the use of Field Formed Sumps are typical sources of leaking from cracks and pipe penetrations. The plans require the use of VGB Compliant Preformed Sumps. In conjunction with the crack repair conducted in May of 2016, sealer appears to have been applied to the sumps.

19. No directions or information related to inspection or replacement of the expansion joint appears to have been provided to Hinman in the Operation and Maintenance Manual for the Pool Created by [BrightView].

20. Based on the statement of Ms. Hinman, new cracks and significant water loss were observed between 12/25/20 and 1/25/21.

21. The Specification[s] require the inclusion of a Crystalline Waterproofing admixture (Xypex C-500 Admixture) in both the concrete cast-in-place and the shotcrete. [BrightView] did not include Xypex in the concrete. The Xypex C-500 Admixture has been shown to materially reduce the permeability [of] concrete. There is no evidence that Xypex was included in the concrete placed around the retrofit expansion joint.

22. The specifications require that all rebars be positioned on chairs or dense shotcrete blocks to assure a minimum 3 inches of cover. Pictures taken during concrete placement indicate that the rebars in some areas of the shell had less than 3 inches of cover at the time of concrete placement.

(*Id.* at 4–7 (footnotes and citations to exhibits omitted).)

Under the heading "Pool Construction Findings," Chapman further opined, in relevant part, that: (1) the Contract required Hinman's approval of any deviations from the Contract

requirements prior to the start of construction, but no requests for deviations were made or approved; (2) the Addendum permitted BrightView to "make changes to effectively any aspect of the design after the start of construction"; (3) BrightView deviated from the plan requirements by using a "shotcrete type construction method" instead of the "cast-in-place construction method" called for in the Contract, and it knew no later than November 2014, before execution of the Contract, that it would employ this type of construction method, meaning that "it is more likely than not that [BrightView] planned to deviate from the required construction method prior to" contracting with Hinman and prior to beginning construction; (4) the retrofitting of the expansion joint "created two construction joints parallel to the expansion joint that may be susceptible to leaking in the future," but this problem would not exist if the expansion joint had been "installed as shown in the plans"; (5) BrightView deviated from the plan requirement that it install "no leak PVC flanges" at pipe penetrations in the pool shell, which will "more likely than not result in an increased risk of leaks at plumbing penetration in the future"; (6) BrightView's deviation from the plans' requirement that the concrete used in the pool shell include Xypex Admixture "has resulted in the pool shell being materially more permeable than it would have been had the Xypex been included and may be contributing to leaks in the pool shell"; (7) BrightView deviated from the plan's requirement that it use "preformed drain sumps," which "may have caused or contributed to leaks in the pool shell"; (8) BrightView's deviation from the plan requirement that it install a vapor barrier on the outside of the pool shell "has more likely than not resulted in increased expos[ur]e to subsurface moisture that may increase the likelihood of rebar deterioration. This risk is increased in areas where the required concrete cover has not been provided"; and (9) together, the failure to use Xypex and "no leak PVC flanges" has "resulted in a pool shell that is materially less waterproof than the pool described by the Plans and Specifications." (*Id.* at 7–8.) Chapman

concludes this section of his Report by noting that these purported defects can be partially remediated through the removal of the pool plaster finish, the application of various Xypex products, and the replacement of the plaster finish, at a cost of almost $200,000. (*Id.* at 8.)

The next section of Chapman's Report, "Leak Testing," describes the water loss test performed in November 2019 over a two-day period by a company called Wilson and Associates, P.C., at Chapman's request. This test, according to the January 16, 2020 letter to Chapman from Jonathan Bailey, a surveyor with Wilson and Associates, indicated that the pool, during that two-day timeframe, lost 4,189 gallons of water, over and above evaporation. (*See* Doc. No. 91-8, at 37.) Bailey explained:

> The pool in question was surveyed on 11-18-19 and 11-20-19 using a Lieca P20 laser scanner. The water levels between the two scans were compared by calculating the elevation differences between the top of the water in the pool and fixed objects common to both scans. The difference in the top of water measured on both days was calculated to be 0.17 feet. The surface area of the pool was determined by extracting the pool's perimeter from the scan data and calculating the areas of the resultant shape with CAD software. The pool's surface area was determined to be 3,665 square feet. The surface area of the pool could then be multiplied by the difference in the top of water elevations to determine the volume of water loss assuming that the pool had vertical walls on all sides.
>
> To account for the sloping entrances to the pool, two figures were dawn to enclose the surface area lost as the water receded down the slopes. The areas of these figures were calculated with CAD software, and their volume was determined by multiplying the area by the difference in the top of water heights, and then dividing by 2 and subtracting that value from the previously calculated total. The total water loss was determined to be 614 cubic feet, or 4,593 gallons.
>
> To control for evaporation, a five-gallon bucket was placed next to the pool, and the water levels of the [bucket] were determined using the same methods as for the pool. The change in water level of the [bucket] was determined to be .015' and loss in volume was determined to be .01135 cubic feet, or 10.9 fluid ounces.
>
> Adjusting for evaporation, the net water loss was determined to be 560 cubic feet, or 4189 gallons.

(*Id.*)

Chapman also noted that Hinman and her assistant reported a previous dye test for leaks that indicated leaking in the vicinity of the expansion joint. In June 2019, Chapman observed "dye entering certain areas of the expansion joint consistent with the pool leaking at the joint." (*Id.* at 10.) He also noted that Brown's company had conducted a second leak test in May 2022, which also indicated leaking along "the expansion joint only." (*Id.*) Based on these tests, Chapman opined that "it is more likely than not that the pool was leaking a substantial amount of water in November of 2019." (*Id.*)

> 2. *Chapman's Opinions About BrightView's Deviations from the Plans and Specification and the Effect of Such Deviations*

BrightView argues, first, that Chapman should be precluded from offering any opinion about the expansion joint, because he relied exclusively on Luke Brown's opinion in support of the premise that the expansion joint is leaking, and Luke Brown's opinion in that regard should be excluded. The court has already rejected that proposition. The jury will remain free to reject Brown's opinion and, likewise, to discount Chapman's opinion to the extent it relies on Brown's.

BrightView argues that Chapman's opinion should be excluded altogether on the basis that he is a civil engineer with experience related to the construction and inspection of bridges, tunnels, and roads, but he has no experience or qualifications related to the construction of pools such as the "extravagant pool and water project that is the subject of this litigation." (Doc. No. 125-2, at 11; *see also* Doc. No. 131-5, Chapman Dep. 7–8, 13.) Chapman's deposition testimony confirmed that none of the prior cases in which he was retained as an expert involved issues related to pool construction, shotcrete, expansion joints, or Xypex. (Chapman Dep. 32–34, 41, 44.) He has never designed a pool, been involved in the construction of a pool, has never taught classes, conducted research, or been asked to offer opinions related to the construction of a pool or the use of the products or methods used to construct this pool. (Chapman Dep. 54–56, 93–95, 99–100, 106, 141–

42.) According to BrightView, these deficiencies collectively require exclusion of Chapman's opinions about "several issues raised in Plaintiff's Complaint," specifically including his opinion that the construction plans required BrightView to use cast-in-place concrete rather than shotcrete. (Doc. No. 125-1, at 12.)

The Sixth Circuit has explained, however, that "[a]n expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact." *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 446 (6th Cir. 2012) (citing *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293–94 (6th Cir. 2007)). Rather, "Daubert and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts on the case at hand, not that they *know* the answer to all the questions a case presents—even to the most fundamental questions." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 590–92). In this case, Chapman clearly is knowledgeable about construction generally and concrete in particular. Even though he does not have particular experience with pool construction, he has expertise in interpreting construction renderings and plans. The court is not persuaded that his lack of experience in building pools, *per se*, excludes him from testifying as an expert in this case.

Thus, Chapman's expertise renders him qualified to offer opinions to the effect that the Hinman pool project Contract Documents and, more specifically, the "plans and specifications" that are incorporated by the Contract,[5] specify the use of the following elements: (1) that the "pool

---

[5] As the Sixth Circuit has observed, "it is improper for an expert witness to testify concerning legal requirements, as this 'invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law.'" *In Re Air Crash Disaster*, 86 F.3d 498, 523 (6th Cir. 1996) (quoting *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir.1985)); *see also Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) ("[T]estimony offering nothing more than

floor be constructed of concrete using cast-in-place type construction methodology which is evident from the structural details and cross sections"; (2) that "the walls be constructed of wet-mix shotcrete"; (3) that the pool shell be "waterproof"; (4) a nine-inch "footing projection along the bottom perimeter of the pool"; (5) the installation of "no leak PVC flanges" at any "penetrations" through the shell of the pool floor; (6) the installation of an expansion joint near the middle of the pool shell; (7) the installation of a vapor barrier outside the pool shell; (8) the use of "VGB Compliant Preformed Sumps"; and (9) the inclusion of a "Crystalline Waterproofing admixture (Xypex C-500 Admixture) in both the concrete cast-in-place and the shotcrete." (Doc. No. 91-8, at 4–7.) He also has the knowledge and expertise to testify to the effect that the pool as built does not incorporate any of the above referenced items and to his factual observation to the effect that "[n]umerous cracks are present in the floor and wall of the pool shell." (Id. at 6.)

From that point, however, even assuming that Chapman is qualified to testify as to whether these deviations from the plans and specifications ("Deviations"), and thus from the Contract itself, are material, as discussed in the Memorandum addressing BrightView's Motion for Summary Judgment, Chapman's own testimony establishes that the Deviations are not material and have not actually resulted in damage to the pool (or to the plaintiff). First, as BrightView points out, Chapman himself testified that wet-mix shotcrete and cast-in-place concrete are essentially the same product—the only real difference being in how the material is placed. (See Doc. No. 131-5,

---

a legal conclusion—*i.e.*, testimony that does little more than tell the jury what result to reach—is properly excludable under the Rules."). Interpretation of a contract is typically a question of law for the court. *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). However, if ambiguity remains even after the court applies standard rules of construction, the legal meaning of the contract becomes a question of fact for the jury. *Id.* While Chapman's opinions regarding what the Contract at issue here says skirt the border of encroaching on the court's domain, the court finds that interpreting the Contract in light of the accompanying complex architectural renderings—with which the court has no expertise—would be an appropriate subject for expert testimony in this case.

Chapman Dep. 28, 31.) Chapman also agreed it was not a "normal practice" to use a vapor barrier, which is simply a plastic membrane, in the installation of an in-ground pool like the one at issue here. (*Id.* at 207.) Regarding the absence of the nine-inch footer called for by the plans, he agreed that, although this constituted a "deviation of the plans," the "structure" of the pool was nonetheless "capable, in [his] opinion, of supporting the loads that are on it as it has been constructed." (*Id.* at 218.) He has not proffered testimony that any of these Deviations caused damage or materially altered the look, functionality, or structural integrity of the pool.

Chapman's opinion as to the deleterious effect of the other Deviations is entirely speculative. He opines only that the other Deviations, including (aside from the installation of the retrofitted expansion joint) the failure to use "no leak PVC flanges," Xypex admixture, and preformed fiberglass drain sumps, have "resulted in the pool shell being materially more permeable than it would have been" if BrightView had followed the plans and specifications incorporated in the Contract and "may be contributing to leaks in the pool shell" or, alternatively, "more likely than not [have] result[ed] in an increased risk of leaks . . . in the future." (*Id.* at 7–8.) Chapman concedes that none of these Deviations is currently causing the pool to leak. He agrees with Luke Brown's report and, consequently, concedes that there is no evidence that the pool shell itself is leaking,[6] no evidence that the rebar or reinforcing steel is corroding because of the lack of a vapor barrier, no evidence that the pool is losing water at the sumps or the places where the plumbing penetrates the shell, and no evidence that the lack of Xypex is contributing to leaks. (Doc. No. 131-6, Chapman Dep. 157; *see id.* at 203–04 ("I agree with you that [Brown's report] says that he did not observe leaking anywhere other than the . . . expansion joint."), 204 ("I don't

---

[6] Aside from the possible leaks along the expansion joint discussed in connection with Brown's report.

know of any leaks . . . . I know that [Brown] did not find any evidence of any leaks. . . . I don't have any evidence that any leaks can be directly attributed to the lack of Xypex."), 204–05 (confirming he had no evidence of corrosion of the reinforcing steel), 207 (confirming he had no opinion as to whether the absence of the vapor barrier was contributing to the leaking of the expansion joint or the shell), 208 (confirming that he had no opinion as to whether the cracks he observed in the pool shell were causing any leaking), 212 (confirming he had no "evidence . . . that the sumps or drains in this pool are causing any leak in the pool shell").)

In other words, Chapman does not purport to opine that any of the plan Deviations he has noted is currently causing leakage. He states only that these Deviations have increased the risk of leakage in the future. In that regard, however, he has not quantified what the risk of future leaks would be if BrightView had followed ADE's plans and specifications to the letter or to what degree its failure to do so has increased that risk. (*See, e.g.*, Doc. No. 131-5, Chapman Dep. at 59 (asked how much less permeable concrete with Xypex was than concrete without, he answered that it "varies widely, according to the formulation of the concrete and the amount of Xypex that's used").)

In assessing a *Daubert* motion, the court must assess whether the proffered testimony "rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30. While experts are "permitted wide latitude in their opinions, *Dilts*, 500 F. App'x at 445, "the 'knowledge' requirement of Rule 702 requires 'more than subjective belief or unsupported speculation,'" *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (quoting *Daubert*, 509 U.S. at 590). "[N]o matter how good experts' credentials may be, they are not permitted to speculate." *Tamraz*, 620 F.3d at 671 (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000)) (internal quotation marks

omitted). Chapman's proposed opinions that the Deviations he has identified have collectively increased the risk of future leaks is precisely the type of speculation upon speculation—that any one of these failures may have increased the *risk* of *future* leaks and collectively made the structure substantially more likely to leak in the future—that lies outside the bounds of permissible expert testimony. *Accord id.* at 672 (affirming the district court's rejection of proposed expert testimony as premised upon a string of speculations). In short, Chapman's opinion that the Deviations have potentially increased the risk of future leaks is impermissibly speculative.

Moreover, as also discussed in connection with the Motion for Summary Judgment, without evidence that any of the Deviations—collectively or individually—constitutes a *material* deviation from the plans and specifications, one that has actually caused damages, Chapman's testimony to the effect that BrightView's actual construction deviated from the plans and specifications is simply immaterial and will not help the jury to "understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The court, therefore, will grant BrightView's motion, insofar as it seeks to exclude Chapman's opinions regarding the purported Deviations from ADE's plans and specifications and the purported increased risk of future leaks caused by such deviations.

Likewise, because there is no evidence that the absence of Xypex is causing the pool to leak, Chapman's proposed opinion that the purported construction defects can be partially remediated through the application of various Xypex products, at a cost of almost $200,000, is also subject to exclusion. As BrightView argues, Chapman "in essence seeks to provide a solution to a problem that doesn't exist." (Doc. No. 125-1, at 15.)

### 3. *Chapman's Opinions Regarding the Leak Test by Wilson & Associates*

Regarding the leak test performed at Chapman's request by a surveyor with Wilson & Associates, BrightView contends, as an initial matter, that there was a "fundamental lack of control

of the testing as Chapman admitted he was not present for the entire time (2 days) and obviously is unaware of what variables could have contributed to the purported result." (Doc. No. 125-1, at 17.) BrightView also complains that the test was performed by a surveyor rather than an engineer and that Chapman did not do anything to independently verify the methodology used or the results, as a result of which the test results have "no indicia of reliability." (*Id.*) In response, Hinman argues that reliance on a third-party test is appropriate for an expert. (Doc. No. 138, at 13 (citing *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 852 (6th Cir. 1981)).)

Regarding this test, Chapman testified that he retained Wilson & Associates, a surveying company, to "collect data" to ascertain whether the pool was losing water volume. (Doc. No. 131-5, Chapman Dep. 113.) He stated that he did not provide the surveyor, Jonathan Bailey, any "assumptions," though he would have told him that he had been advised by the pool owner that the pool was leaking and that the purpose of the test was to "measure that quantity of water . . . to see if it was changing." (*Id.* at 114.) Chapman, at that point, had not formed an opinion as to whether the pool was leaking. (*Id.*) He also told Bailey that he wanted to make sure to "measure any loss that could be related to evaporation," and he "specified the [use of] scanning as a way of measuring" the variation in water level over a two-day period. (*Id.* at 115.) He also directed Bailey to account for the sloping pool walls at two entrances into the pool. (*Id.* at 122.) He stated that he chose this method as an accurate means of measurement, given the shape of the pool and the volume of water at issue. (*Id.* at 116–17.)

Chapman testified that he was not present for the entirety of the forty-eight hour test period, but he was there both mornings for about two hours while Bailey collected data, and he had specifically directed Hinman's staff to leave the water features off, "to not run any of the equipment during this time," so as not to interfere with the testing process. (*Id.* at 118–19.)

BrightView's argument that this test is inadmissible because Chapman was not present during the entire two days over which it was conducted, and therefore did not exercise any "control" over the test, is not persuasive. Chapman was there while the surveying was conducted, and he instructed Hinman and her staff not to run any equipment during that time frame. He instructed Wilson & Associates on what kind of test he wanted the surveyors to perform and what variables should be considered—including the sloping entrances and the amount of evaporation. His Report states that "little or no precipitation fell at the site during the duration of the test." (Doc. No. 91-8, at 10.) Even if Chapman had personally conducted the testing himself, there would have been no reason for him to camp out by the side of the pool for forty-eight hours. While BrightView can certainly cross-examine him about this purported lack of control, it does not *per se* make the test unreliable.

BrightView also contests Chapman's reliance on the test, because it was conducted by a surveyor and based on "unknown and untested methodology." (Doc. No. 125-1, at 17.) But the methodology was not unknown to Chapman: it is clearly explained in Bailey's letter and was based on what appear to be relatively fundamental surveying principles and geometry, not rocket science. The law is clear, moreover, that an expert may "rely on documents, even hearsay documents that are otherwise inadmissible." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 786 (6th Cir. 2002); *see also Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994) ("Rule 703 allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion."). The reason for this is that "the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements upon which he bases his expert opinion." *Mannino*, 650 F.2d at 852 (quoting *United States v. Williams*, 447 F.2d 1285 (5th Cir. 1971)).

Finally, BrightView objects that Chapman's opinion lacks reliability because he "did nothing to determine and does not offer an opinion as to the cause of the water loss." (Doc. No. 125-1, at 17.) In other words, BrightView objects, not to Chapman's proposed opinion but his failure to offer an opinion as to the cause of the water loss. But Chapman was not asked to opine about the cause of the water loss. He was asked to opine about whether the pool was losing water. His failure to do something beyond the scope of his engagement is not a basis for excluding his findings within the scope of that engagement: that the water level decreased substantially during a forty-eight hour period in November 2019.

The court finds, in sum, that Chapman is qualified by training and education to offer an opinion as to the reduction in water volume, that his opinion in that regard is based on sufficient facts or data and the product of reliable methods, and that it will assist the trier of fact to understand the evidence or determine a fact at issue. Fed. R. Evid. 702. The court will deny the motion to exclude Chapman's opinion that the pool was "leaking a substantial amount of water in November of 2019." (Doc. No. 91-8, at 10.)

### C. Douglas Cook

#### 1. Cook's Opinions and Testimony

Cook has been involved in the swimming pool industry, in various capacities, for more than forty years, and he purports to bring "a professional swimming pool person's view of this project." (Doc. No. 125-7, at 2.) Regarding the pool's "mechanical systems," Cook states that the pool is equivalent in size and scope to a commercial installation, the operation and maintenance of which requires the skill of an experienced and individually trained technician. He finds that the sanitation, ozone, chlorine, and acid systems, all "parts of the original system," are in "non-working condition," with "broken pipes, lines, and pumps (acid & liquid chlorine)," and "in need

of replacement." (*Id.* at 3.) He estimates that the cost to repair the sanitation systems, based on his experience in the industry, would be from $12,000 to $16,000.

Next, regarding the "water features design and construction," Cook finds that the water features, incorporating "long elevated concrete basins and concrete channels in lush landscape" are badly designed, insofar as they entail the "flush[ing]" of the "naturally accumulating debris from the beautiful, designed landscape surrounding these water features back into the pool." (*Id.* at 4.) He observes that the concrete finish in the channels is "deteriorated and is missing many pieces," while the "concrete that is left is rough and very porous and displays visible algae growth." (*Id.*) He opines that the rough finish concrete constitutes a design flaw, insofar as it "create[es] a higher demand for chlorine which has a negative sustainable impact," and that the "surface material is failing and needs to be replaced" using "suitable materials." (*Id.*) He estimates that the cost to do so, including the demolition and removal of the failing concrete and the liner (which he believes will be damaged by the demolition) and the installation of "smooth and color appropriate riverstones" over a "pond liner," will be $30,000 to $35,000 per water feature, for a total of $90,000 to $100,000 to repair all three. (*Id.*)

Regarding the swimming pool interior finishes and allegedly leaking expansion joint, based on Brown's opinion that the pool is leaking in several places along the expansion joint and Chapman's opinion that the pool shell as installed is not consistent with ADE's design plans and specifications, Cook supplied an estimate of the cost to remove the "current interior finish or plaster down to the shotcrete shell," remove all existing seals, fittings, and water-line tile, and apply "water proofing material" to the shotcrete, around the floor returns, skimmers, and joints "as outlined in original specification," and install new tile and new plaster. (*Id.* at 5.) He estimates the cost of all of this, including the cost to replace the expansion joint, to be $238,731. (*Id.* at 6.) He

states that he arrived at this estimate to replace the interior finish ($199,940) "based on [his] experience and knowledge of decades of pricing and estimating pool construction and repairs." (*Id.*) He further explains that the method he used was to estimate labor and materials at a cost of approximately $25 per square foot, plus a 35% margin for profit and overhead, multiplied by the pool surface area. (*Id.*) Attached to his report is a bid specifically relating to the cost to remove and replace the expansion joint and to "[s]upply and install 2ince Emseal Superseal across bottom of pool and up walls," for $12,000. (*Id.* at 13.)

Finally, Cook obtained a bid for the complete removal of the pool from the Crowder Construction Group, which is attached to his report and quotes a cost of $164,121.62. (*Id.* at 14.) Cook states that he obtained this bid based on Chapman's statement in his February 26, 2021 preliminary opinion—omitted altogether from his final opinion—that, "[g]iven that the pool shell has continued to crack, there is no evidence that the retrofitting of the joint has served to prevent or reduce the likelihood of further cracking" (*id.* at 8 (citing Feb. 26, 2021 preliminary opinion, Doc. No. 73-7, at 9)).)

### 2. Objections and Analysis

BrightView objects to Cook's proffered opinions on the basis that he "is not qualified by training or education to offer the opinions contained in his report as he has no real experience with projects of the scope or magnitude of Plaintiff's"; he had no formal education beyond an Associate Degree in Marketing; and "the only evidence he offers for his beliefs about the pool are based on" what Hinman and her friend Steve told him. (Doc. No. 125-1, at 17.) Further, BrightView asserts that Cook offers no real opinions aside from "estimate to provide fixes to the problems allegedly identified by others" and thus "relies solely on opinions of others to support his findings and conclusions." (*Id.* at 18.) As such, BrightView contends, he is simply a late-disclosed fact witness.

Specifically regarding BrightView's objections to Cook's various damages estimates, the court finds that Cook appears to be qualified simply by long experience in the pool industry to offer an opinion as to the estimated cost of replacing mechanical equipment. However, as discussed below, some of his damages estimates are not relevant to any issue remaining to be resolved by the jury.

a)    *Opinions Regarding the Mechanical Systems and Maintenance*

As for Cook's opinions about the mechanical systems, BrightView notes that, although Cook opines that these are in non-working condition, he concedes that the equipment installed was the equipment "suggested by the designer," based on the design drawings. (Doc. No. 131-4, Cook Dep. 178; *see id.* at 182 (agreeing that "all of [the mechanical equipment was] called out in the design.").) He did not indicate that the equipment was of poor quality or improperly installed, only that it needed to be maintained by a full-time, properly trained technician. (*Id.* at 176, 179.) He also could not say when the alleged damage occurred or how, and he agreed that many of the things he described as being damaged were maintenance items. (*Id.* at 187–88.) He noted that the pipes that appeared to have suffered freeze damage at some point "could be just . . . a result of . . . just mother nature and power in that area [being] cut off." (*Id.* at 188.) He agreed that all of the equipment was "good quality" and "installed okay and proper at the time [it] was installed." (*Id.* at 193.)

As discussed in the ruling on the Motion for Summary Judgment, BrightView has carried its burden of establishing that it is entitled to summary judgment on the claims relating to the allegedly poorly functioning or malfunctioning pool equipment. Moreover, nothing in Cook's testimony substantiates a suggestion that BrightView breached the Contract or Addendum or was negligent in the selection of equipment or its installation. The plaintiff's claims related to the mechanical systems appears to be based either on breach of warranty or on her allegations that the

system as designed by ADE and built by BrightView was too complicated for installation in a rural, residential setting and made it difficult or impossible for her to retain a properly trained individual to provide regular maintenance for the pool. Insofar as an identical claim was directed to ADE, the court has already granted ADE's Motion for Summary Judgment based on negligent design, finding that, although the pool is "equivalent in size and complexity to a commercial pool," this fact is "obviously a design feature of which the plaintiff, who paid close to $1 million for the installation of this pool, had to have been well aware even before installation began." (Doc. No. 103, at 14.) Likewise, the court found, in the context of the factual record presented in association with ADE's motion, that there was nothing in the record to suggest that "ADE somehow deviated from the requisite standard of care by providing, in accordance with the plaintiff's apparent desires, design plans for an elaborate, expensive installation." (*Id.*) Here, insofar as the claim against BrightView is based on allegations that it breached a duty to Hinman to ensure that she was able to find (and retain) suitable and adequately trained technicians to maintain the system, it clearly had no contractual duty to assist the plaintiff in maintaining the pool, and any negligence claim based on the same allegation is time-barred.

b)      *Opinions Regarding the Design and Construction of Water Features*

As set forth above, the defendant remains free to challenge Cook's price estimates at trial, but he is qualified by his long experience in the industry to offer them. He is also qualified to offer his factual observation that the finish concrete is crumbling in places and needs to be replaced. The question of whether BrightView has any liability for these issues is an entirely different question, outside the scope of Cook's purview.

c)      *Replacement of Swimming Pool Interior and Expansion Joint*

The court has already found, in connection with Chapman's proffered testimony, that no evidence has been offered to establish the need to entirely remove the pool shell plaster and tile

down to the shotcrete in order to add a waterproofing layer and then replace everything, because there is no evidence that the pool shell is leaking. Cook's testimony about the related costs, therefore, will not assist the jury in resolving any fact at issue and is excludable on that basis.

There is admissible evidence that the expansion joint is leaking. Cook offers an estimate from a third-party contractor to repair or replace the expansion joint for $12,000. The estimate obtained in that regard, whether deemed factual evidence or expert, is clearly admissible as evidence of the cost to repair the expansion joint. It will remain up to the jury to determine whether BrightView should be responsible for that cost.

It does not appear at this juncture that there is any evidence in the record that would permit the court to conclude that it is impossible to repair the pool leak. Without such evidence, Cook's estimate as to the cost of removing the pool altogether would not help the jury to "understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

## IV.   CONCLUSION AND ORDER

For the reasons set forth herein, the Motion to Exclude Opinion Testimony of Plaintiff's Expert Witnesses (Doc. No. 125) is **GRANTED IN PART AND DENIED IN PART**. The motion is **DENIED**, insofar as it pertains to Luke Brown's opinions and testimony; **DENIED**, insofar as it pertains to David Chapman's opinions and testimony relating to the leak test performed under his supervision but **GRANTED**, with respect to his opinions regarding the Contract Deviations; and **DENIED** with respect to Douglas Cook's opinions about the cost of repairing the water features and the expansion joint, but otherwise **GRANTED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge